# EXHIBIT 1

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief



106

NOTE

0004540126

MIN: 1001631-2000397890-2    **NOTE**    Loan Number: 20003978900

This is certified to be a true copy of the original.
SILVER STATE MORTGAGE
By: [signature]

MAY 5, 2003                    HENDERSON                    NEVADA
[Date]                         [City]                       [State]

509 CANYON GREENS DRIVE, LAS VEGAS, NEVADA 89144 .
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 960,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is SILVER STATE FINANCIAL SERVICES, DBA SILVER STATE MORTGAGE, A NEVADA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on JULY 1 2003 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JUNE 1, 2033 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2920 N. GREEN VALLEY PKWY., #424, HENDERSON, NEVADA 89014
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S. $ 5,910.89

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE–Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                    Page 1 of 3

DocMagic *eFarms* 800-649-1362
www.docmagic.com

Us32001.not



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000        % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                          Page 2 of 3

*DocMagic* **800-649-1362**
*www.docmagic.com*

Us32002.nzt



**10. UNIFORM SECURED NOTE**

    This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

        If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

        If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)       _____ (Seal)
WILLIAM R SCHULTE     -Borrower                                  -Borrower

_____ (Seal)       _____ (Seal)
                    -Borrower                                  -Borrower

_____ (Seal)       _____ (Seal)
                    -Borrower                                  -Borrower

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE–Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01          Page 3 of 3

DocMagic *eFprms* 800-649-1362
www.docmagic.com

Us3200b.not

# EXHIBIT 2

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief

BAPCPA, JNTADMN, LEAD

# U.S. Bankruptcy Court
## District of Nevada (Las Vegas)
## Bankruptcy Petition #: 09-29123-mkn

|  |  |
|---|---|
| *Date filed:* | 10/11/2009 |
| *Debtor discharged:* | 12/15/2015 |
| *Joint debtor discharged:* | 12/15/2015 |
| *Plan confirmed:* | 03/08/2011 |
| *341 meeting:* | 12/17/2009 |
| *Deadline for filing claims:* | 02/17/2010 |
| *Deadline for objecting to discharge:* | 01/18/2010 |

*Assigned to:* MIKE K. NAKAGAWA
Chapter 11
Voluntary
Asset

*Debtor*
**MELANI SCHULTE**
9811 W. CHARLESTON BLVD. #2-351
LAS VEGAS, NV 89117
CLARK-NV
SSN / ITIN: xxx-xx-0225

represented by **NEDDA GHANDI**
GHANDI DEETER BLACKHAM
725 SOUTH 8th STREET SUITE 100
LAS VEGAS, NV 89101
(702) 878-1115
Fax : (702) 447-9995
Email: bankruptcy@ghandilaw.com
*TERMINATED: 08/23/2016*

**BRYAN A. LINDSEY**
SCHWARTZ FLANSBURG PLLC
6623 LAS VEGAS BLVD. SO.,, STE
300
LAS VEGAS, NV 89119
Email: bryan@nvfirm.com
*TERMINATED: 08/21/2014*

**DANIEL L. MCGOOKEY**
MCGOOKEY LAW OFFICES, LLC
225 MEIGS STREET
SANDUSKY, OH 44870
(419) 502-7223
Fax : (419) 502 0044
Email: dmcgookey@mcgookeylaw.com

**DAVID A RIGGI**
5550 PAINTED MIRAGE ROAD #120
LAS VEGAS, NV 89149
(702) 808-0359
Email: darnvbk@gmail.com

**SAMUEL A. SCHWARTZ**
6623 LAS VEGAS BLVD. SO., STE
300
LAS VEGAS, NV 89119
(702) 385-5544
Fax : (702) 385-2741
Email: sam@nvfirm.com
*TERMINATED: 08/21/2014*

STEVEN L. YARMY
7464 W. SAHARA AVENUE
LAS VEGAS, NV 89117
(702) 586-3513
Fax : (702) 586-3690
Email: sly@stevenyarmylaw.com

*Jnt Admin Debtor*
**5218 MISTY MORNING LLC**
7201 W. LAKE MEAD BLVD.
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1477405

represented by **DAVID A RIGGI**
(See above for address)

**SAMUEL A. SCHWARTZ**
(See above for address)

*Jnt Admin Debtor*
**HOT ENDEAVOR LLC**
7201 W LAKE MEAD BLVD
LAS VEGAS, NV 89128
Tax ID / EIN: 20-2392946

represented by **DANIEL L. MCGOOKEY**
(See above for address)

**DAVID A RIGGI**
(See above for address)

**SAMUEL A. SCHWARTZ**
(See above for address)

**STEVEN L. YARMY**
(See above for address)

*Jnt Admin Debtor*
**2704 SATTLEY LLC**
7201 W. LAKE MEAD BLVD. SUITE 550
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1478517

represented by **SAMUEL A. SCHWARTZ**
(See above for address)

*Jnt Admin Debtor*
**1341 MINUET LLC**
7201 W LAKE MEAD BLVD
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1477364

*Jnt Admin Debtor*
**1708 PLATO PICO LLC**
7201 W LAKE MEAD BLVD
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1477561

*Jnt Admin Debtor*
**2228 WARM WALNUT LLC**
7201 W LAKE MEAD BLVD
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1478850

*Jnt Admin Debtor*
**9425 VALLEY HILLS LLC**
7201 W LAKE MEAD BLVD

LAS VEGAS, NV 89128
Tax ID / EIN: 20-1478764

*Jnt Admin Debtor*
**9500 ASPEN GLOW LLC**
7201 W LAKE MEAD BLVD
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1434262

*Jnt Admin Debtor*                              represented by **SAMUEL A. SCHWARTZ**
**CHERISH LLC**                                               (See above for address)
7201 W. LAKE MEAD BLVD #550
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1999539

*Jnt Admin Debtor*                              represented by **NEDDA GHANDI**
**SABRECO INC.**                                              (See above for address)
7201 W LAKE MEAD BLVD #550                                    *TERMINATED: 08/23/2016*
LAS VEGAS, NV 89128
Tax ID / EIN: 88-0253740                                      **DANIEL L. MCGOOKEY**
                                                              (See above for address)

*Jnt Admin Debtor*                              represented by **SAMUEL A. SCHWARTZ**
**KEEP SAFE LLC**                                             (See above for address)
7201 W LAKE MEAD BLVD #550
LAS VEGAS, NV 89128
Tax ID / EIN: 20-1999483

*Joint Debtor*                                 represented by **NEDDA GHANDI**
**WILLIAM R. SCHULTE**                                        (See above for address)
9811 W. CHARLESTON BLVD. #2-351                               *TERMINATED: 08/23/2016*
LAS VEGAS, NV 89117
CLARK-NV                                                      **BRYAN A. LINDSEY**
SSN / ITIN: xxx-xx-6233                                       (See above for address)
                                                              *TERMINATED: 08/21/2014*

                                                              **DANIEL L. MCGOOKEY**
                                                              (See above for address)

                                                              **DAVID A RIGGI**
                                                              (See above for address)

                                                              **SAMUEL A. SCHWARTZ**
                                                              (See above for address)
                                                              *TERMINATED: 08/21/2014*

                                                              **STEVEN L. YARMY**
                                                              (See above for address)

*U.S. Trustee*
**U.S. TRUSTEE - LV - 11, 11**
300 LAS VEGAS BOULEVARD S.

# EXHIBIT 3

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief

1724



PO Box 14547
Des Moines, IA 50308-4547

Page 1 of 3

**For informational purposes**

**Escrow account disclosure statement
and notice of new mortgage payment**

WILLIAM R SCHULTE
STE 2-351
9811 W CHARLESTON BLVD
LAS VEGAS NV 89117-7528

| | |
|---|---|
| Loan number: | 1205242971 |
| Next payment due date: | December 01, 2009 |
| New payment effective date: | November 01, 2016 |
| New payment amount: | $7,443.92 |
| Overage amount: | $52,040.26 |
| Principal balance: | $798,785.11 |
| Interest rate: | 8.250% |
| Statement date: | September 08, 2016 |
| Account review period: | Dec 2015 - Oct 2016 |
| Customer service: | 1-800-842-7654 |
| Customer service hours: | Mon - Fri 7 a.m. - 8 p.m. CT. |

We accept telecommunications relay service calls.

Property address:
    509 CANYON GREENS DR
    LAS VEGAS NV 89144-0830

Dear WILLIAM R SCHULTE

Each year, we review your escrow account to make sure the escrow portion of your scheduled mortgage payment covers your property taxes and/or insurance premiums. Increases or decreases in your annual taxes and/or insurance premiums may cause your mortgage payment amount to change. Here are the details of your most recent escrow account review.

Note: This notice is for informational purposes only and is being provided as a courtesy should you voluntarily decide to make any escrow shortage payment, if applicable. This notice should not be construed as an attempt to collect a debt or a demand for payment contrary to any protection you may have received pursuant to your bankruptcy case.

**New escrow and mortgage payment amount**

| New payment effective date<br>November 01, 2016[1] | Current<br>payment ($) | New<br>payment ($) |
|---|---|---|
| Principal and/or interest | 5,910.89 | 5,910.89 |
| Escrow payment | 1,732.89 | 1,533.03 |
| Escrow shortage/prepayment[2] | 0.00 | 0.00 |
| Total payment amount | 7,643.78 | 7,443.92 |

1. If you use one of our automatic payment options, we will adjust your electronic withdrawal(s) to ensure your November 01, 2016 payment is made in full.

2. If your current payment includes an amount to cover a previous escrow shortage, this amount will be added. If your current payment includes an adjustment for extra funds you deposited to your escrow account, this amount will be deducted.

The escrow disclosure indicates an overage of $52,040.26. If your loan is current or is brought current within 30 days of this statement date, a check may be sent in a separate envelope or your next payment amount reduced by the overage amount.

**A guide to your escrow questions and answers is available at: wellsfargo.com/escrowquestions**

*** This section intentionally left blank ***

Page 2 of 3

For informational purposes                                                     Loan number:    1205243971

**The following information covers your projected escrow account activity from Nov 2016 to Oct 2017**

Projected escrow account disbursements
Annualized items to be paid from your escrow account ($):

| | |
|---|---|
| COUNTY TAX | 12,724.29 |
| HAZARD INS | 5,672.00 |
| Total disbursements | 18,396.29 |
| Scheduled escrow payment | 1,533.03[1] |

*1. Your escrow payment is calculated by dividing the total disbursements by 12.*

Projected escrow account activity for the next 12 months

| Date | Anticipated payments ($) To escrow | From escrow | Description | Escrow balance ($) Projected | Required |
|---|---|---|---|---|---|
| Nov 2016 | | | Starting balance | 53,827.58 | 4,368.09 |
| Nov 2016 | 1,533.03 | 0.00 | | 55,360.61 | 5,901.12 |
| Dec 2016 | 1,533.03 | 3,180.62 | CLARK COUNTY | 53,713.02 | 4,253.53 |
| Jan 2017 | 1,533.03 | 0.00 | | 55,246.05 | 5,786.56 |
| Feb 2017 | 1,533.03 | 3,180.62 | CLARK COUNTY | 53,598.46 | 4,138.97 |
| Mar 2017 | 1,533.03 | 5,672.00 | CHUBB GROUP | 49,459.49[2] | 0.00[3] |
| Apr 2017 | 1,533.03 | 0.00 | | 50,992.52 | 1,533.03 |
| May 2017 | 1,533.03 | 0.00 | | 52,525.55 | 3,066.06 |
| Jun 2017 | 1,533.03 | 0.00 | | 54,058.58 | 4,599.09 |
| Jul 2017 | 1,533.03 | 3,182.43 | CLARK COUNTY | 52,409.18 | 2,949.69 |
| Aug 2017 | 1,533.03 | 0.00 | | 53,942.21 | 4,482.72 |
| Sep 2017 | 1,533.03 | 3,180.62 | CLARK COUNTY | 52,294.62 | 2,835.13 |
| Oct 2017 | 1,533.03 | 0.00 | | 53,827.65 | 4,368.16 |
| **Total** | **18,396.36** | **18,396.29** | | | |

These calculations indicate the projected escrow balance will be more than the required escrow balance.

The projected escrow account activity is based on the most recent tax and/or insurance information available as well as the assumption that your payments will be received as agreed.

*2. Projected low point. The point during the annual period at which the projected escrow balance will reach its lowest point.*

*3. Required escrow balance. To cover unanticipated disbursements, including increases to tax or insurance payments, there is a minimum escrow balance allowable by state law and/or your mortgage contract. This amount does not include mortgage insurance.*

  • *Your minimum escrow balance is $0.00*
  • *State law requires that this minimum escrow balance not exceed $0.00*
  • *Note: If you have an adjustable rate mortgage (ARM), you will receive a notice about your new mortgage payment when your ARM rate is scheduled to change.*

Information about your escrow account overage

| | |
|---|---|
| Your lowest projected escrow account balance (low point) ($) | 49,459.49 |
| Plus escrow adjustment[4] ($) | 2,580.77 |
| Less your required minimum escrow account balance ($) | 0.00 |
| **This means your escrow account has an overage of ($)** | **52,040.26** |

*4. An Escrow Adjustment of $2,580.77, scheduled to be repaid through the bankruptcy, is included in this calculation.*

Page 3 of 3

For informational purposes                    Loan number:        1205243971

The following information covers your escrow account history activity from Dec 2015 to Oct 2016

| | Payments to escrow ($) | | Payments from escrow ($) | | | Escrow balance ($) | |
|---|---|---|---|---|---|---|---|
| Date | Projected | Actual | Projected | Actual | Description | Projected | Actual |
| Dec 2015 | | | | | Starting balance | 5,542.42 | 91,253.14- |
| Dec 2015 | 1,475.07 | 0.00[1] | 3,075.85 | 3,174.27[1] | CLARK COUNTY | 3,941.64 | 94,427.41- |
| Jan 2016 | 1,475.07 | 0.00[1] | 0.00 | 0.00 | | 5,416.71 | 94,427.41- |
| Feb 2016 | 1,475.07 | 0.00[1] | 3,075.85 | 3,174.27[1] | CLARK COUNTY | 3,815.93 | 97,601.68- |
| Feb 2016 | 0.00 | 0.00 | 0.00 | 5,672.00[1] | CHUBB GROUP | 3,815.93 | 103,273.68- |
| Mar 2016 | 1,475.07 | 0.00[1] | 5,291.00 | 0.00[1] | CHUBB GROUP | 0.00 | 103,273.68- |
| Apr 2016 | 1,475.07 | 0.00[1] | 0.00 | 0.00 | | 1,475.07 | 103,273.68- |
| May 2016 | 1,475.07 | 0.00[1] | 0.00 | 0.00 | | 2,950.14 | 103,273.68- |
| Jun 2016 | 1,475.07 | 0.00[1] | 0.00 | 0.00 | | 4,425.21 | 103,273.68- |
| Jul 2016 | 1,475.07 | 0.00[1] | 3,182.21 | 3,182.43[1] | CLARK COUNTY | 2,718.07 | 106,456.11- |
| Aug 2016 | 1,475.07 | 0.00[1] | 0.00 | 0.00 | | 4,193.14 | 106,456.11- |
| Sep 2016 est. | 1,475.07 | 161,989.24[1] | 3,075.85 | 3,180.62[1] | CLARK COUNTY | 2,592.36 | 53,352.51 |
| Oct 2016 est. | 1,475.07 | 1,475.07 | 0.00 | 0.00 | | 4,067.43 | 53,827.58 |
| Totals | 16,225.77 | 163,464.31 | 17,700.76 | 18,383.59 | | | |

1. Indicates where a difference exists between the projected and actual account activity.

Wells Fargo Home Mortgage, doing business as America's Servicing Company, is a division of Wells Fargo Bank, N.A. © 2012 Wells Fargo Bank, N.A. All rights reserved. NMLSR ID 399801



Manage your mortgage payments easily with the Preferred Payment Plan℠

·   Schedule weekly, biweekly, semi-monthly or monthly payments
·   Save time and money with free, secure withdrawals
·   No due dates to remember or checks to write
It's free, secure and convenient. To enroll, call 1-866-386-8519.

A guide to your escrow questions and answers is available at: wellsfargo.com/escrowquestions

# EXHIBIT 4

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief

| United States Bankruptcy Court District of Nevada | Proof of Claim |
|---|---|

**In re (Name of Debtor):**
Melani Schulte and William R. Schulte

Case Number:
09-29123-BAM

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. ' 503.

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

**Name of Creditor** (The person or other entity to whom the debtor owes money or property):
BANK OF NEW YORK MELLON, SUCCESSOR IN INTEREST TO JPMORGAN CHASE , SUCCESSOR IN INTEREST TO BANK ONE NATIONAL ASSOCIATION, AS TRUSTEE FOR CREDIT SUISSSE FIRST BOSTON MORTGAGE-BACKED PASS THROUGH TRUSTS, SERIES 2003-27 ITS SUCCESSORS AND/OR ASSIGNS

**Name and Address Where Notices Should be Sent:**
America's Servicing Company as servicer for BANK OF NEW YORK MELLON, SUCCESSOR IN INTEREST TO JPMORGAN CHASE , SUCCESSOR IN INTEREST TO BANK ONE NATIONAL ASSOCIATION, AS TRUSTEE FOR CREDIT SUISSSE FIRST BOSTON MORTGAGE-BACKED PASS THROUGH TRUSTS, SERIES 2003-27Bankruptcy Department
3476 Stateview Blvd
Fort Mill, SC 29715

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**Name and Address Where Payment Should be Sent (if different from above):**
America's Servicing Company as servicer for BANK OF NEW YORK MELLON, SUCCESSOR IN INTEREST TO JPMORGAN CHASE , SUCCESSOR IN INTEREST TO BANK ONE NATIONAL ASSOCIATION, AS TRUSTEE FOR CREDIT SUISSSE FIRST BOSTON MORTGAGE-BACKED PASS THROUGH TRUSTS, SERIES 2003-27Bankruptcy Department
One Home Campus, Attn: Bkcy Payment Processing
MAC# x2302-04C
Des Moines, IA 50328
(304) 606-7072

**5. Amount of claim Entitled to Priority under 11 U.S.C '507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**
Specify the priority of the claim.

**1. Amount of Claim at Time Case Filed: $ 873,415.57\***
If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete item 5.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or charges.
\* This is an estimated figure and is not to be relied upon as a payoff statement.

**2. Basis for Claim:** __Money loaned (Real Estate Mortgage)_____

**3.** Last four digits of any number by which creditor identifies debtor: XXXXXX3971
3a. Debtor may have scheduled account as: _____

**4. Secured Claim**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☒ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property: _____   Annual Interest Rate 6.25 %

Amount of arrearage and other charges as of time case filed included in secured claim.
if any $ 77,562.88 Basis for perfection: _Recorded Deed of Trust,_____

Amount of Secured Claim: $873,265.57\*   Amount Unsecured: $_____

☐ Domestic support obligations under 11 U.S.C. ' 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950\*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier--11 U.S.C. ' 507(a)(4).

☐ Contributions to an employee benefit plan---11 U.S.C. ' 507(a)(5).

☐ Up to $2,425\* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use---11 U.S.C. ' 507(a)(7).

☐ Taxes or penalties owed to governmental units---11 U.S.C. ' 507(a)(8).

☐ Other--Specify applicable paragraph of -11 U.S.C. ' 507(a)_____.

**Amount entitled to priority:**
$_____

**6. CREDITS:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. DOCUMENTS:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary.

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

\*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

Date: 2/11/2010

FOR COURT USE ONLY

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.
/s/
Alice A. Blanco/Karrollanne K. Cayce/John D. Schlotter/Michael J. McCormick/A. Michelle Hart/Richard H. Siegel/Whitney Groff/Maria Tsagaris/Melissa Sawyers/ Michelle G. Smith/Anthony E. Maselli/Deborah L. Conley Agent for America's Servicing Company as servicer for U.S. Bank National Association, as Trustee for CSFB 2003-27 its Successors and/or assigns . 1544 Old Alabama Road, Roswell, Georgia 30076, Telephone: 770-643-7200

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. ' ' 152 and 3571   ASC-09-19127

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA
LAS VEGAS DIVISION

IN RE:                                    )
                                          )  CASE NO. 09-29123-BAM
Melani Schulte                            )  CHAPTER 11
William R. Schulte                        )  JUDGE Bruce A. Markell
                                          )

## EXHIBIT A

ITEMIZATION OF CLAIM

Total Debt  as of 10/11/2009

| | | |
|---|---|---:|
| • | Unpaid Principal Balance | 813,881.69 |
| • | Interest on Principal Balance at 6.25% through 10/11/2009 | 39,579.18 |
| • | Late Charges | 2,659.86 |
| • | Escrow Advance | 13,997.07 |
| • | Inspection Fees | 78.75 |
| • | Appraisals/BPO | 95.00 |
| • | Pre Petition Bankruptcy Costs | 150.00 |
| • | Pre Petition Bankruptcy Fees | 550.00 |
| • | Pre Petition Foreclosure Fees | 360.00 |
| • | Pre Petition Foreclosure Costs | 2,064.02 |

                                    TOTAL DEBT        $873,265.57

The Interest Rate is: 6.25%

Please forward all payments to America's Servicing Company as servicer for U.S. Bank National Association, as Trustee for CSFB 2003-27, Bankruptcy Department, One Home Campus, Attn: Bkcy Payment Processing, MAC# x2302-04C, Des Moines, IA 50328

Please forward all correspondence and court pleadings to McCALLA RAYMER, LLC, National Bankruptcy Department, 1544 Old Alabama Road, Roswell, Georgia 30076-2102, 770-643-7200. File No. ASC-09-19127, Property Address: 509 Canyon Greens Drive, Las Vegas, NV 89144.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA
LAS VEGAS DIVISION

IN RE:                     )

                           )   CASE NO. 09-29123-BAM

Melani Schulte            )   CHAPTER 11

William R. Schulte       )   JUDGE Bruce A. Markell

                           )

## EXHIBIT B

ITEMIZATION OF CLAIM

Total Arrearage   as of 10/11/2009

- Regular Monthly Installments of $ 7,918.98                71,270.82
  February 2009 through 10/1/2009
- Late Charges                                       2,659.86
- Escrow Shortage                                  184.43
- Inspection Fees                                   78.75
- Appraisals/BPO                                  95.00
- Pre Petition Bankruptcy Costs                  150.00
- Pre Petition Bankruptcy Fees                  550.00
- Pre Petition Foreclosure Fees                 360.00
- Pre Petition Foreclosure Costs               2,064.02

Post Petition Amounts

- Pre Confirmation Attorney Fees              150.00

                   TOTAL ARREARAGES     $77,562.88

The current monthly payment amount is $7,918.98
The Interest Rate is: 6.25%

Please forward all payments to America's Servicing Company as servicer for U.S. Bank National Association, as Trustee for CSFB 2003-27, Bankruptcy Department, One Home Campus, Attn: Bkcy Payment Processing, MAC# x2302-04C, Des Moines, IA 50328

Please forward all correspondence and court pleadings to McCALLA RAYMER, LLC, National Bankruptcy Department, 1544 Old Alabama Road, Roswell, Georgia 30076-2102, 770-643-7200. File No. ASC-09-19127, Property Address: 509 Canyon Greens Drive, Las Vegas, NV 89144.

Itemization of Post-Petition services performed as of the date of claim:
File setup; Obtain case information; Attorney review of loan information, dockets, and schedules; Preparation and filing of Notice of Appearance; Preparation and filing of Proof of Claim; Review and analysis of Bankruptcy plan., Notification of claim filing to debtors counsel, trustee and claimant.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA
LAS VEGAS DIVISION

IN RE: )
)  CASE NO. 09-29123-BAM
Melani Schulte )  CHAPTER 11
William R. Schulte )  JUDGE Bruce A. Markell
)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Proof of Claim, has been served by

First Class Mail, postage pre-paid, upon the following parties in interest on the ___17th___ day of

February, 2010

Debtor's Attorney:

David A. Riggi, Esq.
5550 Painted Mirage Road #120
Las Vegas, NV 89149

Chapter 11 Trustee:

U.S. Truste-LV-11
300 Las Vegas Boulevard S.
Suite 4300
Las Vegas, NV 89101

/s/ _____
Alice A. Blanco, Georgia Bar No. 062160
Karrollanne K. Cayce, Georgia Bar No. 428978
John D. Schlotter, Georgia Bar No. 629456
Michael J. McCormick, Georgia Bar No. 485749
A. Michelle Hart, Georgia Bar No. 334291
Richard H. Siegel, Georgia Bar No. 645825
Whitney Groff, Georgia Bar No. 738079
Maria Tsagaris, Georgia Bar No. 143071
Melissa Sawyers, Georgia Bar No. 142597
Michelle G. Smith, Georgia Bar No. 076232
Anthony E. Maselli, Georgia Bar No. 558670
Deborah L. Conley, Georgia Bar No. 181171
Lakisha A. Clark, Georgia Bar No. 754011

File No. ASC-09-19127

THIS LAW FIRM IS ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.
ANY INFORMATION OBTAINED MAY BE USED FOR THAT PURPOSE.



| Prepared by and after Recording Return to: | )  |
|---|---|
| Name: | ELIZABETH HUNTER PITTS )  |
| Firm/Company: | PROMMIS SOLUTIONS, LLC )  |
| Address: | ATTN: ASSIGNMENTS )  |
| Address 2: | 1544 OLD ALABAMA ROAD )  |
| City, State, Zip: | ROSWELL, GA 30076 |
| Phone: | (800) 275-7171 |

--------Above This Line Reserved For Official Use Only------------

Assessor's Property Tax Parcel/Account Number: 138-30-712-004

ASC#: [redacted]2004

## ASSIGNMENT OF DEED OF TRUST

**Name and Address of Assignor:**
Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage whose address is 3300 SW 34th Avenue, Suite 101, Ocala, FL 34474

**Name and Address of Assignee:**
Bank of New York Mellon, successor in interest to JPMorgan Chase, successor in interest to Bank One, National Association, as Trustee for Credit Suisse First Boston Mortgage-Backed Pass-Through Trusts ,Series 2003-27 whose address is c/o Wells Fargo Bank, N.A., PO Box 10335, Des Moines, IA 50306

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, the undersigned, Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage, "Assignor",

whose address is above, does hereby grant, sell, assign, transfer and convey to Bank of New York Mellon, successor in interest to JPMorgan Chase, successor in interest to Bank One, National Association, as Trustee for Credit Suisse First Boston Mortgage-Backed Pass-Through Trusts, "Assignee," whose address is above, all interest of the undersigned Assignor in and to the following described deed of trust:

| | |
|---|---|
| **Date of Mortgage:** | May 5, 2003     **Maturity Date:** June 1, 2033 |
| **Executed by (Mortgagor(s)):** | William R. Schulte |
| | As His Sole and Separate Property |
| **To and in favor of (Mortgagee):** | Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage |
| **Original Trustee:** | First American Title Co |

**Filed of Record:**
Document/Inst. No. _____ 20030512-01840 _____ , in the Office of the County Recorder of _____ Clark _____ County, Nevada, on _____ May 12, 2003 _____

**Property:**     509 Canyon Greens Drive, Las Vegas, Nevada 89144
(As described in Legal Description attached hereto as Exhibit A.)

**Given:** to secure a certain Promissory Note in the amount of     $ 960,000.00
payable to Mortgagee.

Together with the note(s) and obligations therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee and unto its successors and assigns forever, subject only to the terms and conditions of the above-described Deed of Trust.

Assignor is the present holder of the above-described Deed of Trust.

IN WITNESS WHEREOF, this assignment was executed by the undersigned Assignor on this the 25th day of January 2010.

**MIN** ░░░░░░░**890-2**          **MERS PHONE: 1-888-679-6377**

Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage

BY NAME: / John Kennerty
TITLE: Assistant Secretary

State of SOUTH CAROLINA

County YORK

On the 25th day of January 2010, before me, Wendy Albertson Al-Hammadi, a notary public, in and for said state and county, personally appeared, John Kennerty personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



_____
Notary Public
Print Name:  Wendy Albertson Al-Hammadi

My commission expires:_____

138-30-712-004

200305 12
.01840

Assessor's Parcel Number: 138-30-712-004

~~Recording Requested~~ By:
SILVER STATE FINANCIAL SERVICES,
DBA SILVER STATE MORTGAGE

And When Recorded Return To:
SILVER STATE FINANCIAL SERVICES, DBA S
ILVER STATE MORTGAGE 2920 N. GREEN VAL
LEY PKWY., #424 HENDERSON, NEVADA 89014
Loan Number: ███████8900

_____[Space Above This Line For Recording Data]_____

# DEED OF TRUST

**MIN:** ███████████890-2

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated MAY 5 , 2003, together with all Riders to this document.
**(B)** "**Borrower**" is WILLIAM R SCHULTE AS HIS SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument.
**(C)** "**Lender**" is SILVER STATE FINANCIAL SERVICES, DBA SILVER STATE MORTGAGE
Lender is a CORPORATION organized
and existing under the laws of NEVADA
Lender's address is 2920 N. GREEN VALLEY PKWY., #424, HENDERSON, NEVADA 89014
**(D)** "**Trustee**" is FIRST AMERICAN TITLE CO

---

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3029 1/01                              Page 1 of 13

DocMagic *eFormss* 800-649-1362
www.docmagic.com

Nv3029l.mzd

200305 12
.01840

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated        MAY   5            , 2003. The Note states that Borrower owes Lender    NINE HUNDRED SIXTY THOUSAND AND 00/100
Dollars (U.S. $ 960,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than     JUNE 1, 2033        .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

DocMagic *@Roms* 800-649-1362
www.docmagic.com

Nv30292.mzd

200305 12
.01840

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of CLARK :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A".
A.P.N. #: 138-30-712-004

which currently has the address of    509 CANYON GREENS DRIVE
[Street]

LAS VEGAS                , Nevada    89144             ("Property Address"):
[City]                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

---

2003051 2
.01840

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.

2003 05 12
.01840

Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater

Nv30295.mzd

20030512
.01840

or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

   6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

   7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

---

20030512
.01840

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Nv30297.mzd

20030512
.01840

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3029 1/01
Page 8 of 13

DocMagic *eForms* 800-649-1362
www.docmagic.com

Nv30298.mzd

20030305 12
.01840

or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires


200305 12
.01840

otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

Nv302910.mzd

20030512
.01840

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

200305 12
.01840

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lenders' election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $

*DocMagic eForms* *800-649-1362*
*www.docmagic.com*

Nv302912.mzd

200305 12
.01840

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security
Instrument and in any Rider executed by Borrower and recorded with it.

 _____ (Seal)          _____ (Seal)
WILLIAM R SCHULTE        -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                              -Borrower

Witness:                              Witness:

_____              _____


State of Nevada
County of  CLARK

        This instrument was acknowledged before me on  *May 5, 2003*                    by
WILLIAM R SCHULTE

Notary Public - State of Nevada
County of Clark
CORY BAKER
My Appointment Expires
No: 03-80054-1    December 3, 2006

                                                    _____
                                                            Notary Public

        (Seal)                        My commission expires:  *Dec 3, 2006*

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic eForms 800-649-1362
Form 3029 1/01                        Page 13 of 13                        www.docmagic.com

Nv302913.mzd



20030512
.01840

Loan Number: ███████8900

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this    5th    day of MAY   2003         , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to SILVER STATE FINANCIAL SERVICES, DBA SILVER STATE MORTGAGE (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

509 CANYON GREENS DRIVE, LAS VEGAS, NEVADA 89144
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration"). The Property is a part of a planned unit development known as

SUMMERLIN VILLAGE
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                Page 1 of 2

*DocMagic CFoms* 800-649-1362
*www.docmagic.com*

Us31501.rid

20030512
.01840

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)　　　　　_____ (Seal)
WILLIAM R SCHULTE　　-Borrower　　　　　　　　　　　　　　-Borrower

_____ (Seal)　　　　　_____ (Seal)
　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　-Borrower

_____ (Seal)　　　　　_____ (Seal)
　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　-Borrower

MULTISTATE PUD RIDER--Single Family　　　　　　　　　　　DocMagic *eFormns* 800-649-1362
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT　　　　　　　　www.docmagic.com
Form 3150 1/01　　　　　　　　　　Page 2 of 2

Us3150Z.rid



20030512
.01840

File Number: 113-2051077

## EXHIBIT "A"

## LEGAL DESCRIPTION

LOT TWELVE (12) IN BLOCK "A" OF CANYON FAIRWAYS" AS SHOWN ON THE
FINAL MAP OF SUMMERLIN VILLAGE 3 CUSTOM LOTS, UNIT NO. 1, AS SHOWN BY
MAP THEREOF ON FILE IN BOOK 74 OF PLATS, PAGE 36, AND AS AMENDED BY
CERTIFICATE OF AMENDMENT RECORDED AUGUST 20, 1996 IN BOOK 960820 AS
DOCUMENT NO. 01210 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK
COUNTY, NEVADA.

***** CLARK COUNTY, NEVADA *****
FRANCES DEANE, RECORDER
RECORDED AT REQUEST OF: FIRST AMERICAN TITLE COMPANY
05-12-2003  14:23    CDO    PAGE COUNT: 16
OFFICIAL RECORDS
BOOK/INSTR:20030512-01840    FEE:    29.00
RPTT:    .00

113-2051077

MIN: ███████████890-2      **NOTE**      Loan Number: █████8900 

MAY 5, 2003                          HENDERSON                            NEVADA
  [Date]                               [City]                             [State]

509 CANYON GREENS DRIVE, LAS VEGAS, NEVADA 89144
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 960,000.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is SILVER STATE FINANCIAL SERVICES, DBA SILVER STATE MORTGAGE, A NEVADA CORPORATION                    .
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on   JULY 1                ,
2003   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   JUNE 1, 2033              , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2920 N. GREEN VALLEY PKWY., #424, HENDERSON, NEVADA 89014

                                        or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 5,910.89           .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                          Page 1 of 3

*DocMagic eFarms* 800-649-1362
www.docmagic.com

Us32001.not



### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000        % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

#### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

---

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                          Page 2 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

Us3200Z.not

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)                    _____ (Seal)
WILLIAM R SCHULTE            -Borrower                                                      -Borrower

_____ (Seal)                    _____ (Seal)
                             -Borrower                                                      -Borrower

_____ (Seal)                    _____ (Seal)
                             -Borrower                                                      -Borrower

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                    Page 3 of 3

DocMagic **€Ferms** 800-649-1362
www.docmagic.com

Us3200.3.net

# EXHIBIT 5

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief



Inst #: 201005180001779
Fees: $17.00
N/C Fee: $25.00
05/18/2010 11:32:00 AM
Receipt #: 355247
Requestor:
PROMMIS SOLUTIONS LLC
Recorded By: GILKS   Pgs: 4
DEBBIE CONWAY
CLARK COUNTY RECORDER

| Prepared by and after Recording Return to: | ) |
|---|---|
| Name:   ELIZABETH HUNTER PITTS | ) ) |
| Firm/Company:   PROMMIS SOLUTIONS, LLC | ) ) |
| Address:   ATTN: ASSIGNMENTS | ) ) |
| Address 2:   1544 OLD ALABAMA ROAD | ) ) |
| City, State, Zip:   ROSWELL, GA 30076 | ) |
| Phone:   (800) 275-7171 | |

------Above This Line Reserved For Official Use Only------

Assessor's Property Tax Parcel/Account Number: 138-30-712-004

ASC#: 13830712004

## ASSIGNMENT OF DEED OF TRUST

**Name and Address of Assignor:**
Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage whose address is 3300 SW 34th Avenue, Suite 101, Ocala, FL 34474

**Name and Address of Assignee:**
Bank of New York Mellon, successor in interest to JPMorgan Chase, successor in interest to Bank One, National Association, as Trustee for Credit Suisse First Boston Mortgage-Backed Pass-Through Trusts ,Series 2003-27 whose address is c/o Wells Fargo Bank, N.A., PO Box 10335, Des Moines, IA 50306

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, the undersigned, Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage, "Assignor",

whose address is above, does hereby grant, sell, assign, transfer and convey to Bank of New York Mellon, successor in interest to JPMorgan Chase, successor in interest to Bank One, National Association, as Trustee for Credit Suisse First Boston Mortgage-Backed Pass-Through Trusts, "Assignee," whose address is above, all interest of the undersigned Assignor in and to the following described deed of trust:

| Date of Mortgage: | May 5, 2003 | **Maturity Date:** | June 1, 2033 |
|---|---|---|---|
| **Executed by (Mortgagor(s)):** | William R. Schulte | | |
| | As His Sole and Separate Property | | |
| **To and in favor of (Mortgagee):** | Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage | | |
| **Original Trustee:** | First American Title Co | | |

Filed of Record:
Document/Inst. No. _____20030512-01840_____ , in the Office of the County Recorder of _____Clark_____ County, Nevada, on _____May 12, 2003_____
Property: 509 Canyon Greens Drive, Las Vegas, Nevada 89144
(As described in Legal Description attached hereto as Exhibit A.)
Given: to secure a certain Promissory Note in the amount of $ __960,000.00__ payable to Mortgagee.

Together with the note(s) and obligations therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee and unto its successors and assigns forever, subject only to the terms and conditions of the above-described Deed of Trust.

Assignor is the present holder of the above-described Deed of Trust.

IN WITNESS WHEREOF, this assignment was executed by the undersigned Assignor on this the 25th day of January 2010.

**MIN: 1001631-2000397890-2**        **MERS PHONE: 1-888-679-6377**

Mortgage Electronic Registration Systems, Inc., solely as nominee for Silver State Financial Services, DBA Silver State Mortgage

BY NAME: ___John Kennerty___
TITLE: Assistant Secretary

State of SOUTH CAROLINA

County YORK

On the 25th day of January 2010, before me, Wendy Albertson Al-Hammadi, a notary public, in and for said state and county, personally appeared, John Kennerty personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



Notary Public

Print Name:  Wendy Albertson Al-Hammadi

My commission expires:_____

EXHIBIT "A"

LEGAL DESCRIPTION

LOT TWELVE (12) IN BLOCK "A" OF CANYON FAIRWAYS" AS SHOWN ON THE
FINAL MAP OF SUMMERLIN VILLAGE 3 CUSTOM LOTS, UNIT NO. 1, AS SHOWN BY
MAP THEREOF ON FILE IN BOOK 74 OF PLATS, PAGE 36, AND AS AMENDED BY
CERTIFICATE OF AMENDMENT RECORDED AUGUST 20, 1996 IN BOOK 960820 AS
DOCUMENT NO. 01210 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK
COUNTY, NEVADA.

# EXHIBIT 6

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief

# In The Matter Of:

*Geline v.*
*Northwest Trustee Services, et al*

---

*H. John Kennerty*
*May 20, 2010*

---

*Van Pelt, Corbett, Bellows*
*Court Reporters*
*401 Second Avenue South, Suite 700*
*Seattle, Washington 98104*

Original File KENNERTY.txt
Min-U-Script® with Word Index

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

**Page 1**

```
                    SUPERIOR COURT FOR THE STATE OF WASHINGTON
                         IN AND FOR THE COUNTY OF KING


LYDIA GELINE,                      )
                                   )
              Plaintiff,           )
v.                                 ) Case No. 09-2-46576-2 SEA
                                   )
NORTHWEST TRUSTEE SERVICES,        )
INC.; WELLS FARGO BANK, N.A.       )
dba WELLS FARGO HOME MORTGAGE;     )
LINEAR HOME, L.P. dba QUADRANT     )
HOME LOANS; U.S. BANK, N.A. as)    )
Trustee for and Doe Defendants     )
1 through 20, inclusive,           )
                                   )
              Defendants.)         )


             DEPOSITION UPON ORAL EXAMINATION OF
                      H. JOHN KENNERTY


                         9:00 a.m.
                        May 20, 2010
             LAW OFFICES OF MELISSA A. HUELSMAN
                705 Second Avenue, Suite 1050
                   Seattle, Washington 98104
                        May 20, 2010
                         9:00 a.m.




                       JUDITH A. ROBINSON
                 VAN PELT, CORBETT, BELLOWS
                401 Second Avenue South, Suite 700
                      Seattle, WA 98104
```

---

**Page 2**

```
                    A P P E A R A N C E S


  FOR THE PLAINTIFF:

  MELISSA A. HUELSMAN
  LAW OFFICES OF MELISSA A. HUELSMAN
  705 Second Avenue, Suite #1050
  Seattle, Washington 98104
  Phone  206.447.0103
  Fax    206.447.0115
  Email mhuelsman@predatorylendinglaw.com




  FOR THE DEFENDANTS,
  WELLS FARGO:

  ANDREW G. YATES
  LANE POWELL
  1420 5th Avenue, Suite #4100
  Seattle, Washington 98101-2338
  Phone  206.223.7034
  Fax    206.223.7107
  Email  yatesa@lanepowell.com




  Court Reporter:   JUDITH A. ROBINSON
                    VAN PELT, CORBETT, BELLOWS
                    100 South King Street, Ste. 560
                    Seattle, WA 98104
```

---

**Page 3**

```
              I N D E X   O F   E X A M I N A T I O N

Witness               Examination               Page

H. John Kennerty

                      By Ms. Huelsman ............. 4-76



              I N D E X   O F   E X H I B I T S

No.               Description                     Page

1........... Certification Of Loan Documents ......... 37

2........... Appointment Of Successor Trustee ....... 41

3........... Assignment Of Mortgage/Deed Of Trust ... 50

4............... Fixed/Adjustable Rate Note ......... 53

5........... Beneficiary Declaration (Note Holder)
              (Attorney In Fact For Beneficiary) ..... 56

6............. Assignment Of Deed Of Trust ......... 65

7........... Declaration Of Amy Brodish In Support
              Of Defendant's Response ............ 69
```

---

**Page 4**

1    SEATTLE, WASHINGTON; THURSDAY, MAY 20, 2010;
2         9:00 A.M.
3         * * * * * * * *
4    H. JOHN KENNERTY          having been first duly
5                              sworn by the Notary
6                              Public, appeared and
7                              testified as follows:
8         E X A M I N A T I O N
9    BY MS. HUELSMAN:
10       Q.  Will you please state and spell your name.
11       A.  Herman John Kennerty, K-E-N-N-E-R-T-Y.
12       Q.  Thank you.  So you're here today pursuant to a
13   notice of deposition that I sent to your Counsel; is that
14   correct?
15       A.  Yes.
16       Q.  I should clarify and say Counsel for your employer;
17   correct?
18       A.  Yes.
19       Q.  Can you please tell me your address?
20       A.  Work or home?
21       Q.  Work is fine.
22       A.  3476 Stateview Boulevard, Fort Mill, South
23   Carolina.
24       Q.  By whom are you employed?
25       A.  Wells Fargo.

---

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

**Page 5**

1  Q.  Can you tell me which part of Wells Fargo?
2  A.  Wells Fargo Home Mortgage.
3  Q.  Which is a subsidiary of Wells Fargo Bank?
4  A.  Right.
5  Q.  Can I get your educational background starting
6  after high school?
7  A.  I attended Appalachian State University and went
8  into the military after that and then joined HFC in 1984.
9  Q.  That's Household Finance?
10  A.  Yes.  I was with Household until May of 2008, and
11  then in August of 2008 I joined Wells Fargo.
12  Q.  Did you get a degree from Appalachian State?
13  A.  No.
14  Q.  What was your job at HFC?
15  A.  It varied.
16  Q.  Why don't you start with your first job and take me
17  through.  I'm also going to tell you I want a little job
18  description.  If you could provide that, that would be
19  fantastic.
20  A.  When I first started with HFC, I was a branch
21  representative manager in training.  I went through the ranks
22  and became a manager.
23      From there I went into their first mortgage
24  program.  I stayed in that for a brief period.  Then I went
25  into the collections, real estate collections.

**Page 6**

1  Q.  Can you kind of give me some time lines?
2  A.  Sure.  The original branch representative manager
3  in training program was July '84 through '85 or thereabouts.
4  Q.  I understand we're not going to be totally precise.
5  But if you can give me ballpark that would be great.
6  A.  Sure.
7  Q.  Thank you.
8  A.  I was a manager in the '85-'86 time frame, through
9  '87-'88.  First mortgage program, '88 to '89.  Real estate
10  collections, '89 through '92, March of '92.
11      From there I went into policy and compliance, and I
12  was in the compliance department as a state manager.  Then I
13  was the manager of the forms group within the compliance
14  group until 2001.
15      2001 through 2008 I was specifically with Decision
16  One Mortgage which is a subsidiary of Household as the
17  operations manager, reconciling sales to investors as well as
18  managing the processing and posting of payments.
19  Q.  And that's what you're doing now?
20  A.  No.  With Wells Fargo I am a --
21  Q.  Sorry.  I lost track.  Go ahead.
22  A.  With Wells Fargo, I am a loan administration
23  manager managing our default document group.
24  Q.  Why don't you tell me what your job duties are of
25  that.

**Page 7**

1  A.  There's three main areas within the default doc.
2  group.  The first one is the ordering and obtaining of
3  collateral documents for loans.  The assignment team, the
4  execution of assignments, as well as the executable team
5  which is the executing of other foreclosure-related
6  documents.
7  Q.  So in summary is it -- your department goes and
8  gets original loan documents when they're necessary and it
9  executes documents in connection with foreclosures, whether
10  it's assignments or other necessary documents?
11  A.  Correct.
12  Q.  Is that pretty much what your unit does all day
13  long?
14  A.  Pretty much, yes.
15  Q.  And does it do it for the entire country for your
16  employer?
17  A.  Yes.
18  Q.  Are there other locations as well, or is your
19  office the one that handles all of it?
20  A.  My office is the one that handles all of it.
21  Q.  So your title is Loan Administration Manager?
22  A.  Yes.
23  Q.  Are you also vice president?
24  A.  Of loan documentation.
25  Q.  Have you had the vice president title since you

**Page 8**

1  became employed there?
2  A.  Shortly thereafter.
3  Q.  So the official title is vice president of Loan
4  Administration?
5  A.  No.
6  Q.  I'm sorry.  Can you --
7  A.  Vice president of Loan Documentation.
8  Q.  Vice president of Loan Documentation.  I'm sorry.
9  My fingers are faster than my brain.
10      How many employees do you supervise?
11  A.  53 full-time employees.  And we currently have 15
12  contract workers.
13  Q.  Are they the people who are actually executing the
14  documents that you were just describing?
15  A.  Yes.
16  Q.  And you're their supervisor?
17  A.  I manage the department.  I have direct reports
18  that are supervisors that manage the day-to-day.
19  Q.  So you supervise the supervisors?
20  A.  As well as the processors.
21  Q.  Right, okay.  And when is it that you -- or I
22  should say, excuse me.
23      How often do you actually sign documents?
24  A.  Daily.
25  Q.  Can you tell me about how many documents you sign a

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 9

1    day?
2        A.  Anywhere from 50 to 150.
3        Q.  That actually reminds me because I was running late
4    and again I apologize.
5            Have you ever had your deposition taken before?
6        A.  It has been quite some time.
7        Q.  Did you have it taken while you were an employee of
8    HFC?
9        A.  No.
10       Q.  For what reason did you have your deposition taken?
11       A.  It was a child custody hearing.
12       Q.  So you have never had your deposition taken in
13   connection with your employment at Wells Fargo?
14       A.  No.
15       Q.  Going back to the question we were on, you said
16   from what I understood just a second ago, you're the
17   supervisor or you manage the unit, and then there are
18   supervisors who actually then manage the day-to-day
19   operations of the unit; correct?
20       A.  Correct.
21       Q.  Do you know how many documents per day on average
22   the supervisors sign documents?
23       A.  I would -- roughly the same amount.
24       Q.  Is it the same then for the people that are
25   subordinate to the supervisors?

Page 10

1        A.  Not quite.  Simply because if they process it, they
2    obviously can't sign it.
3        Q.  I'm sorry.  Why is it obvious that they can't sign
4    it?
5        A.  They -- not all the processors or any of the
6    processors hold a title of vice president of Loan
7    Documentation, so they can't sign it, depending upon the
8    nature of the document.
9        Q.  So only people who have a title can sign documents,
10   depending upon the nature of the document?
11       A.  Yes.
12       Q.  What kind of documents require a title?
13       A.  Just about everything that we do, with the
14   exception of when we order collateral files.
15       Q.  We'll go through that in a second.
16           So what kind of documents do you regularly sign?
17       A.  Assignments; declarations; various affidavits.
18       Q.  Are they all in connection with foreclosures or
19   motions for relief to stay in bankruptcy?
20       A.  More so foreclosure.
21       Q.  You would still also participate in bankruptcy
22   motions for relief?
23       A.  It's rare --
24       Q.  Oh, okay.
25       A.  -- that I would.

Page 11

1        Q.  Usually those two departments are combined so
2    that's why I was asking.
3            And are there other people that you supervise who
4    also have a title?
5        A.  Yes.
6        Q.  And do all the supervisors then have a title that
7    you supervise?  I'm talking about your unit.
8        A.  Not all of them.
9        Q.  So is it only the ones that have titles that are
10   allowed to sign the documents?
11       A.  Yes.
12       Q.  What titles do supervisors have?
13       A.  Other than supervisor it would be vice president of
14   Loan Documentation.
15       Q.  So is it true that they have that title simply for
16   purposes of signing documents?
17           MR. YATES:  Object to the form.  It misstates
18   prior testimony.  You can answer.
19       A.  Can you repeat the question?
20           (Requested testimony was read.)
21       A.  I can't really answer that question.  That's not --
22   I mean, I don't grant authorizations for that title, so I
23   really can't answer that.
24   BY MS. HUELSMAN:
25       Q.  Do they act as officers of the company to perform

Page 12

1    other functions?
2            MR. YATES:  Object to the extent it calls for
3    a legal conclusion.  You can answer.
4        A.  With respect to the execution of documents, yes.
5    BY MS. HUELSMAN:
6        Q.  But that's their only function as the vice
7    president; correct?
8        A.  For loan documentation, yes.
9        Q.  So in other words, they are not going to board
10   meetings or interacting with the board of directors or other
11   corporate officers; correct?
12       A.  They interact with other officers of the company.
13   Now, as far as board members, I can't answer that.
14       Q.  What other officers of the company do they interact
15   with?
16       A.  They interact with vice presidents as well as
17   assistant vice presidents.
18       Q.  Those are just other people that perform similar
19   functions in the company; correct?
20       A.  Similar --
21           MR. YATES:  I'm just going to object to the
22   extent it misstates prior testimony.  You can answer.
23       A.  Similar how?  I don't understand your --
24   BY MS. HUELSMAN:
25       Q.  You understand that I do not want you to have to

Page 13

1 come to a legal conclusion. I just want to get your general
2 understanding regarding the role of a president of the
3 company, you understand what a president of the company is;
4 correct?
5    A. Yes.
6    Q. And the other officers underneath a president.
7 Vice president and secretary and things like that.
8       You understand that; correct?
9    A. Yes.
10    Q. Are you and the supervisors who work for you in
11 what would be kind of a stereotypical vice president role, in
12 other words, involved in operations of the company?
13    A. With respect to operations of the company, with the
14 execution of documents, yes.
15    Q. But that's what I'm saying. It's limited to the
16 execution of documents; correct?
17    A. Yes.
18    Q. You're not making decisions about shareholders or
19 things like that; correct?
20    A. No.
21    Q. In your role as a supervisor of the department, the
22 loan documentation department, do you ever sign anything
23 other than the assignments and declarations using the title
24 vice president?
25    A. Yes.

Page 14

1    Q. What other documents do you sign using that title?
2    A. There's two declarations that come to mind. One is
3 for California and one for Washington.
4    Q. Those are the beneficiary declarations?
5    A. For Washington there's a loss mitigation
6 declaration, as well as in California there's actually two
7 types of declarations. There is a default and notice of
8 sale.
9    Q. But whenever you're filling out say internal forms,
10 or I guess I'm assuming you probably do evaluations of
11 employees or sign off on, you know, write ups of employees
12 and things like that.
13    A. Yes.
14    Q. I'm assuming that's what you do as a supervisor.
15       Do you ever use your title, vice president, when
16 you're filling out those types of internal company documents?
17    A. Title is not required.
18    Q. So internal company documents, you never use your
19 title?
20    A. No.
21    Q. You described your department as being involved in
22 ordering collateral files; is that correct?
23    A. Correct.
24    Q. Can you explain to me what that means?
25    A. The collateral files are held by various

Page 15

1 custodians.
2    Q. First of all, I'm going to have you define what a
3 collateral file is. I know what it means, but just to put it
4 in the record.
5    A. A collateral file would consist of an original
6 signed note or loan agreement. An original signed and
7 recorded mortgage or deed of trust. Final title policy. And
8 it could also contain original signed documents such as
9 writers and various other documents associated with the loan
10 itself signed by the borrower or borrowers.
11    Q. So those are the only kinds of documents that are
12 in collateral files; correct?
13    A. Correct.
14    Q. Those are all the original documents; correct?
15    A. Correct.
16    Q. That's because the rest of the time -- excuse me --
17 most of the time when you're using -- you're operating your
18 department, you're using electronic records of documents;
19 correct?
20       MR. YATES: I'm going to object to the extent
21 that misstates prior testimony. I understand you want to
22 lead to little bit to save time, but I have to make that
23 objection.
24 BY MS. HUELSMAN:
25    Q. How do you look at documents normally when you're

Page 16

1 performing your job?
2    A. Depends upon the state. Approximately half the
3 states are copy states.
4    Q. What do you mean by "copy states"?
5    A. The actual state does not require original loan
6 documents to proceed with any type of foreclosure or
7 bankruptcy action.
8    Q. So when it's a copy state where are the records
9 kept?
10    A. They are kept with a custodian. However we request
11 them if they have not been previously imaged. And if they
12 have not been previously imaged then we order them and they
13 get reimaged and then returned to the custodian.
14    Q. So in -- in copy states, really all you're using is
15 the images; right?
16    A. Correct.
17    Q. In non-copy states, explain your process.
18       You still have images of the documents; correct?
19    A. Yes.
20    Q. Right.
21    A. We refer to them as original document states where
22 we order the collateral file from the custodian. They are
23 processed by being imaged, and then we actually receive that
24 collateral file and retain it until the file or the loan goes
25 active in foreclosure.

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 17

1    Q.  Okay.  So I want to make sure I'm understanding
2  you.
3        So I guess we actually -- your department becomes
4  involved only when there's a foreclosure pending; is that
5  correct?
6    A.  Prior to foreclosure.
7    Q.  So in other words, when there has been some kind of
8  default?
9    A.  Yes.
10    Q.  And it's involved in anticipation of a foreclosure
11  proceeding; correct?
12    A.  Yes.
13    Q.  So in other words, if some homeowner gets a loan,
14  pays on time, never has any problem, your department is not
15  going to be involved; right?
16    A.  Not entirely true.
17    Q.  Okay.
18    A.  If they filed bankruptcy we would still order that
19  collateral file.
20    Q.  But aside from some kind of default event which
21  would be nonpayment or bankruptcy or something like that?
22    A.  Correct, we would not be able to.
23    Q.  So I understand you're employed by Wells Fargo.
24        But do you only respond to inquiries regarding
25  loans that are serviced by Wells Fargo, or do you also

Page 18

1  respond to someone using servicing that's not Wells Fargo?
2    A.  Only Wells.
3    Q.  All right.  I realize that puzzled you, but you
4  know.
5    A.  I was making sure that --
6    Q.  Okay, okay.  So in other words, if your department
7  has to become involved, it's done so because somebody
8  involved with Wells Fargo has determined that the loan is
9  going into default; is that correct?
10    A.  Correct.
11    Q.  Can you explain to me how that process occurs?
12    A.  Which process?
13    Q.  That a file gets referred to you at the loan
14  documentation department.
15    A.  We -- there are several criteria that we look at
16  prior to ordering the file.  One of course is delinquency, as
17  well as if the property is occupied, and who the investor is
18  will help us determine how far in advance of the anticipated
19  foreclosure we would order the collateral file.
20    Q.  So although your referrals are coming from Wells
21  Fargo's servicing entity it could well be that they're
22  servicing for somebody other than Wells Fargo; correct?
23        MR. YATES:  Object to the extent it misstates
24  prior testimony.  You can answer.
25    A.  Can you read that back, please?

Page 19

1        (Requested testimony was read.)
2    A.  Yes, we would be the servicing.
3  BY MS. HUELSMAN:
4    Q.  Right.  Because you referred to investor.
5        So that means there's somebody other than Wells
6  Fargo that owns the loan when you refer to an investor;
7  correct?
8    A.  Correct.
9    Q.  Wells Fargo could also be an investor; right?
10    A.  Correct.
11    Q.  But when you use the phrase investor it refers to
12  the owner of the loan; is that correct?
13    A.  Yes.
14    Q.  Even when you use the phrase, "investor," similarly
15  you could well also be referring to a full trust; correct?
16    A.  Correct.
17    Q.  I just want to make sure I understand your
18  terminology.
19    A.  Sure.
20    Q.  So the Wells Fargo servicing arm identifies that
21  there has been a default or some kind of problem with the
22  loan and makes the referral over to your department, okay?
23    A.  The -- the term, "referred it over to my
24  department" is -- it's -- misleading is not the word I'm
25  looking for, but it's not entirely accurate.

Page 20

1    Q.  It's done by computer instead of in an old-
2  fashioned sense of making a referral; correct?
3    A.  Right.  It's a referral to obtain the documents.
4  Not to -- in essence -- at that point that's as far as it
5  goes.
6    Q.  Why don't you explain how it occurs.
7    A.  The referral?
8    Q.  Yes.
9    A.  The -- once the collection department has completed
10  their process, it goes to our foreclosure referral group who
11  ensures that -- obviously depending upon the state, that the
12  criteria has been met, and then they actually refer it for
13  foreclosure.
14    Q.  So -- sorry.  It goes from the servicing arm to,
15  what was the department called?
16    A.  Well, it would be in collections.
17    Q.  And then collections sends, essentially the message
18  to your department?
19    A.  No.  It goes to the foreclosure referral group.
20    Q.  That's what I was actually looking for.
21        So the foreclosure referral group is actually
22  separate from your department?
23    A.  Yes.
24    Q.  Do they operate out of the same offices as you?
25    A.  There's a second building.

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 21

1    Q.  But it's there at the same location?
2    A.  Yes.
3    Q.  And just generally what does the foreclosure
4    referral group do?
5    A.  I -- I could only give you a very high level,
6    because I'm not, nor have I worked --
7    Q.  I just want you to give me your basic understanding
8    just because I'm trying to make sure that I'm following the
9    whole process.
10   A.  My understanding is they review these loans to
11   ensure that the proper due diligence has been completed, and
12   then they run this through their automation and the loans are
13   referred for foreclosure.
14   Q.  So it goes from collections to the foreclosure
15   referral group and then to your department?
16   A.  To order collateral files, yes.
17   Q.  And again, all this is just done really by computer
18   messaging on a software program; correct?
19   A.  Yes.
20   Q.  What software program is that?
21   A.  It's our -- off our main frame which is Daisy.
22   Q.  D-A-I-S-Y?
23   A.  Yes.
24   Q.  Is that an acronym?
25   A.  If it is I don't know what it means.

Page 22

1    Q.  So it goes from collections, foreclosure referral
2    group, your department.  And your department's sole purpose
3    is to get collateral file and execute documents; is that
4    correct?
5            MR. YATES:  Object to the extent it misstates
6    prior testimony.
7    A.  Yes.
8    BY MS. HUELSMAN:
9    Q.  Yes?
10   A.  Yes.
11   Q.  Is there anything else it does?  I mean I'm not
12   trying to --
13   A.  No.  We order the collateral file.  We execute
14   assignments and other --
15   Q.  Declarations?  Affidavits?
16   A.  Correct.
17   Q.  And that's it?
18   A.  We have a small file room where we store the files
19   until they're needed.
20   Q.  Anything else?
21   A.  No, that's it.
22   Q.  I'm going to get back to what you do.  But what
23   happens to the foreclosure referral after it comes to your
24   department?  Where does it go on from there?
25   A.  I can't answer that because I don't know.

Page 23

1    Q.  You don't know any information from your --
2    A.  We just refer it to an attorney.
3    Q.  Okay.
4    A.  But the mechanics of that I can't speak to.
5    Q.  All right.  So it's going from your department to
6    whoever is then ultimately going to handle the foreclosure?
7    A.  It's actually going from the foreclosure referral
8    group to the foreclosing attorney.
9    Q.  That's what I'm trying to get at.
10          After you're finished performing your tasks in the
11   loan documentation department you're giving the information
12   back to the foreclosure referral group?
13   A.  No.
14   Q.  No?
15   A.  Once it's referred at that point, it's going to the
16   foreclosure attorney.
17   Q.  And that is also done through the software?
18   A.  Yes.
19   Q.  Okay.
20   A.  It's a parallel process.
21   Q.  That's just trying to understand.
22          So foreclosure referral group is sending off the
23   message through the computer software to whatever attorney is
24   going to handle the foreclosure.  And concurrent to that a
25   message is being sent out to your group to perform your

Page 24

1    functions?
2    A.  Correct.
3    Q.  And when your group performs its function, all the
4    information is simply uploaded back into the software system;
5    is that correct?
6    A.  Yes.
7    Q.  So where it goes from there you don't know?
8    A.  With respect to the information that we upload, it
9    goes into the system.
10   Q.  Right.  But I mean that's the end of your
11   department's involvement in the process; right?
12   A.  Other than sending the documents to the attorney,
13   yes, that would be the end of it.
14   Q.  So why don't you explain to me what happens when
15   the referral comes into your department from the foreclosure
16   referral group?
17   A.  We look to see -- well, we have a daily report that
18   will -- that is generated to let us know what files we need
19   to forward to the attorney, and once those files are pulled
20   they are processed out and literally checked out with the
21   information of what attorney they are going to and the
22   tracking number in which they are being sent with.
23   Q.  I'm going to go through this in a lot of detail.
24   So let's go through that process, okay?
25          So the report comes in every day and that's how

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

Page 25

1  your department knows what new matters it's working on; is
2  that correct?
3    A.  Correct.
4    Q.  Who does that report come to?
5    A.  It's generated to our file room.
6    Q.  Okay.  And is there a person there that retrieves
7  it and disseminates it to everybody else or does everybody in
8  the department also get it?
9    A.  No.  It goes into a shared directory.  It's pulled
10  from there and printed out and then, depending upon how many
11  loans are on for that particular day it's allocated out to
12  the team members.
13    Q.  How is it allocated to the team members, is there
14  organization by state or alphabetical?  How is it organized?
15    A.  Based on volume, and it's printed in numerical
16  order, and so then you pull it.  You know, if there's five
17  team members that are available to pull, then you know,
18  depending upon how many are on the list it could be several
19  sheets.  And then you get one sheet or two sheets or
20  something from there.
21        Their task is to go to the shelves and pull those
22  off.
23    Q.  So these are -- I'm sorry.  What is their position
24  called?
25    A.  They are, a general term is clerk but their

Page 26

1  official title is operations clerk.
2    Q.  Operations clerk.  And these are the people that
3  the supervisors supervise?
4    A.  Yes.
5    Q.  And then you supervise the supervisors as well as
6  the clerks?
7    A.  Correct.
8    Q.  Making sure I understand you.
9    A.  Correct.
10    Q.  So you said that the operations clerks pull the
11  file.  Can you explain to me what you mean by that?
12    A.  They physically go get the file off the shelf.
13    Q.  By that you mean the collateral file?
14    A.  Yes.
15    Q.  The collateral file which includes these original
16  documents then is already there at your location by the time
17  the operations clerks are getting the print out; correct?
18    A.  Yes.
19    Q.  So can you describe to me the process -- let's
20  backtrack a bit.  About how the collateral files end up at
21  your location.  I know you've given it to me generally but I
22  want to go through it in some detail.
23    A.  Depending upon the delinquency and the occupancy of
24  the property would determine at what stage of actual
25  delinquency we would request that file.  We run a process on

Page 27

1  a daily basis to determine what files we need to order based
2  on that criteria.
3    Q.  Okay.
4    A.  Depending upon the custodian and the nature of the
5  file, and by that is it a Freddie or Fannie type loan would
6  determine how we actually order that file.  And that's
7  whether it be an electronic request or a paper request, and
8  depending upon which way it falls, we would order directly
9  from that particular custodian.
10    Q.  Do you know how many custodians you have to deal
11  with regularly?
12    A.  There are five that we order from more frequently
13  than others.  There are 22, 25 that may or may not have
14  files.  But there's five that we order from on a regular
15  basis.
16    Q.  Can you tell me what those five are?
17    A.  Wells Fargo dot custody; La Salle; US Bank and
18  there's various arms of US Bank depending upon the location.
19  And Deutsche Bank.
20    Q.  That was four.
21    A.  City would be the fifth one.
22    Q.  And you still deal with La Salle even though it was
23  acquired by B of A?
24    A.  Yes.
25    Q.  Do they still run a custodian operation?

Page 28

1    A.  Yes.
2    Q.  So some other part of the company makes that
3  determination regarding the request with the collateral file;
4  right?
5    A.  We run the automation ourselves.
6    Q.  I'm sorry?
7    A.  That's part of our department.
8    Q.  So there's some other report that you get.
9        I'm trying to understand.  You told me there's one
10  report where you actually are getting the collateral file.
11  I'm trying to figure out and understand the process of how
12  the collateral file gets to your location.
13    A.  That would be the front-end piece, the ordering of
14  the collateral file, and that is also again based on
15  delinquency.
16    Q.  Sure.
17    A.  And occupancy.  Those types of factors.
18    Q.  Sure.
19    A.  That is set up with respect to the referral, the
20  foreclosure referral process.
21    Q.  But that's still your department that performs that
22  function, making the request to get the collateral file?
23    A.  Yes.
24    Q.  So is it also the foreclose referral group then
25  that tasks you with that or tells you, hey, this one, you

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 29

1 know, needs to be obtained?
2   A. No. There's -- there's no type of communication
3 like that. It's -- again, it's based on the criteria that
4 has been established.
5   Q. So if I'm understanding you correctly, it's simply
6 a function of the computer software program. In other words,
7 when a particular type of loan meets this particular criteria
8 the software program simply sends a message to your
9 department that the collateral file needs to be obtained.
10     Is that what you're saying?
11   A. When we run the automation process it would fall on
12 that particular process. There really is no type of message,
13 per se.
14   Q. So something gets triggered in the software system
15 and when you're doing your daily batching, I guess, or
16 reports, it comes up?
17   A. Correct.
18   Q. I'm trying to use -- just so you understand, when I
19 say things like "messages," I do want you to clarify.
20   A. Sure.
21   Q. I'm trying to use familiar terminology so we can
22 effectively communicate. I understand that it's an automated
23 process and the computer chugs it out, but I don't know what
24 else to call it except for a message.
25   A. I understand.

Page 30

1   Q. Just so I understand that.
2     But again I do want -- it is helpful when you
3 clarify that this is not necessarily, Fred, go get a file.
4 It's an automated report.
5   A. Sure.
6   Q. And so does that work get distributed in the same
7 way that you described a few minutes ago to the operations
8 clerks as well?
9   A. We have a team collectively, and they are called
10 the automation group, that perform those tasks with respect
11 to actually ordering the collateral files.
12   Q. And who makes up the automation group?
13   A. There are three people that, I think, four. We
14 just added one. They are people that handle that task.
15 There are three loan servicing specialists and a work
16 director.
17   Q. Do they work underneath you also?
18   A. Yes. They report directly to me.
19   Q. Are they housed in the same office space as the
20 operations clerks and supervisors?
21   A. Yes.
22   Q. But they have separate titles?
23   A. Yes.
24   Q. So I assume the loan servicing specialists are the
25 people who perform the work and the work director is

Page 31

1 essentially their supervisor?
2   A. As the title indicates, they truly direct the work
3 flow.
4   Q. And so these loan servicing specialists are the
5 ones that then actually go about determining where the
6 collateral is and how and to whom the request needs to be
7 made; correct?
8   A. Actually our automation program does that.
9   Q. So they are going to get a report?
10   A. A report.
11   Q. That says this loan is with Deutsche Bank?
12   A. Yes.
13   Q. And they know how to contact Deutsche Bank to go
14 get that document; correct?
15   A. Yes.
16   Q. So they send out the request for the collateral
17 file and you described that a little while ago as being
18 either done electronically or by letter depending upon the
19 custodian; correct?
20   A. Not necessarily the custodian. It depends upon the
21 investor.
22   Q. Okay.
23   A. There's some that require a paper request.
24   Q. So that would be determined by the pooling and
25 servicing agreement?

Page 32

1   A. Yes.
2   Q. In your offices then do you have access to the
3 pooling and servicing agreements, or is that simply indicated
4 on the computer information that's available to you?
5   A. It's indicated.
6   Q. So there's going to be an indication on the
7 computer screen?
8   A. Yes.
9   Q. And then is there a time line for them, or a
10 standard time for the collateral file to be obtained?
11   A. Depending the custodian, it could be as little
12 as 24 hours, or as much as ten days.
13   Q. I would assume it probably has to with the location
14 of the custodian.
15   A. Yes.
16   Q. So once that request is made and sent out and the
17 file actually gets -- the collateral file gets delivered to
18 your offices, how does that occur?
19   A. We get it via UPS or Fed Ex.
20   Q. And I assume those probably end up showing up at
21 your offices daily?
22   A. Yes.
23   Q. What happens to them once they come into your
24 office?
25   A. We confirm what they receive based on the shipping

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

Page 33

1　report, and then we process them in by uploading, once the
2　verification has been completed, uploading the shipping
3　report into the tracking system.
4　　Q.　So who performs that task?
5　　A.　That's done by the file room team.
6　　Q.　Those are the operations clerks?
7　　A.　Some are operation clerks and some are loan
8　servicing specialists as well.
9　　Q.　So they upload the shipping report you said?
10　　A.　Once the verification is completed, yes.
11　　Q.　So they actually physically go through each one of
12　the collateral files and make sure the documents that are
13　listed on the shipping report match up with the documents
14　that are in the collateral file?
15　　A.　That specific task is actually performed in Eagan,
16　Minnesota.
17　　Q.　Okay.  Could you explain it to me?
18　　A.　The collateral files are shipped to Eagan.
19　　Q.　First.
20　　A.　For imaging purposes.  Depending upon if it is a
21　copied state file and once it's imaged, the images are
22　verified that they have been uploaded to our imaging
23　platform, then the files are returned to the custodian.
24　　　　If it's an original document state file, those
25　files are then categorized on a shipping manifest and shipped

---

Page 34

1　to us.
2　　Q.　So you're sending out the request to the custodian
3　and it goes first to Eagan, Minnesota, and is that an office
4　of Wells Fargo?
5　　A.　Yes.
6　　Q.　And documents are imaged and then they are either
7　returned to the custodian or they're forwarded on to your
8　offices in South Carolina; correct?
9　　A.　Correct.
10　　Q.　But the team in Eagan is responsible for verifying
11　the contents of the collateral file; is that correct?
12　　A.　They image it.  And based on those images an
13　electronic data stream is provided to us of what documents
14　are in the file.
15　　Q.　And by electronic data stream what do you mean?  Is
16　it something like a checklist on a computer screen or actual
17　images of the documents or both?
18　　A.　It truly is a stream of data that comes in that we
19　process.  That gets uploaded to say, okay, we received
20　original note and original recorded mortgage.
21　　Q.　Okay.
22　　A.　Then of course the images are available as well.
23　　Q.　So the data is coming in electronically.  But then
24　once you receive it you can actually see the documents;
25　correct?

---

Page 35

1　　A.　The images; correct.
2　　Q.　All right.  So once the collateral file is arriving
3　there in South Carolina, there's no additional verification
4　of the contents of those collateral files because it has
5　already been done in Eagan; is that correct?
6　　A.　Prior to it being sent to the attorney, we document
7　what is being sent.
8　　Q.　Again?
9　　A.　Yes.
10　　Q.　But when it's being received by your offices that's
11　just uploading of the shipping report, you called it?
12　　A.　Correct.
13　　　　MS. HUELSMAN: Are we doing okay of not
14　talking over each other?  I think we're probably talking over
15　each other.
16　　　　COURT REPORTER: Just a little.
17　BY MS. HUELSMAN:
18　　Q.　We just have to watch talking over each other
19　because she has to take down everything that we both say.
20　It's really common in conversation to do that, but it makes
21　her life hard.  And it's especially hard because I talk
22　really fast, even though actually right now I'm actually slow
23　for me.
24　　A.　Sure.
25　　Q.　So the file room team then performs its task and

---

Page 36

1　takes the collateral documents.  The collateral file.  I'm
2　sorry.
3　　　　And you say that you actually have a storage unit
4　there in your offices; correct?
5　　A.　We have a small file room, yes.
6　　Q.　That's where the collateral files are stored until
7　they have to be sent?
8　　A.　Either to the attorney or back to the custodian.
9　　Q.　And what kind of state is Washington state treated
10　as?
11　　A.　It's -- if it's a foreclosure state or foreclosure
12　action it's a copy state.
13　　Q.　Washington is considered a copy state?
14　　A.　Yes.
15　　Q.　And so your offices would never get the collateral
16　file because Washington is a copy state; correct?
17　　A.　Unless there's some type of --
18　　Q.　Special request or?
19　　A.　Yes.
20　　Q.　All right.  So the documents in our case that we're
21　dealing with here, the Geline case, those were sent to Eagan,
22　imaged and then sent back to the custodian; correct?
23　　A.　Initially, yes.
24　　　　MS. HUELSMAN: Your attorney has provided me
25　with some documents here so we are going to go through those.

---

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 37

1    MR. YATES: I could use a restroom break.
2    (Off the record.)
3    (Exhibit No. 1 was marked.)
4 BY MS. HUELSMAN:
5    Q.  Before we turn to this document, so what did you do
6 to prepare for your deposition today?
7    A.  Booked a flight, hotel, and rental car.
8    Q.  Did you review any files?
9    A.  Yes.
10    Q.  Can you tell me what you reviewed without
11 disclosing anything that's privileged?
12    A.  The collateral file.
13    Q.  That was it?
14    A.  Yes.
15    Q.  And so you didn't review any of the electronic
16 records?
17    A.  No.
18    Q.  Were you involved at all personally in the Geline
19 file?
20    A.  How?
21    Q.  Did you perform any work in connection with
22 Ms. Geline's foreclosure?
23    A.  No.
24    Q.  But you can describe to me how it came to be in
25 your department; correct?

Page 38

1    A.  Correct.
2    Q.  So from my understanding of what you told me a few
3 minutes ago, your office would have had a report that
4 indicated that the collateral file needed to be requested; is
5 that correct?
6    A.  Correct.
7    Q.  And then that occurred according to the process
8 that you just described to me a few minutes ago; correct?
9    A.  Correct.
10    Q.  Do you know who performed that task in your
11 department?
12    A.  It would have been our automation group.
13    Q.  But you don't know the person within the automation
14 group?
15    A.  No.
16    Q.  Did you review any records to verify that that
17 process occurred before you came here today?
18    A.  I had the file, so --
19    Q.  So there's no other way the documents could have
20 arrived at your offices but through the process you described
21 to me?
22    A.  Correct.
23    Q.  That's what I want to be sure of.
24    So do you know when the collateral file was
25 requested from Ms. Geline's --

Page 39

1    I guess I should say, do you know when Ms. Geline's
2 file was requested initially from the custodian?
3    A.  No.
4    Q.  Would there be electronic records of that in the
5 system, the software system that you described?
6    A.  Yes.
7    Q.  And do you know the custodian that had Ms. Geline's
8 collateral file?
9    A.  If memory serves, I believe it was Wells Fargo
10 document custody.
11    Q.  Where is that located?
12    A.  It is Hennepin, Minnesota.  I believe Eagan and
13 Hennepin run together.
14    Q.  Okay.
15    A.  I believe it is considered Hennepin.
16    Q.  One is on one side of the city or border or
17 whatever?  I'm sure there is probably a big line between
18 Eagan and Hennepin.
19    A.  Yes.
20    Q.  And then initially would the collateral file have
21 then gone back to the custodian?
22    A.  Once it was imaged; correct.
23    Q.  Right, right, okay.
24    I recognize that you said later on it came back,
25 but initially it would have gone back to the custodian;

Page 40

1 correct?
2    A.  Correct.
3    Q.  Did you review any records that confirmed that that
4 occurred?
5    A.  The comments in the system where the file was
6 ordered.
7    Q.  So you did look at the electronic records?
8    A.  Not -- the second time because it was ordered
9 twice.
10    Q.  But I mean you have looked at the electronic
11 records regarding the file; right?
12    A.  Correct.
13    Q.  You just told me a few minutes ago you hadn't.  So
14 I just wanted to make sure.
15    MR. YATES: I'm going to object.  It's vague.
16 You might want to clarify the time.
17 BY MS. HUELSMAN:
18    Q.  So at some point have you reviewed the electronic
19 records in the file?
20    A.  Yes.
21    Q.  But you didn't necessarily do it directly before
22 coming here to testify, but you have looked at the electronic
23 records in the past?
24    A.  Yes.
25    Q.  And you're basing your testimony regarding your

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

**Page 41**

1  previous viewing of the electronic files?
2  A.  Yes.
3  Q.  So the collateral file went back and then what
4  happened in your department with the Geline file?
5  A.  We received a second request to request or to order
6  the collateral file.
7  Q.  Did your department perform any other work in
8  connection with Ms. Geline's foreclosure before that second
9  request for the collateral file?
10  A.  I can't specifically say one way or the other
11  because I do not know.
12  MS. HUELSMAN: Okay.  Let's mark this as
13  Exhibit 2.
14  (Exhibit No. 2 was marked.)
15  BY MS. HUELSMAN:
16  Q.  Have you ever seen this document before?
17  A.  No.
18  Q.  Is Ms. Hosenfeld, H-O-S-E-N-F-E-L-D, is she one of
19  your employees?
20  A.  She was a notary that we had.
21  Q.  So she was an employee of Wells Fargo?
22  A.  She was a contract worker.
23  Q.  So she was a contract employee, but she wasn't an
24  employee of Wells Fargo?
25  A.  Yes.

---

**Page 42**

1  Q.  Was she one of the people that you supervised as
2  part of the loan documentation team?
3  A.  Yes.
4  Q.  I'm assuming, based on your statement, she is no
5  longer there.
6  A.  She went to another department.
7  Q.  Is Ms. Moua, M-O-U-A -- is that how you pronounce
8  it?
9  A.  Yes.
10  Q.  Xee Moua.
11  A.  Yes.
12  Q.  And that's X-E-E.  That's the first name.  Last
13  name is M-O-U-A.
14  She is one of your employees; correct?
15  A.  Yes.
16  Q.  And she's still an employee?
17  A.  Yes.
18  Q.  What is her actual title?
19  A.  She is a work director.
20  Q.  She is a work director?
21  A.  Yes.
22  Q.  So she's part of the automation group?
23  A.  No.  She is part of the executable team.
24  Q.  So I thought -- okay.  She's part of the executable
25  team.

---

**Page 43**

1  What does the executable team do?
2  A.  They receive documents for execution; various types
3  of documents; affidavits; substitution of trustees; judgment
4  figures.
5  There's requests for power of attorneys, and there
6  are various other types of requests.  There are foreclosure
7  related requests.
8  Q.  What other, I guess, departments or teams do you
9  manage?  We have the automation group and we have the
10  executable team.
11  What else is there?
12  A.  Assignment team.
13  Q.  What does the assignment team do?
14  A.  They execute assignments.
15  Q.  I thought the executable team could do that.
16  A.  It's separate.
17  Q.  So the assignment team does nothing except execute
18  assignments?
19  A.  Assignments, yes.
20  Q.  That's got to get redundant.
21  Then we have the automation group; executable team;
22  assignment team.
23  Any other teams or groups?
24  A.  File room team.
25  Q.  What do they do?

---

**Page 44**

1  A.  They process the files in and maintain and manage
2  the file room and then process files out.
3  Q.  Any other teams or groups in your department?
4  A.  No.
5  Q.  All right.  So Ms. Moua is a work director of the
6  executable team?
7  A.  Yes.
8  Q.  And she works under you; correct?
9  A.  Correct.
10  Q.  So would it be part of her regular job duties and
11  responsibilities to sign documents like Exhibit 2 which is an
12  appointment of successor trustee document?
13  A.  Yes.
14  Q.  Would your officers create this document or would
15  it be created by a third party?
16  A.  It would be created by a third party.
17  Q.  So would it be created by an attorney that was
18  going to perform the foreclosure?
19  A.  Yes.
20  Q.  So I'm trying to clarify this.  But so from what I
21  understand already, based upon what we've already talked
22  about, the collateral file that's sent, gets imaged and gets
23  sent back and then the data is streamed to your offices;
24  correct?
25  A.  Correct.

---

Geline v.                                                                                      H. John Kennerty
Northwest Trustee Services, et al                                                              May 20, 2010

| Page 45 | Page 47 |
|---|---|

**Page 45**

1   Q.   And then your offices perform execution of
2   documents that need to be executed so that the foreclosure
3   process can continue on; correct?
4   A.   Correct.
5   Q.   And I understand that you said that the actual work
6   performed by the attorneys and the rest of that process is
7   outside of your realm of knowledge?
8   A.   Correct.
9   Q.   But based upon this, it does appear that there is
10  communication between your department and the foreclosing
11  attorney because you just told me that they create these
12  documents and then Ms. Moua signs them.
13  A.   Yes.
14  Q.   Can you explain to me how that occurs?
15  A.   The communication?
16  Q.   Yes.
17  A.   They would send a Word format document to a
18  specific mailbox and from there, depending upon the type of
19  document and whoever is responsible for that particular
20  mailbox would review it and process it.
21  Q.   Okay.  So if I understand it correctly, the work is
22  getting sent out to the attorney to perform the foreclosure,
23  and the attorney is then creating the paperwork to have it
24  self appointed as the trustee and that is simply sent back to
25  your team for execution; correct?

**Page 47**

1   BY MS. HUELSMAN:
2   Q.   Can you explain to me how that occurs?
3   A.   There's a foreclosure matrix that is maintained
4   with foreclosing entities.  That is these documents are, for
5   lack of a better term, bumped up against for verification
6   purposes.
7   Q.   So if I'm understanding you correctly, there's
8   information on a computer screen that lays out the parties
9   who should be involved in the foreclosure?
10  A.   Yes.
11  Q.   And it's Ms. Moua's responsibility to take a look
12  at that and make sure that the information on the document
13  she signs matches up with what's on the computer screen?
14  A.   Yes.
15  Q.   So Ms. Moua is looking at the document to make
16  certain that the description of the deed of trust that's at
17  issue in this case is correct; is that right?
18  A.   Yes.
19  Q.   And she is going to be looking to make sure that
20  the entity whose name she is signing on behalf of matches up
21  also with the information that's on the computer screen;
22  correct?
23  A.   Yes.
24  Q.   So according to this document, Ms. Moua was signing
25  this document on behalf of Wells Fargo who was acting as the

| Page 46 | Page 48 |
|---|---|

**Page 46**

1   A.   The part about the trustee is outside of my realm.
2   Q.   Well, that's what this document is.
3   A.   Okay.
4   Q.   So that's --
5   A.   Again, the mechanics of it, I can't speak to, but
6   as far as what they send to us, yes.
7   Q.   I know.  I'm just -- your employees are the ones
8   signing the documents appointing the trustees.
9   A.   Yes.
10  Q.   I'm not trying to trick you.  It's the document.
11  A.   Yes.
12  Q.   So Ms. Moua, does she have an obligation to review
13  the document and make sure it's accurate or anything else?
14  Or is she just signing what is sent to her?
15  A.   From a quality standpoint, yes.  There's a -- the
16  requirement to ensure that it's accurate.
17  Q.   And how does she ensure that it's accurate?
18       MR. YATES:  Object, to the extent it falls
19  beyond his notice.  It's another witness.  It's not a person
20  that you're asking about.
21       MS. HUELSMAN: I understand.  He's also their
22  supervisor.  Go ahead.
23  A.   They look at the information as far as the name to
24  foreclose in.  And there's a verification of process that
25  they complete.

**Page 48**

1   attorney for US Bank as a trustee of a pooled trust?
2   A.   Yes.
3   Q.   Am I understanding that correctly?
4   A.   Yes.
5   Q.   So US Bank was the trustee of this pooled trust
6   WFMBS2004-N; is that correct?
7   A.   Correct.
8   Q.   And you think that Wells Fargo was acting as the
9   custodian for this pooled trust; correct?
10  A.   Not as custodian.  Custodian to me -- oh, you mean
11  for the collateral file?
12  Q.   Yes.
13  A.   Yes.
14  Q.   That's what you told me earlier.
15  A.   Yeah, I was --
16  Q.   Yeah.
17  A.   Okay.
18  Q.   US Bank is just the trustee --
19  A.   Right.
20  Q.   -- according to this; right?
21  A.   Right.
22  Q.   All right.  Once Ms. Moua signs this document, what
23  happens to it?
24  A.   The notary notarizes it, and then they are shipped
25  via overnight mail to the applicable attorney.

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

---

Page 49

1  Q.  So the original leaves your office it as goes to
2  the trustee?
3  A.  Yes.
4  Q.  And do Ms. Moua and Ms. Hosenfeld at the time, do
5  they work in the same physical location?
6  A.  Yes.
7  Q.  Let's take a look at Exhibit 1. We've back tracked
8  a little bit.
9  A.  (Witness complies.)
10  Q.  Can you explain to me what this document is, the
11  certification of loan documents?
12  A.  This is exactly that. It's a document that we use
13  when we have to make copies of a document or documents and
14  send somewhere for whatever the purpose may be. This says we
15  have examined. We have reviewed the original documents and
16  the attached copies are true and accurate.
17  Q.  Okay.
18  A.  They are copies of the originals.
19  Q.  And Ms. Al Hamadi, she is an employee of Wells
20  Fargo?
21  A.  Yes.
22  MS. HUELSMAN: That's A-L, capital
23  H-A-M-A-D-I. Also, it's on the document. I know it's easier
24  for you if I just spell it.
25  COURT REPORTER: Thank you.

---

Page 50

1  BY MS. HUELSMAN:
2  Q.  So Ms. Al Hamadi is currently an employee of Wells
3  Fargo; correct?
4  A.  Yes.
5  Q.  And she witnessed your signature on this document
6  on May 17th, 2010?
7  A.  Yes.
8  Q.  And for what purpose did you execute this document?
9  A.  To provide copies of the original note from the
10  collateral file to Counsel.
11  MS. HUELSMAN: Mark this as Exhibit 3.
12  (Exhibit No. 3 was marked.)
13  BY MS. HUELSMAN:
14  Q.  Okay. Exhibit 3, I assume you've seen this
15  document before?
16  A.  Yes.
17  Q.  And can you tell me what this document is?
18  A.  It's an unrecorded assignment of the mortgage.
19  Q.  That's Ms. Geline's Deed of Trust?
20  A.  Yes.
21  Q.  I'm being particular because she actually has a
22  deed of trust instead of a mortgage. So. And so it was your
23  testimony on this Exhibit 1 and your testimony here today
24  that Exhibit 3 is a photocopy of the original unrecorded
25  assignment document that you saw --

---

Page 51

1  A.  It is.
2  MR. YATES: Wait for her to finish the
3  question.
4  MS. HUELSMAN: Yeah.
5  BY MS. HUELSMAN:
6  Q.  That you saw in Fortmill, South Carolina on
7  May 17th, 2010; correct?
8  A.  Correct.
9  Q.  And do you know the reason that this document has
10  never been recorded?
11  A.  No.
12  Q.  Is that usual for original assignments to be
13  unrecorded in collateral files?
14  A.  It's -- I've seen that before.
15  Q.  But it's not the -- it's not normal?
16  MR. YATES: Object to the extent it misstates
17  prior testimony. You can answer.
18  BY MS. HUELSMAN:
19  Q.  Why don't you give me your best estimation of the
20  percentage of times that you see original assignments sitting
21  in the collateral file unreported.
22  A.  Half the time. 50%.
23  Q.  Do you know why this document was not recorded
24  prior to the foreclosure proceeding?
25  A.  No.

---

Page 52

1  Q.  And do you know what Wachovia Bank's involvement is
2  as the trustee in this particular loan file?
3  A.  No.
4  Q.  Do you understand why I'm asking you that question?
5  Just because they're on here.
6  MR. YATES: I'm going to object to the extent
7  that the document speaks for itself.
8  MS. HUELSMAN: I understand. I'm just --
9  BY MS. HUELSMAN:
10  Q.  Have you ever seen Wachovia Bank in the chain of
11  custody for this particular loan file?
12  A.  Have I? No.
13  Q.  No. So in other words, your testimony I believe
14  you told me was that your records would show it coming from
15  Wells Fargo Bank, the custodian entity, to Eagan, Minnesota
16  for scanning or imaging you said?
17  A.  Yes.
18  Q.  It goes back to Wells Fargo as the custodian;
19  right?
20  A.  Yes.
21  Q.  And then it since then comes from Wells Fargo, the
22  custodian, back to your offices now because of the
23  litigation?
24  A.  Yes.
25  Q.  Right?

---

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 53

1  A.  Yes.
2  Q.  So at no point in that was Wachovia involved;
3  right?
4  A.  Not from my perspective, no.
5  Q.  All right.  Has this document been sent for
6  recording since you saw the original on May 17th?
7  A.  No.
8  Q.  So it's still sitting in your files back in South
9  Carolina?
10  A.  Yes.
11         (Exhibit No. 4 was marked.)
12  BY MS. HUELSMAN:
13  Q.  I assume you have seen this document before?
14  A.  Yes.
15  Q.  This is also you're contending a photocopy of the
16  original promissory note which is in your offices in South
17  Carolina that you have testified to be in possession of on
18  May 17th.  And I assume you're going to tell me that same
19  thing today.
20  A.  Yes.
21  Q.  Turn to the last page of the promissory note.
22  A.  (Witness complies.)
23  Q.  There are two endorsement stamps on the last page.
24      Do you see those?
25  A.  Yes.

Page 54

1  Q.  Do you have any idea when those endorsement stamps
2  were affixed to this promissory note?
3  A.  No.
4  Q.  So when it came back to you for the second time
5  from the Wells Fargo custodian facility it had both of these
6  stamps on it?
7  A.  Yes.
8  Q.  And do you know if it had both of these stamps on
9  the original note when it came to your offices the first
10  time?
11  A.  No, I do not know.
12  Q.  Now, according to what you told me, this original
13  note should have been imaged when it went to Eagan the first
14  time it was requested; correct?
15  A.  Correct.
16  Q.  So if the note had these stamps affixed to it at
17  that time it should have been caught in that image system;
18  correct?
19  A.  Yes.
20  Q.  I'm assuming based upon imaging that somebody is
21  sticking it in a machine and the machine is reading it and
22  copying it; correct?
23  A.  Correct.
24  Q.  And you just don't know because you haven't looked
25  at that image; correct?

Page 55

1  A.  Correct.
2  Q.  Was the promissory note reimaged when it came back
3  to you the second time?
4  A.  It should have been, yes.
5  Q.  So it should have gone from Wells Fargo the
6  custodian to Eagan to you even on the second trip to you?
7  A.  Yes.
8  Q.  And would it have -- would the reimaging have
9  written over the previous image or would there just be a
10  separate file created such that there would be two images of
11  the collateral file?
12  A.  Separate image.
13  Q.  So on the system there should be two separate
14  images of the collateral file from the different dates at
15  which it was imaged?
16  A.  Yes.
17  Q.  Does Joan Mills work in your department?
18  A.  No.
19  Q.  Do you know if she ever worked in your department?
20  A.  I do not know if she ever did.
21  Q.  Does your department ever -- does your department
22  employees ever sign on endorsements of promissory notes?
23  A.  Yes.
24  Q.  On a regular bases?  Or just under particular
25  circumstances?

Page 56

1  A.  Depending upon your definition of regular basis.
2  Q.  Why don't you give me your --
3  A.  In -- part of our process would be to do that when
4  it was necessary or needed.
5  Q.  When would it be necessary?
6  A.  At the request of the foreclosing attorney.
7  Q.  So if the foreclosing attorney provided the
8  instruction to Wells Fargo to endorse the promissory note
9  then your department would be the people who would do that?
10  A.  Yes.
11  Q.  And the instruction would only come from the
12  foreclosing attorney?
13  A.  Yes.
14  Q.  And would the foreclosing attorney also tell you to
15  whom the endorsement should be made payable?
16  A.  Yes.
17  Q.  So in other words, the foreclosing attorney would
18  say either endorsing a blank or endorse it to X, Y, Z
19  corporation?
20  A.  Yes.
21         (Exhibit No. 5 was marked.)
22  BY MS. HUELSMAN:
23  Q.  Have you seen this document before?
24  A.  Yes.
25  Q.  And this is your signature on this document?

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 57

1   A.  Yes.
2   Q.  When did you sign this document?
3   A.  It would have been August of 2000 -- August 8,
4   2009.
5   Q.  You just know that based upon looking at the date
6   on the document?
7   A.  Yes.
8   Q.  I'm assuming you don't have any specific
9   recollection of signing it?
10  A.  No.
11  Q.  Have you ever signed one of these documents with an
12  incorrect date on it?
13  A.  No.
14  Q.  So you're always careful to look at the date when
15  you sign?
16  A.  Yes.
17  Q.  Can you tell me for what purpose you signed this
18  document?
19  A.  It printed as part of the loss mitigation
20  declaration packet when this was referred to foreclosure.
21  Q.  So you're referring to the requirement under our
22  State statute that somebody sign off on it for the entity
23  that's foreclosing indicating that loss mitigation has been
24  provided to the borrower; is that correct?
25  A.  Yes.

Page 58

1   Q.  So this beneficiary declaration is a part of that
2   package?
3   A.  Yes.
4   Q.  So this declaration was created and sent to your
5   offices by the foreclosing trustee; is that correct?
6   A.  No.
7   Q.  Who would have created this?
8   A.  This is created daily after the referral.
9   Q.  Can you explain to me how that happens?
10  A.  Sure.  Once a loan is referred there is a 24-hour
11  delay before it's uploaded into the system and we get
12  notification that the loan has been referred.
13  Q.  From the foreclosing referral group?
14  A.  Correct.
15  Q.  So that's the report that you were talking about
16  getting daily?
17  A.  Oh, the report for pulling collateral documents?
18  Q.  I thought -- I'm sorry.  I thought you also told me
19  that there was a report that tells you that the matter is
20  potentially being referred to you.
21      Am I wrong?
22  A.  Yes.
23  Q.  Correct me.
24  A.  It goes through -- which part?  The report or with
25  respect to --

Page 59

1   Q.  Why don't you describe the whole process to me so I
2   understand it.
3   A.  The loans are referred by the referral, foreclosure
4   referral group.
5   Q.  And I just want to make clear that you told me
6   earlier that that essentially was a message on the automated
7   system.
8       Am I wrong?
9   A.  Correct.
10  Q.  I'm right, okay.
11  A.  Make sure we get our terminology correct.
12  Q.  Exactly, and I like to be right as much as
13  possible.  Go ahead.
14  A.  Once it's referred, our system picks it up the next
15  day.
16  Q.  Okay.
17  A.  And once it's picked up we -- it pulls in the data
18  for the processing of that loss mitigation declaration as
19  well as the beneficiary declaration.
20  Q.  Okay.  So the loss mitigation declaration and the
21  beneficiary declaration are documents that are created by
22  Wells Fargo?
23  A.  Yes.
24  Q.  So the system pops up a message or whatever with
25  that packet of documents for somebody to sign; is that right?

Page 60

1   A.  They are actually printed.
2   Q.  Wow, what do you know, something's printed, okay.
3   So do you regularly sign these types of documents?
4   A.  Yes.
5   Q.  Do other members of your various teams also sign
6   these documents?
7   A.  Only when they are asked.
8   Q.  So the loss mitigation and the beneficiary
9   declaration are types of documents that generally only you
10  sign?
11  A.  Correct.
12  Q.  What is the reason that you are tasked with signing
13  those documents?
14  A.  I was -- when the -- when we implemented the
15  process it was just convenient for me to sign them.
16  Q.  And what do you do before you sign the documents?
17  Do you verify any information or are you just signing
18  whatever is printed?
19      MR. YATES: I'm going to object to the extent
20  it has been asked and answered.
21  A.  The verification of the date; the foreclosing
22  entity information is pulled in from a, the foreclosure
23  matrix.  And then it's -- I sign it.
24  BY MS. HUELSMAN:
25  Q.  So I want to be particular about this.

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 61

1    So you're getting these documents, the loss
2  mitigation declaration, and the beneficiary declaration, and
3  those two documents are printed and presented to you by
4  somebody else for signing; right?
5    A.  Correct.
6    Q.  That's one of your other file clerks or staff
7  people that gives you those documents?
8    A.  Yes.
9    Q.  And those are part of the 50 to 150 documents per
10  day that you sign; correct?
11    A.  Yes.
12    Q.  Somebody comes and brings you those documents and
13  you sit down to sign them.  And you're looking at the
14  documents to make sure that the date is correct and
15  consistent with the date you're signing the document;
16  correct?
17    A.  Yes.
18    Q.  And you're looking on a computer screen at the
19  foreclosure matrix that you described to me to make certain
20  that the name of the foreclosing -- of the beneficiary on the
21  document that you're signing matches with the matrix; is that
22  correct?
23    A.  No.  That's not correct.
24    Q.  Okay.  What are you looking at on the matrix?
25    A.  I'm not looking at the matrix.

Page 62

1    Q.  Okay.
2    A.  The matrix is updated daily, and this information
3  is pulled from that matrix.
4    Q.  So you're simply signing the document that's
5  presented to you and you're just making sure that the date is
6  correct?
7    A.  Correct.
8    Q.  So how do you know when you're signing this
9  document that it's true and correct?
10    MR. YATES:  Objection, asked and answered.
11    A.  There are people that are responsible for the --
12  for maintaining that foreclosure matrix.
13  BY MS. HUELSMAN:
14    Q.  So you're relying upon your employees to have the
15  correct information in the matrix system?
16    A.  Not my employees.
17    Q.  Okay.
18    A.  Fellow Wells Fargo team members.
19    Q.  Who puts the information into the matrix?
20    A.  It's generated from our foreclosure departments.
21  Specifically I don't know who.
22    Q.  That's coming from the foreclosure referral;
23  correct?
24    A.  No.  It's coming from the foreclosure department.
25    Q.  And that's separate from the foreclosure referral

Page 63

1  group?
2    A.  Yes.
3    Q.  And again, just generally I know you don't work
4  there.
5    What does the foreclosure department do?
6    A.  They -- they are the liaison, conduit, if you will,
7  between Wells Fargo and the foreclosing attorney.
8    Q.  And that's separate from the foreclosure referral
9  group?
10    A.  Yes.
11    Q.  All right.  So someone at the foreclosure
12  department makes sure that the information on the matrix is
13  correct.
14    That's your understanding?
15    A.  Correct.  That is my understanding.
16    Q.  You told me that your department is the one that
17  actually has the collateral documents in your possession.
18    If it's in the original file state in your
19  department that's also going to have a copy on the imaging
20  system if it's a copy file state; right?
21    A.  Correct.
22    Q.  Does the foreclosure department also have access to
23  the imaging system?
24    A.  Yes.
25    Q.  So it is from the imaging system that you're

Page 64

1  surmising that the foreclosure department gets the
2  information to put into the matrix?
3    A.  I can't answer that.
4    Q.  You just know it's the foreclosure department's
5  responsibility to put the information in the matrix; right?
6    A.  Correct.
7    Q.  And then the matrix is -- the information from the
8  matrix is inserted into this document, the beneficiary
9  declaration and that's presented to you for signature?
10    A.  As part of our daily, morning processing.
11    Q.  Right.
12    A.  It's updated, with any updates and then it gets
13  pushed out to the various processors.
14    Q.  And so when you sign this beneficiary declaration
15  and any other beneficiary declaration, you don't have any
16  independent knowledge about whether or not the information is
17  truthful, you're relying on the other people in the process
18  to make sure that the information is correct on the document
19  that you're signing?
20    A.  Yes.
21    MR. YATES:  Let her get the question out so
22  she can take it down.
23    WITNESS:  Okay.
24  BY MS. HUELSMAN:
25    Q.  And do you know the difference between whether or

Geline v.                                                                    H. John Kennerty
Northwest Trustee Services, et al                                            May 20, 2010

| Page 65 | Page 67 |
|---|---|

**Page 65**

1  not an entity has a -- is the actual holder of the promissory
2  note or the requisite authority under RCW 62A.3-301 to
3  enforce the obligation?
4        MR. YATES: Objection to the extent it calls
5  for a legal conclusion.
6    A.  Could you read the question again?
7        (Requested testimony was read.)
8        MR. YATES: Same objection.
9    A.  No.
10       MS. HUELSMAN: I'm going to take another break
11  because I forgot to bring a document.
12       (Off the record.)
13       (Exhibit No. 6 was marked.)
14  BY MS. HUELSMAN:
15   Q.  Have you ever seen this document before?
16   A.  No.
17   Q.  You said you had looked at the collateral file in
18  this case; correct?
19   A.  Correct.
20   Q.  And I believe you told me that it should contain
21  all of the original promissory note recorded deed of trust
22  assignments, things like that; correct?
23       MR. YATES: Object to the extent it misstates
24  prior testimony.
25   A.  Depending upon the custodian.

**Page 67**

1    A.  I can't really answer that because I don't know
2  what their process is.
3    Q.  Right.  But normally when you -- you deal with a
4  lot of collateral files; right?
5    A.  Yes.
6    Q.  I'm sure you've looked at a lot of them; right?
7    A.  Yes.
8    Q.  Is it normal when an assignment is returned by the
9  recorder's office for that assignment to be put into the
10  collateral file?
11   A.  It should be, yes.
12   Q.  So that's what should happen?
13   A.  It should, but.
14   Q.  Yeah.
15   A.  Again, I don't know their process.
16   Q.  I understand.  But when you get collateral files
17  they're supposed to have original assignments returned by the
18  recorder's office; right?
19   A.  I would think so, yes.
20   Q.  Let's take a look at Exhibit 3.
21       Can you explain to me there are two different
22  assignments of the same loan?
23   A.  No.
24   Q.  Can you explain to me why they were -- the loan was
25  assigned to different entities?

**Page 66**

1  BY MS. HUELSMAN:
2    Q.  Sure.  But it should have all the original
3  documents related to ownership of the loan?
4        MR. YATES: Same objection.
5  BY MS. HUELSMAN:
6    Q.  Correct?
7    A.  One would think, yes.
8    Q.  So this assignment which as you can see by the top
9  is recorded in the records of King County in September of
10  2005.
11       Do you see that at the top?  The big stamp there
12  says 9/22/05.
13   A.  I see the stamp, yes.  The bar code.
14   Q.  And it was recorded, and then the return address is
15  Wells Fargo Home Mortgage.  Final documents they are in
16  Eagan, Minnesota.
17       Do you see that in kind of the upper left-hand
18  corner?
19   A.  Yes.
20   Q.  So the original of this document should have been
21  mailed back by the county to Wells Fargo there on Eagan.
22       Do you know why it wouldn't have been put in the
23  collateral file?
24   A.  No.
25   Q.  Should it have been?

**Page 68**

1    A.  No.
2    Q.  Do you know who Georgiana Rice is?
3    A.  No.
4    Q.  Looks like she is probably in Minnesota, but I
5  thought you might know who she was.
6    A.  It looks like she's with Linear Financial.
7    Q.  But certainly based upon your testimony today and
8  this certification of the loan document, you executed this
9  assignment, Exhibit 6, the deed of trust is not presently in
10  the collateral file?
11   A.  Correct.
12   Q.  Do you know if it was in the imaged file?
13   A.  No.
14   Q.  You testified a few minutes ago about signing
15  declarations regarding loss mitigation; do you recall that?
16   A.  Yes.
17   Q.  In connection with foreclosures in Washington
18  state.
19   A.  Yes.
20   Q.  You said you signed one in this case and I just
21  didn't bother to bring it in.
22       Do you have any knowledge about whether or not the
23  loss mitigation has been offered to the borrower when you
24  sign that document as well?
25   A.  It would not -- it would not have been referred if

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 69

1    the due diligence hadn't been completed.
2        Q.   Right.  But again you don't have any personal
3    knowledge when you sign any of those declarations; correct?
4            MR. YATES: Object to the form.  It misstates
5    prior testimony.  You can answer.
6        A.   Personal knowledge that I sat there and watched
7    somebody do it, no, I did not.
8    BY MS. HUELSMAN:
9        Q.   So again, you're just relying upon the rest of the
10   employees at Wells Fargo to have made certain that the task
11   that needed to be performed was performed and you're just
12   signing the document; correct?
13       A.   Yes.
14       Q.   Do you know what part of Wells Fargo provides the
15   loss mitigation service?
16       A.   It would be collections department and then the
17   foreclosure referral department does a confirmation.
18           (Exhibit No. 7 was marked.)
19   BY MS. HUELSMAN:
20       Q.   Have you ever seen Ms. Brodish's declaration
21   before?
22       A.   No.
23       Q.   That's B-R-O-D-I-S-H.
24           Do you know Ms. Brodish?
25       A.   Only from speaking to her on the phone.

Page 70

1        Q.   Is she somebody with whom you work regularly in
2    your job?
3        A.   I wouldn't say regularly.  Periodically.
4        Q.   And for what reason are you required to speak to
5    Ms. Brodish?
6        A.   She is in our litigation department and they
7    periodically request that we order collateral files.
8        Q.   So that's usually the context in which you're
9    speaking to her?
10       A.   Yes.
11       Q.   Do you know if the collateral file has ever been
12   provided to Ms. Brodish?
13       A.   Yes.
14       Q.   And when did that occur?
15       A.   I believe it was April 2009, if memory serves.
16       Q.   Okay.
17       A.   It -- it -- actually that might have been April of
18   this year.  I -- April is standing out, but I don't
19   specifically recall the year.
20       Q.   Okay.  So it was either April of this year or April
21   of last year?
22       A.   Yes.
23       Q.   Do you know for what reason the collateral file was
24   sent to Ms. Brodish?
25       A.   She would have requested it.

Page 71

1        Q.   So I'm surmising from what you're saying is it's
2    normal if the litigation part of Wells Fargo contacts your
3    office asking for a collateral file that you send it?
4        A.   Yes.
5        Q.   Again that's by Federal Express or UPS?
6        A.   Yes.
7        Q.   Did Ms. Brodish return the collateral file to your
8    location?
9        A.   Yes, she did.
10       Q.   Do you recall when that occurred?
11       A.   That might have been the April of this year when it
12   was returned to us.
13       Q.   And is there any record kept of what was in the
14   collateral file when it gets sent to Ms. Brodish?
15       A.   It would have been the documentation from when it
16   was processed in.
17       Q.   That's the shipping report, I think you called it?
18       A.   Yes.
19       Q.   But there's no additional imaging that's occurred
20   at your offices; correct?
21       A.   Once it comes back to us, no.  We don't reimage it
22   again.
23       Q.   Is it reimaged before it's sent to Ms. Brodish?
24       A.   Yes.
25       Q.   In other words, it has been imaged at Eagan the two

Page 72

1    times we have talked about?
2        A.   Yes.
3        Q.   And then it has come back to your offices and you
4    sent it to Ms. Brodish and she sent it back to you.  But
5    there has been no additional imaging during those two
6    transfers?
7        A.   Not to my knowledge.
8        Q.   Nobody has independently verified the contents of
9    the collateral file during those two shipments, they are just
10   relying on the shipping record?
11           MR. YATES: Object to the form.
12       A.   Could you repeat that, please?
13           (Requested testimony was read.)
14       A.   Correct.
15   BY MS. HUELSMAN:
16       Q.   I was wondering if we could look at anything that
17   would show whether or not this assignment went missing during
18   this process?
19       A.   Nothing that I'm aware of, no.
20       Q.   All right.  Does Wells Fargo handle all of its own
21   foreclosures?
22           It's not a well phrased question, let me try again.
23           When Wells Fargo services a loan, does your
24   department handle all of the collateral, the documentation
25   for all of the -- all of Wells Fargo servicing when loans go

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 73

1  to foreclosure?
2  A.  To my knowledge, yes.
3  Q.  So Wells is not using third parties like lenders
4  processing services or other companies?
5  A.  Not for collateral files.
6  Q.  And that includes assignments and things like that,
7  that's what you mean by involving collateral files?
8  A.  Correct.
9  Q.  So I just want to make certain that if an
10 assignment needs to be done on behalf -- regarding a loan
11 that Wells Fargo is servicing it be should be coming through
12 your department, right?
13 A.  For the most part, yes.
14 Q.  Okay.
15 A.  The one exception would be any MERS-related
16 assignments in which the foreclosing attorney has
17 authorization and power of attorney to execute.
18 Q.  And so if it's a loan that has been registered on
19 the MERS system then it doesn't have to come back to your
20 offices for assignment, the foreclosing attorney could simply
21 do it themselves?
22 A.  Correct.  If they have the authorization.
23 Q.  Right.
24 A.  And the power of attorney.
25 Q.  So it's still essentially the collateral file is

Page 74

1  coming through your office, it just doesn't have to come back
2  to your department for actual signing of assignments?
3  A.  Correct.
4  MS. HUELSMAN: Let me just review my notes for
5  just a second, okay.
6  WITNESS: Sure.
7  BY MS. HUELSMAN:
8  Q.  When we started out this morning we were kind of
9  going through the flow through Wells Fargo department that a
10 foreclosure goes through, but I just want to make sure I
11 understand that correctly.
12 It starts at collections when somebody gets
13 delinquent?
14 A.  Yes.
15 Q.  It goes to the foreclosure referral group?
16 A.  Yes.
17 Q.  And it goes to loan documentation, your department?
18 I'm sorry.  It goes to -- I'm sorry.  It goes from
19 collections to loan documentation and foreclosure referral
20 group concurrently; right?
21 A.  Yes.
22 Q.  Right?
23 A.  Yes.
24 Q.  And then you guys do what you do, foreclosure group
25 does what it does and then do you know, does it then go to

Page 75

1  the foreclosure department?
2  A.  Once it's referred, it goes to the for -- it goes
3  to the foreclosure department.
4  Q.  So when it's coming from collections is it going to
5  foreclosure referral group, loan documentation and the
6  foreclosure department kind of all at the same time?
7  A.  That I don't know.
8  Q.  Okay.
9  A.  If it's concurrent with the referral aspect and
10 loan documentation and then going to foreclosure, I don't
11 know if that's taking place.
12 Q.  I'm just trying to figure out how the foreclosure
13 department gets the information in the foreclosure matrix
14 that you're relying upon when you sign documents.
15 A.  I can't answer that.  I do not know.
16 Q.  But certainly they have to fill it in before it
17 gets to you, otherwise you wouldn't have a document to sign;
18 correct?
19 A.  Correct.
20 Q.  Do people from the foreclosure department have
21 access to the collateral files that you're holding in your
22 offices?
23 A.  They have access to the images.
24 Q.  So they don't come down to your file room to go
25 look at the collateral file?

Page 76

1  A.  No.
2  Q.  They are just relying on the imaging?
3  A.  Correct.
4  MS. HUELSMAN: I think that's it.  Thank you.
5  MR. YATES: Thank you.
6  MS. HUELSMAN: Are you reserving signature?
7  MR. YATES: Yes.
8  (The deposition of H. John Kennerty was
9  concluded at 11:40 a.m.)
10 (Signature was reserved.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Geline v.
Northwest Trustee Services, et al

H. John Kennerty
May 20, 2010

Page 0

```
 1              C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON )

 4   COUNTY OF KING      )      ss.

 5

 6         I, Judith A. Robinson, Certified Court Reporter and

 7   an officer of the Court under my commission as a Notary

 8   Public, in and for the State of Washington, do hereby certify

 9   that the foregoing deposition was transcribed under my

10   direction; that the transcript of the deposition is a full,

11   true and correct transcript to the best of my ability; that I

12   am neither attorney for, nor a relative or employee of any of

13   the parties to the action or any attorney or Counsel employed

14   by the parties hereto, nor financially interested in its

15   outcome.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17   and affixed my official seal this_____day of

18   _____, 2010.

19

20          _____

21

22               Judith A. Robinson, Notary Public
                 in and for the State of Washington
23                   residing at Seattle.
                 My Commission expires November 4,
24                 2012.
                     CCR License #2171
25
```



## CERTIFICATION OF LOAN DOCUMENTS

Loan No: 0041179441

Trustee Sale NO:
Owner:
Property Address:

I certify that the attached documents are true and correct copies of the original documents in my possession.

(   ) Deed of trust
(X ) Note
( X   ) Assignment - unrecorded
(   ) Title Policy _____
(   ) _____

By: _____
      John Kennerty, VP of Loan Documentation

3476 Stateview Blvd
Fort Mill, SC 29715
     (Address)

State of South Carolina
County of York

Signed and sworn to (or affirmed) before me on 5/7/10 .
by Wendy Albertson Al Hammadi

_____
(Signature of notarial official)

My commission expires: _____

OFFICIAL SEAL
Notary Public
State of South Carolina
WENDY ALBERTSON AL-HAMMADI
My Commission Expires March 10, 2018




EXHIBIT
5/20/10 2
KENNERTY

**Electronically Recorded**
**20090916000478**

SIMPLIFILE                                    AST  14.00
Page 001 of 001
09/16/2009 11:13
King County, WA

After Recording Return to:
Kathy Taggart
Northwest Trustee Services, Inc.
P.O. Box 997
Bellevue, WA 98009-0997

## Appointment of Successor Trustee

LYDIA K. GELINE and ROBERT M. GELINE, wife and husband is/are the grantor(s), Chicago Title Insurance Company is the trustee and Linear Financial, LP DBA QUADARANT HOME LOANS is the beneficiary under that certain deed of trust dated 05/10/04 and recorded on 05/14/04 under King County, Washington Auditor's File No. 20040514002817.

The present beneficiary under said deed of trust appoints Northwest Trustee Services, Inc., a Washington corporation, whose address is P.O. Box 997, Bellevue, WA 98009-0997, as successor trustee under the deed of trust with all powers of the original trustee.

The undersigned present beneficiary warrants and represents that, as of the date this Appointment of Successor Trustee has been executed and acknowledged, it is the owner and holder of the obligation secured by the subject deed of trust and is not holding the same as security for a different obligation.

4189193
1ST AM   D/14

Wells Fargo Bank NA, Attorney in fact for US Bank National Association, as Trustee for WFMBS 2004-N

By _____
Xee Moua, VP of Loan Doc

STATE OF _____South Carolina_____ )
                                                              )ss
COUNTY OF ____·____York _ )

I certify that I know or have satisfactory evidence that ____Xee Moua_____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the _____VP of Loan Doc ____ of_____Wells Fargo Bank NA, Attorney in fact _____to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: ____08/31/2009

AMANDA ELIZABETH HOSENFELD
Notary Public, South Carolina
My Commission Expires
April 27, 2017

_____
Notary Public in and for the State of ____South Carolina____
Residing at_____Fort Mill
My appointment expires _____

NORTHWEST TRUSTEE SERVICES, INC.
P.O. Box 997
BELLEVUE, WA 98009-0997
425-586-1900   FAX 425-586-1997

Client:    «ClientName»
Borrower: «MatterName»

SERVING WASHINGTON, OREGON, IDAHO & ALASKA

Exhibit ____C____
PAGE_____ OF ____1



RETURN TO:
Wells Fargo Bank, N.A.
Attention: Final Documents
MAC X4701-02B
3601 Minnesota Drive Suite 200
Bloomington, MN 55435

Loan      0041179441
Service   0041179441
Chan      RTL

## ASSIGNMENT OF MORTGAGE/DEED OF TRUST

For value received, Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.
7001 Westown Parkway, West Des Moines, IA 50266  hereby sells, assigns, and transfers to:

WACHOVIA BANK, N.A., AS TRUSTEE

4527 METROPOLITAN COURT  SUITE C

FREDERICK, MD 21704

Its successors and assigns, all its rights, title, and interest in a certain Mortgage/Deed of Trust executed by
Execution Date :  05/10/2004
Legal Name : LYDIA K GELINE

Beneficiary :
Recorded in   KING                    County, State of, WA
in the Book                            Page                          Document #
on the date
Signed        July 26, 2004
Legal:

WELLS FARGO BANK, N.A.

Jo Lennox                              Greg Ceneviva
Vice President                         Vice President
Loan Documentation                     Loan Documentation

Chianh Pham                            Dayna Crim
Witnessed by                           Witnessed by

STATE OF MARYLAND ( SS
COUNTY OF FREDERICK)

Property Address: 910 5TH STREET
                  KIRKLAND, WA 98033

On this 26th day of   July, 2004  before me, the undersigned a Notary Public of the state of
Maryland, personally appeared Jo Lennox and Greg Ceneviva, respectively to me personally known,
who being duly sworn, did say that they are the Vice President(s) of Loan Documentation respectively,
of Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc., and that the seal
affixed to the foregoing instrument is the corporate seal of said corporation by authority of its Board of
Directors and the said, Jo Lennox and Greg Ceneviva acknowledged the execution of said instrument
to be the voluntary act and deed of Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home
Mortgage, Inc., by it voluntary done and executed.  Witnessed  by my hand and notarial seal the day and
last year above written.

THIS INSTRUMENT PREPARED BY:
Wells Fargo Bank, N.A.
7495 New Horizon Way
Frederick, Maryland 21703
Prepared by:

Jim Mangel

NOTARY PUBLIC

Erica L. Whipp
Notary Public
Washington County, MD
My Commission Expires 05/05/2007

True and Certified Copy

0041179441



# FIXED/ADJUSTABLE RATE NOTE
### (One-Year Treasury Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MAY 10, 2004                          BELLEVUE                          WASHINGTON
[Date]                                     [City]                                  [State]

910 5TH STREET, KIRKLAND, WA  98033

[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ *****605,000.00            (this amount is called "Principal"), plus interest, to the order of Lender. Lender is LINEAR FINANCIAL, LP DBA QUADRANT HOME LOANS

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  4.375        %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.   PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on JULY 01, 2004
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JUNE 01, 2034        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at WELLS FARGO HOME MORTGAGE, P.O. BOX 10304, DES MOINES, IA  503060304
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ *3,020.68        . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JUNE, 2009        , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - ONE-YEAR TREASURY INDEX - Single Family - Fannie Mae UNIFORM INSTRUMENT

VMP®-843N (0005)           Form 3522 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 5                       Initials: _____



True and Certified Copy

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND THREE-QUARTERS percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.375 % or less than 2.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 9.375 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

True and Certified Copy



**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

   **(A) Late Charges for Overdue Payments**

   If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

   **(B) Default**

   If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

   **(C) Notice of Default**

   If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

   **(D) No Waiver By Note Holder**

   Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

   **(E) Payment of Note Holder's Costs and Expenses**

   If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

   Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

   Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

   If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

   I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

   This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

   (A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:



True and Certified Copy



**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



True and Certified Copy



WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Lydia K. Geline_ _____ (Seal)
LYDIA K. GELINE                        -Borrower

_Robert M. Geline_ _____ (Seal)
ROBERT M. GELINE                       -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
BY _Joan M. Mills_
Joan M. Mills, Vice President

_____ (Seal)
                    -Borrower

[Sign Original Only]

PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
WITHOUT RECOURSE
LINEAR FINANCIAL, LP

_Lynette Hanson_
LYNETTE HANSON, VICE PRESIDENT

True and Certified Copy



BENEFICIARY DECLARATION
(NOTE HOLDER)
(Attorney in Fact for Beneficiary)

Loan No. 0041179441

The undersigned, under penalty of perjury, declares as follows:

US Bank National Association, as Trustee for WFMBS 2004-N is the actual holder of the promissory note or other obligation evidencing the above-referenced loan or has requisite authority under RCW 62A.3-301 to enforce said obligation.

The trustee may rely upon the truth and accuracy of the averments made in this declaration.

Dated this 8th day of August, 2009, in Fort Mill, SOUTH CAROLINA.

US Bank National Association, as Trustee for WFMBS 2004-N, beneficiary
Wells Fargo Bank, N.A., its Attorney in Fact

By: Herman John Kennerty
Its: Vice President of Loan Documentation

NWTS #:7023.05235
Matter name: GELINE, LYDIA K. and ROBERT M.

Exhibit    D
PAGE _____ OF _____



EXHIBIT
5/20/10 6
KENNETH



20050922002268
WELLS FARGO HO ADT
PAGE001 OF 001
09/22/2005 15:17
KING COUNTY, WA

This document prepared by and
When recorded, return to:

Wells Fargo Home Mortgage - Final Documents
1000 Blue Gentian Rd
Eagan, MN 55121
Attention: MAC # X9999-01M
Loan Number: 0041179443

MIN #:   100011300058874867
MERS Phone: 1-888-679-6377

## Assignment of Deed of Trust

For Value received,

    Linear Financial, LP dba Quadrant Home Loans
    P.O. BOX 10304
    DES MOINES, IA 503060304
Hereby sells, assigns and transfers to:

    Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.
    1000 Blue Gentian Rd - X9999-01M
    Eagan, MN 55121

Its successors and assigns all of its right, title, and interest to a certain Deed of Trust as follows:

Execution Date 5/14/2004
Legal Name:   LYDIA K GELINE and ROBERT M GELINE, Trustor

Beneficiary:   Linear Financial, LP dba Quadrant Home Loans

| | | |
|---|---|---|
| County: | King | KIRKLAND, WA 98033 |
| State: | WA | Address: 910 5TH STREET |
| Recording Date: | 5/14/2004 | Loan Amount: $605,000.00 |
| Document Number: | 20040514002817 | Book:    Page: |
| Pin/Tax Number: | 124500-3500-02  Folio # | Certificate #: |
| | | Section: |

LEGAL DESCRIPTION AS SHOWN AND/OR ATTACHED TO THE DEED OF TRUST REFERRED
TO HEREIN.
    Linear Financial, LP dba Quadrant Home Loans

_____
GEORGIANA RICE
Vice President Loan Documentation, Linear
Financial, LP dba Quadrant Home Loans

_Seble Molla_
SEBLE MOLLA
Witnessed by

_Tim Falck_
TIM FALCK
Witnessed by

State of Minnesota   } ss.
County of Dakota   }

On This Thursday, July 28, 2005 before me the undersigned a Notary Public of the state of Minnesota
personally appeared GEORGIANA RICE, respectively to me personally known, who being duly Sworn, did say
that they are a(n) Vice President Loan Documentation respectively, of Linear Financial, LP dba Quadrant Home
Loans and that the seal affixed to the foregoing instrument is the seal of said national association by authority of
its Board of Directors and the said GEORGIANA RICE acknowledged the execution of said instrument to be the
voluntary act and deed of Linear Financial, LP dba Quadrant Home Loans, by it voluntary done and executed.
Witnessed by my hand and notarial seal the day an last year above written.

_____
Christina A. Burrell

Prepared By:   SEBLE MOLLA


CHRISTINA A. BURRELL
Notary Public
Minnesota
My Commission Expires January 31, 2007



EXHIBIT
5/20/10
KENNEDY

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | | |
|---|---|---|
| LYDIA GELINE, | ) | |
| Plaintiffs, | ) | No. 09-2-46576-2 SEA |
| | ) | |
| v. | ) | **DECLARATION OF AMY BRODISH** |
| | ) | **IN SUPPORT OF DEFENDANT'S** |
| NORTHWEST TRUSTEE SERVICES, INC; | ) | **RESPONSE** |
| WELLS FARGO BANK, NA dba WELLS | ) | |
| FARGO HOME MORTGAGE; LINEAR | ) | |
| HOME, L.P. dba QUADRANT HOME | ) | |
| LOANS; U.S. BANK, N.A., as Trustee for | ) | |
| WFMBS 2004-N and doe Defendants 1 through | ) | |
| 20, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF AMY BRODISH

I, Amy Brodish, hereby declare:

1.    I am a Litigation Specialist for Wells Fargo Home Mortgage. This declaration is made in support of Wells Fargo Bank's, N.A. as Attorney in Fact for U.S. Bank, N.A., as Trustee for WFMBS 2004-N ("Wells Fargo") Response to Plaintiff's Motion for Preliminary Injunction to Further Restrain Trustee's Sale. I make the following declaration based upon my own personal knowledge and if called to testify in this action I could and would competently testify thereto.

BUMGARDNER DECLARATION IN SUPPORT OF
MOTION FOR ORDER OF DEFAULT AND DEFAULT
JUDGMENT 1 of 3

**ROUTH CRABTREE OLSEN, P.S.**
*A Law Firm and Professional Services Corporation*
3535 Factoria Boulevard SE, Suite 200
Bellevue, Washington 98006
Telephone (425) 586-1952
Facsimile (425) 283-5952



2.      I have personal knowledge of the procedures governing the creation and
maintenance of Wells Fargo's loss mitigation and default records and am familiar with the record
keeping procedures of Wells Fargo as to those records that pertain to the attempts to modify
Lydia Geline's loan that is the subject of this lawsuit.

3.      I have reviewed the records that pertain to the Geline file and as to the following
facts, I know them to be true of my own knowledge or I have gained knowledge of them from
the business records of Wells Fargo on behalf of Wells Fargo, which records were made at or
about the time of the events recorded, and are maintained in the ordinary course of Wells Fargo's
business at or near the time of the acts, conditions or events to which they relate. Any such
document was prepared in the ordinary course of business of Wells Fargo by a person who had
personal knowledge of the event being recorded and had or has a business duty to record
accurately such event. As to Wells Fargo's business records that consist of documents created by
third parties, Wells Fargo relies on the accuracy of such records in conducting its business of
servicing and collecting loans.

4.      A loan workout was cancelled by Lydia Geline in June 2009.

5.      A second loan workout was denied by Wells Fargo in August 2009 because Wells
Fargo received "no response from the borrower."

6.      A third loan workout was denied in September 2009 because a workout was
"outside of the investor guidelines," in that the loan was twelve months delinquent and the
investor requires that the loan be less than twelve months delinquent for a workout.

//

//

//

BUMGARDNER DECLARATION IN SUPPORT OF
MOTION FOR ORDER OF DEFAULT AND DEFAULT
JUDGMENT 2 of 3

ROUTH CRABTREE OLSEN, P.S.
A Law Firm and Professional Services Corporation
3535 Factoria Boulevard SE, Suite 200
Bellevue, Washington 98006
Telephone (425) 586-1952
Facsimile (425) 283-5952

1

2    I declare under penalty of perjury under the laws of the State of Washington that the

3    foregoing is true and correct.  This declaration was executed this 30th day of January 2010 at

4    Frederick, MD.

5

6

7    Amy Brodish, Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BUMGARDNER DECLARATION IN SUPPORT OF
MOTION FOR ORDER OF DEFAULT AND DEFAULT
JUDGMENT 3 of 3

ROUTH CRABTREE OLSEN, P.S.
A Law Firm and Professional Services Corporation
3535 Factoria Boulevard SE, Suite 200
Bellevue, Washington 98006
Telephone (425) 586-1952
Facsimile (425) 283-5952

# EXHIBIT 7

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
The Schwartz Law Firm, Inc.
701 E. Bridger Avenue, Suite 120
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 385-2741
Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA**

|  |  |
|---|---|
| In re: | ) Case No. 09-29123-BAM |
| | ) |
| Melani Schulte and William R. Schulte, | ) Chapter 11 |
| | ) |
| | ) Jointly Administered with: |
| 2704 Sattley LLC, | ) |
| Hot Endeavor LLC, | ) 09-27238-BAM |
| Cherish LLC, | ) 09-27909-BAM |
| SABRECO Inc., | ) 09-28513-BAM |
| Keep Safe LLC | ) 09-31584-BAM |
| | ) 09-31585-BAM |
| Debtors. | ) |
| | ) Confirmation Hearing Date: January 31, 2011 |
| | ) Confirmation Hearing Time:  9:30 a.m. |

**ORDER CONFIRMING THE DEBTORS'**
**CHAPTER 11 PLAN OF REORGANIZATION**

The above-captioned debtors and debtors-in-possession (the "**Debtors**"), having proposed

and filed their Third Amended Chapter 11 Plan of Reorganization (the "**Plan**");[1] and the Court

---

[1]   All capitalized terms used but not defined herein shall have the respective meanings
ascribed to such terms in the Plan.

1

having conducted a hearing on January 31, 2011 (the "**Hearing**") to consider confirmation of the Plan, and the Court having considered (i) the Debtors' Memorandum of Law in Support of Confirmation of their Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Reply to Objection (the "**Memo**"), (ii) the declaration of the Debtors submitted in support of their Plan, (iii) the arguments of counsel presented at the Hearing, (iv) the objection of Chase Home Finance, LLC filed with respect to confirmation of the Plan and the response filed thereto, and (v) the pleadings filed in support of confirmation; and the Court being familiar with the Plan and other relevant factors affecting these Chapter 11 cases pending under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"); and the Court having taken judicial notice of the entire record of the Chapter 11 cases, including, without limitation, all pleadings and papers filed by the Debtors in the Chapter 11 cases, the order (the "**Disclosure Statement Order**") entered by the Court on December 1, 2010 (a) approving the Debtors' Fourth Amended Disclosure Statement with Respect to the Plan (the "**Disclosure Statement**"), (b) approving the forms of ballots and solicitation and tabulation procedures, (c) prescribing the form and manner of notice thereof, (d) fixing the last date for filing objections to the Plan, and (e) scheduling the Hearing to consider confirmation for the Chapter 11 Plan and (f) appointing The Schwartz Law Firm, Inc. ("**SLF**") as solicitation and tabulation agent; and the Court having found that due and proper notice has been given with respect to the Hearing and the deadlines and procedures for objections to the Plan and the appearance of all interested parties having been duly noted in the record of the Hearing; and upon the record of the Hearing, and after due deliberation thereon, and sufficient cause appearing therefore;

2

**IT IS HEREBY FOUND AND CONCLUDED**,[2] that:

## JURISDICTION AND VENUE

A.      The Court has jurisdiction to conduct the Hearing and to confirm the Plan pursuant to 28 U.S.C. § 1334.

B.      Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court has jurisdiction to enter a final order with respect thereto.

C.      The Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

D.      Each of the conditions precedent to the entry of this Order has been satisfied.

## JUDICIAL NOTICE

E.      This Court takes judicial notice of the docket of the Debtors' Chapter 11 cases maintained by the Clerk of the Court and/or its duly-appointed agent, and all pleadings and other documents filed, all orders entered, and evidence and arguments made, proffered or adduced at, the hearings held before the Court during the pendency of the Chapter 11 cases.

### STANDARDS FOR CONFIRMATION UNDER
### SECTION 1129 OF THE BANKRUPTCY CODE

F.      <u>Section 1129(a)(1)</u>.   The Plan complies with each applicable provision of the Bankruptcy Code.  In particular, the Plan complies with the requirements of sections 1122, 1123, 1125 and 1126 of the Bankruptcy code.

---

[2]    The Findings of Fact and Conclusions of Law contained herein constitute the findings of fact and conclusions of law required to be entered by this Court pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  To the extent any finding of fact constitutes a conclusion of law, it is adopted as such.  To the extent any conclusion of law constitutes a finding of fact, it is adopted as such.

3

G.     Section 1129(a)(4).  No payment for services or costs in connection with the Chapter 11 cases or the Plan has been made by the Debtors other than payments that have been authorized by order of the Court.

H.     Section 1129(a)(7).  Each holder of an impaired Claim that has not accepted the Plan will, on account of such Claim, receive or retain property under the Plan having a value, as of the effective date of the Plan (the "**Effective Date**"), that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

I.     Section 1129(a)(8).  The Plan has not been accepted by all impaired classes of Claims.  Nevertheless, the Plan is confirmable because it satisfies 1129(b)(1) of the Bankruptcy Code with respect to such non-accepting classes of Claims.

J.     Section 1129(a)(9).  The Plan provides treatment for Administrative and Priority Claims that is consistent with the requirements of section 1129(a)(9) of the Bankruptcy Code.

K.     Section 1129(a)(10).  The Plan has been accepted by a class of impaired Claims that voted on the Plan, including Classes 2(c), (f), (h), (i), (l), (n), (o), (v), (x), (y), (cc), (ff) and (kk), and Class 5, determined without including any acceptance of the Plan by any insider.

L.     Section 1129(a)(11).  Confirmation of the Plan is not likely to be followed by the liquidation or the need for the further financial reorganization of the Debtors.

M.     Section 1129(a)(12).  The Plan provides for the payment of all fees payable under Section 1930, Title 28 of the United States Code by the Debtors on the Effective Date (or as soon as practicable thereafter).  After the Effective Date and until these Chapter 11 cases are closed, converted or dismissed, the Plan provides for the payment by the Disbursement Agent of all such fees as they become due and payable.

N.    <u>Section 1129(a)(15).</u>    There were no objections to the Plan from creditors holding allowed unsecured claims.  In accordance with section 1129(a)(15) and as indicated on the record at the Hearing, the Debtors will not make any Plan payments to their unsecured creditors.

O.    <u>Section 1129(c).</u>    The Plan (including previous versions thereof) is the only plan that has been filed in the Chapter 11 cases that has been found to satisfy the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

P.    <u>Section 1129(d).</u>    No party in interest, including but not limited to any governmental unit, has requested that the Court deny confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and the principal purpose of the Plan is not such avoidance.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## **EXECUTORY CONTRACTS**

Q.    Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the occurrence of the Effective Date, the Plan provides for the rejection of each and every executory contract and unexpired lease that is not listed on Exhibit 2 to the Plan as being rejected.  The Debtors' decisions regarding the assumption and rejection of executory contracts and unexpired leases are based on and are within the sound business judgment of the Debtors, are necessary to the implementation of the Plan and are in the best interests of the Debtors, their estate, holders of Claims and other parties in interest in these Chapter 11 cases.

## **SETTLEMENTS**

R.    Pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a), and in consideration of the classification, distributions and other benefits provided under the Plan,

the provisions of the Plan constitute a good faith compromise and settlement of all the Claims and controversies resolved pursuant to the Plan.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

**A.    General**

1.    The Plan, attached hereto as **Exhibit A**, is hereby confirmed and the record of the Hearing is hereby closed.

2.    The Effective Date of the Plan shall occur on the tenth day after the Court signs and enters this Order confirming the Plan (the "**Confirmation Date**").

3.    In accordance with section 1141(a) of the Bankruptcy Code and upon the occurrence of the Effective Date, the Plan shall be binding upon and inure to the benefit of (i) the Debtors and their respective successors and assigns, (ii) the holders of Claims and their respective successors and assigns (whether or not they voted to accept the Plan, whether or not they are impaired under the Plan, and whether or not any such holder has filed or is deemed to have filed a proof of Claim), (iii) any other Person giving, acquiring or receiving property under the Plan, (iv) any party to an executory contract or unexpired lease of a Debtors and (v) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries or guardians, if any.

**B.    Treatment of Secured Claims**

4.    The secured portions of the claims of the Debtors' lenders (the "**Lenders**") are reduced to either the appraised value of the underlying properties (the "**Properties**"), pursuant to 11 U.S.C. § 506(a) or as agreed upon between the parties, as set forth in this Order and the Plan.

5.    That the unsecured portions of the Lenders' claims are reduced and shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a).

6

6.     That the secured and unsecured claims against the property located at 509 Canyon Greens Drive, Las Vegas, Nevada, are bifurcated in accordance in accordance with the agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 509 Canyon Greens Drive, Las Vegas, Nevada  are:

   a.   First Lien – America's Servicing Company – Loan Number: 1205043971

  i.  Secured Claim - $807,141.58

  ii.  Unsecured Claim - $0.00

   b.   Second Lien – Countrywide/BAC Home Loans Servicing, LP – Loan Number: 110655785

  i.  Secured Claim - $0.00

  ii.  Unsecured Claim - $839,500.00

   c.   Third Lien - Deborah Drake

  i.  Secured Claim - $0.00

  ii.  Unsecured Claim - $155,000.00

   d.   Fourth Lien – Z'REA LP

  i.  Secured Claim - $0.00

  ii.  Unsecured Claim - $2,000,000.00

   e.   Fifth Lien – Jeffrey Sylvester

  i.  Secured Claim - $0.00

  ii.  Unsecured Claim - $72,000.00

7.     That the secured and unsecured claims against the property located at 9500 Aspen Glow Drive, Las Vegas, Nevada, are bifurcated in accordance with the agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims,"

pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 9500 Aspen Glow Drive, Las Vegas, Nevada, are:

    a.  First Lien – CitiMortgage - Loan Number – 0577014851-7

        i.      Secured Claim -    $94,646.23

        ii.     Unsecured Claim -   $0.00

    b.  Second Lien – City National Bank - Loan Number – 1824409

        i.      Secured Claim -    $25,777.44

        ii.     Unsecured Claim -   $974,222.56

8.     That the secured and unsecured claims against the property located at 2460 Avenida Cortes, Henderson, Nevada, are bifurcated in accordance with the agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 2460 Avenida Cortes, Henderson, Nevada, are:

    a.  First Lien – JP Morgan Chase Bank - Loan Number – 8483094531

        i.      Secured Claim -    $69,436.96

        ii.     Unsecured Claim -   $0.00

    b.  Second Lien – BAC Home Loans Servicing, LP - Loan Number – 156496481

        i.      Secured Claim -    $39,883.68

        ii.     Unsecured Claim -   $125,427.32

9.     That the secured and unsecured claims against the property located at 4710 Brently Place, Las Vegas, Nevada, are bifurcated in accordance with the agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 4710 Brently Place, Las Vegas, Nevada, are:

   a.  First Lien – BAC Home Loans Servicing  - Loan Number – 86314260

      i.     Secured Claim -    $109,105.70

      ii.    Unsecured Claim -   $0.00

   b.  Second Lien – Bank of America - Loan Number – 68189001596799

      i.     Unsecured Claim -   $100,000.00

   c.  Third Lien – Deborah Drake

      i.     Unsecured Claim -   $155,000.00

10.    That the secured and unsecured claims against the property located at 7873 Bridgefield Lane, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 7873 Bridgefield Lane, Las Vegas, Nevada, are:

   a.  First Lien – JP Morgan Chase Bank  - Loan Number – 8483094549

      i.     Secured Claim -    $73,213.85

      ii.    Unsecured Claim -   $0.00

   b.  Second Lien – Bank of Nevada – Loan Number – 910016328

      i.     Secured Claim  -   $37,309.74

      ii.    Unsecured Claim -   $472,690.26

11.    That the secured and unsecured claims against the property located at 3322 Cheltenham Street, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditor's wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 3322 Cheltenham Street, Las Vegas, Nevada, are:

   a.  First Lien – BAC Home Loans Servicing LP  - Loan Number – 84536650

9

i.    Secured Claim -    $99,806.60

ii.    Unsecured Claim -    $119,936.54

12.    That the secured and unsecured claims against the property located at 3383 Cloverdale Court, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 3383 Cloverdale Court, Las Vegas, Nevada, are:

a.  First Lien – BAC Home Loans Servicing, LP  - Loan Number – 85885825

i.    Secured Claim -    $168,856.34

ii.    Unsecured Claim -    $20,438.13

b.  Second Lien – Bank of America – Loan Number – 68189001211199

i.    Secured Claim  -    $0.00

ii.    Unsecured Claim -    $100,000.00

13.    That the secured and unsecured claims against the property located at 1624 Desert Canyon Court, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 1624 Desert Canyon Court, Las Vegas, Nevada, are:

a.  First Lien – CitiMortgage  - Loan Number – 0011954829-5

i.    Secured Claim -    $90,568.03

ii.    Unsecured Claim -    $0.00

b.  Second Lien – Bank of Nevada – Loan Number – 910016328

i.    Secured Claim  -    $49,244.61

ii.    Unsecured Claim -    $460,755.39

10

14.     That the secured and unsecured claims against the property located at 3729 Discovery Creek Avenue, North Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditor's wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 3729 Discovery Creek Avenue, North Las Vegas, Nevada are:

a.   First Lien – BAC Home Loans Servicing, LP  - Loan Number – 101427028

    i.      Secured Claim -       $125,446.93

    ii.     Unsecured Claim -   $128,092.53

15.     That the secured and unsecured claims against the property located at 1392 Echo Falls Avenue, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 1392 Echo Falls Avenue, Las Vegas, Nevada, are:

a.   First Lien – Litton Loan Servicing  - Loan Number – 19732478

    i.      Secured Claim -       $132,000.00

    ii.     Unsecured Claim -   $0.00

b.   Second Lien – Bank of America – Loan Number – 68189001596999

    i.      Secured Claim -       $0.00

    ii.     Unsecured Claim -   $100,000.00

16.     That the secured and unsecured claims against the property located at 1701 Empire Mine Drive, Henderson, Nevada, are bifurcated in accordance with agreement of the parties; and the creditor's wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 1701 Empire Mine Drive, Henderson, Nevada, are:

a. First Lien – BAC Home Loans Servicing, LP  - Loan Number – 85885841

    i.      Secured Claim -    $80,000.00

    ii.     Unsecured Claim -    $99,633.34

17.    That the secured and unsecured claims against the property located at 9020 Feather River Court, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 9020 Feather River Court, Las Vegas, Nevada, are:

a. First Lien – JP Morgan Chase Bank  - Loan Number – 8483094523

    i.      Secured Claim -    $73,692.98

    ii.     Unsecured Claim -    $0.00

b. Second Lien – Countrywide/BAC Home Loans Servicing, LP – Loan Number – 156496465

    i.      Secured Claim -    $44,941.33

    ii.     Unsecured Claim -    $153,468.46

18.    That the secured and unsecured claims against the property located at 1013 Golden Hawk Way, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 1013 Golden Hawk Way, Las Vegas, Nevada, are:

a. First Lien – CitiMortgage  - Loan Number – 0616443148-5

    i.      Secured Claim -    $64,854.69

    ii.     Unsecured Claim -    $0.00

b. Second Lien – BAC Home Loans Servicing, LP – Loan Number – 156496457

Transferred to Green Tree Servicing – Loan Number: 89741392

    i.      Secured Claim  -    $0.00

    ii.     Unsecured Claim -    $167,756.00

19.    That the secured and unsecured claims against the property located at 4521 W. La Madre Way, North Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 4521 W. La Madre Way, North Las Vegas, Nevada, are:

a. First Lien – CitiMortgage  - Loan Number – 0011951495-8

    i.      Secured Claim -    $74,304.10

    ii.     Unsecured Claim -    $0.00

b. Second Lien – Wells Fargo – Loan Number – 65065048763141998

    i.      Secured Claim  -    $0.00

    ii.     Unsecured Claim -    $149,951.83

20.    That the secured and unsecured claims against the property located at 8562 Lambert Drive, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 8562 Lambert Drive, Las Vegas, Nevada, are:

a. First Lien – CitiMortgage  - Loan Number – 0002525827-8

    i.      Secured Claim -    $138,423.56

    ii.     Unsecured Claim -    $0.00

b. Second Lien – BAC Home Loans Servicing – Loan Number – 156496473

    i.      Secured Claim  -    $0.00

13

ii.      Unsecured Claim -   $146,269.17

21.     That the secured and unsecured claims against the property located at 276 Manzanita Ranch Lane, Henderson, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 276 Manzanita Ranch Lane, Henderson, Nevada, are:

a.   First Lien – CitiMortgage  - Loan Number – 0002525553-0

   i.      Secured Claim -     $126,038.87

   ii.      Unsecured Claim -     $0.00

b.   Second Lien – Wells Fargo – Loan Number – 65065047357831998

   i.      Secured Claim  -     $9,172.80

   ii.      Unsecured Claim -     $134,827.20

22.     That the secured and unsecured claims against the property located at 2861 Marathon Drive, Henderson, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 2861 Marathon Drive, Henderson, Nevada, are:

a.   First Lien – CitiMortgage  - Loan Number – 0702460064-0

   i.      Secured Claim -     $101,274.22

   ii.      Unsecured Claim -     $0.00

b.   Second Lien – BAC Home Loans Servicing, LP – Loan Number – 154705549

   i.      Secured Claim  -     $0.00

   ii.      Unsecured Claim -     $114,363.00

14

23.     That the secured and unsecured claims against the property located at 5218 Misty Morning Drive, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 5218 Misty Morning Drive, Las Vegas, Nevada, are:

  a. First Lien – Fifth Third Bank  - Loan Number – 201746682

    i.      Secured Claim -        $141,640.60

    ii.     Unsecured Claim -      $27,573.99

  b. Second Lien – City National Bank – Loan Number – 1824409

    i.      Secured Claim -        $0.00

    ii.     Unsecured Claim -      $1,000,000.00

24.     That the secured and unsecured claims against the property located at 10317 Neopolitan Place, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 10317 Neopolitan Place, Las Vegas, Nevada, are:

  a. First Lien – BAC Home Loans Servicing, LP  - Loan Number – 74761662

    i.      Secured Claim -        $122,425.03

    ii.     Unsecured Claim -      $0.00

  b. Second Lien – BAC Home Loans Servicing, LP – Loan Number – 154705533

    i.      Secured Claim -        $0.00

    ii.     Unsecured Claim -      $117,081.00

25.     That the secured and unsecured claims against the property located at 956 Ostrich Fern Court, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and

15

the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to

11 U.S.C. § 506(a), and the total amounts of the claims against 956 Ostrich Fern Court, Las Vegas,

Nevada, are:

    a. First Lien – Litton Loan Servicing  - Loan Number – 19732460

        i.     Secured Claim -     $152,440.29

        ii.     Unsecured Claim -     $0.00

    b. Second Lien – Bank of America – Loan Number – 68189001609399

        i.     Secured Claim -     $0.00

        ii.     Unsecured Claim -     $102,022.20

    26.     That the secured and unsecured claims against the property located at 8216 Peaceful

Canyon Drive, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and

the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to

11 U.S.C. § 506(a), and the total amounts of the claims against 8216 Peaceful Canyon Drive, Las

Vegas, Nevada, are:

    a. First Lien – JP Morgan Chase Bank  - Loan Number – 5942618181

        i.     Secured Claim -     $86,994.02

        ii.     Unsecured Claim -     $0.00

    b. Second Lien – BAC Home Loans Servicing, LP – Loan Number – 154705557

        i.     Secured Claim -     $39,302.59

        ii.     Unsecured Claim -     $114,127.41

    27.     That the secured and unsecured claims against the property located at 6091

Pumpkin Patch Avenue, Las Vegas, Nevada, are bifurcated in accordance with that certain

stipulation between the parties and filed with this court on March 3, 2011 (Docket No. 907); and

the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to

16

11 U.S.C. § 506(a), and the total amounts of the claims against 6091 Pumpkin Patch Avenue, Las Vegas, Nevada, are:

    a.  First Lien – Chase Home Finance, LLC  - Loan Number – 1251107609

        i.      Secured Claim -    $108,307.50

        ii.     Unsecured Claim -   $0.00

    b.  Second Lien – Wells Fargo – Loan Number – 65065046945011998

        i.      Secured Claim -    $0.00

        ii.     Unsecured Claim -   $154,555.66

28.    That the secured and unsecured claims against the property located at 5709 Ridgetree Avenue, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 5709 Ridgetree Avenue, Las Vegas, Nevada, are:

    a.  First Lien – BAC Home Loans Servicing, LP  - Loan Number – 943813

        i.      Secured Claim -    $57,963.85

        ii.     Unsecured Claim -   $17,235.43

    b.  Second Lien – Deborah Drake

        i.      Secured Claim -    $0.00

        ii.     Unsecured Claim -   $155,000.00

29.    That the secured and unsecured claims against the property located at 5524 Rock Creek Lane, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 5524 Rock Creek Lane, Las Vegas, Nevada, are:

   a.  First Lien – Fidelity Bank  - Loan Number – 99010769

      i.      Secured Claim -     $83,380.18

      ii.     Unsecured Claim -   $0.00

   b.  Second Lien – Wells Fargo – Loan Number - 65065047320381998

      i.      Secured Claim -     $0.00

      ii.     Unsecured Claim -   $145,000.00

30.     That the secured and unsecured claims against the property located at 922 Saddle Horn Drive, Henderson, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 922 Saddle Horn Drive, Henderson, Nevada, are:

   a.  First Lien – CitiMortgage  - Loan Number – 0002415316-5

      i.      Secured Claim -     $96,734.23

      ii.     Unsecured Claim -   $0.00

   b.  Second Lien – Bank of America – Loan Number - 68189001224599

      i.      Secured Claim -     $0.00

      ii.     Unsecured Claim -   $100,000.00

31.     That the secured and unsecured claims against the property located at 5609 San Ardo Place, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 5609 San Ardo Place, Las Vegas, Nevada, are:

   a.  First Lien – CitiMortgage  - Loan Number – 00001535955-7

      i.      Secured Claim -     $100,573.39

18

        ii.      Unsecured Claim -    $0.00

  b.  Second Lien – U.S. Bank – Loan Number: 007-0176-529-098

        i.      Secured Claim  -    $0.00

        ii.      Unsecured Claim -    $48,600.00

  c.  Third Lien – Deborah Drake

        i.      Secured Claim -    $0.00

        ii.      Unsecured Claim -    $155,000.00

32.    That the secured and unsecured claims against the property located at 2704 Sattley Circle, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 2704 Sattley Circle, Las Vegas, Nevada, are:

  a.  First Lien – Maxine Llewellyn and Mel Elizer

        i.      Secured Claim -    $210,000.00

        ii.      Unsecured Claim -    $0.00

  b.  Second Lien – Wells Fargo – Loan Number - 83082507423330001

        i.      Secured Claim  -    $0.00

        ii.      Unsecured Claim -    $31,531.11

  c.  Third Lien – Bank of Nevada – Loan Number – 910016328

        i.      Secured Claim -    $0.00

        ii.      Unsecured Claim -    $510,000.00

33.    That the secured and unsecured claims against the property located at 9521 Sierra Summit Avenue, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims,"

pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 9521 Sierra Summit Avenue, Las Vegas, Nevada, are:

    a.  First Lien – BAC Home Loans Servicing, LP – Loan Number - 5266345

        i.      Secured Claim -     $103,824.33

        ii.     Unsecured Claim -   $0.00

    b.  Second Lien – BAC Home Loans Servicing, LP – Loan Number – 154705541

       Transferred to Green Tree Servicing – Loan Number: 89720808

        i.      Secured Claim  -    $0.00

        ii.     Unsecured Claim -   $151,713.00

34.     That the secured and unsecured claims against the property located at 1528 Splinter Rock Way, North Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 1528 Splinter Rock Way, North Las Vegas, Nevada, are:

    a.  First Lien – Wells Fargo – Loan Number - 3464851

        i.      Secured Claim -     $105,942.62

        ii.     Unsecured Claim -   $0.00

    b.  Second Lien – Bank of Nevada – Loan Number - 910016328

        i.      Secured Claim  -    $0.00

        ii.     Unsecured Claim -   $510,000.00

35.     That the secured and unsecured claims against the property located at 1194 Stormy Valley Road, Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to

11 U.S.C. § 506(a), and the total amounts of the claims against 1194 Stormy Valley Road, Las Vegas, Nevada, are:

    a.  First Lien – CitiMortgage– Loan Number – 0002411561-0

        i.      Secured Claim -    $107,161.54

        ii.     Unsecured Claim -   $0.00

    b.  Second Lien – Wells Fargo – Loan Number - 83765049832011998

        i.      Secured Claim -    $0.00

        ii.     Unsecured Claim -   $130,000.00

36.     That the secured and unsecured claims against the property located at 2290 Surrey Meadows Avenue, Henderson, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 2290 Surrey Meadows Avenue, Henderson, Nevada, are:

    a.  First Lien – CitiMortgage– Loan Number – 0002488054-4

        i.      Secured Claim -    $160,723.30

        ii.     Unsecured Claim -   $0.00

    b.  Second Lien – BAC Home Loans Servicing, LP – Loan Number – 154705565

       Transferred to Green Tree Servicing – Loan Number: 89741262

        i.      Secured Claim -    $0.00

        ii.     Unsecured Claim -   $168,075.00

37.     That the secured and unsecured claims against the property located at 2614 Sweet Leilani Avenue, North Las Vegas, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims,"

21

pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 2614 Sweet Leilani Avenue, North Las Vegas, Nevada, are:

    a.  First Lien – BAC Home Loans Servicing, LP – Loan Number – 100242287

        i.        Secured Claim -    $130,720.99

        ii.       Unsecured Claim -    $48,298.87

    b.  Second Lien – Jeff Sylvester

        i.        Secured Claim -    $0.00

        ii.       Unsecured Claim -    $72,000.00

38.    That the secured and unsecured claims against the property located at 2525 Via Di Autostrada, Henderson, Nevada, are bifurcated in accordance with agreement of the parties; and the creditors' wholly unsecured claims shall be treated as "general unsecured claims," pursuant to 11 U.S.C. § 506(a), and the total amounts of the claims against 2525 Via Di Autostrada, Henderson, Nevada, are:

    a.  First Lien – CitiMortgage – Loan Number – 002519792-2

        i.        Secured Claim -    $85,280.12

        ii.       Unsecured Claim -    $0.00

    b.  Second Lien – Homecomings Financial – Loan Number – 9125505

       Transferred to GMAC Mortgage – Loan Number: 7392714689

       Transferred to Specialized Loan Servicing – Loan Number: 1004257193

        i.        Secured Claim -    $0.00

        ii.       Unsecured Claim -    $141,800.00

39.    That the unsecured portions of the Lenders' claims be reclassified as general unsecured claims with other general unsecured creditors through the Debtors' Plan.

40.    That Lenders' secured rights and/or lien-holder rights in the Properties are hereby modified as set forth above, provided, however, all remaining terms of the mortgages and notes related to the Properties, except as expressly modified herein or in the Plan, shall remain the same.

**C.    Plan Implementation.**

41.    The Debtors are authorized to undertake or cause to be undertaken any and all acts and actions contemplated by the Plan or required to consummate and implement the provisions of the Plan, prior to, on and after the Effective Date, including without limitation, entering, executing, delivering, filing or recording any agreements, instruments or documents necessary to implement the Plan.  All such actions shall be deemed to have occurred and shall be in effect without any requirement or further action by the Debtors.

42.    Each federal, state, commonwealth, local, foreign or other governmental agency is hereby directed and authorized to accept any and all documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

**D.    Plan Distributions.**

43.    There were no objections to the Plan from creditors holding allowed unsecured claims.  In accordance with section 1129(a)(15) and as indicated on the record at the Hearing, the Debtors will not make any Plan payments to their unsecured creditors.

44.    In accordance with the Plan, all applications for payment of fees and reimbursement of expenses by professionals retained in these Chapter 11 cases as well as parties seeking compensation pursuant to section 503 of the Bankruptcy Code must be filed with the Court by the date that is no later than forty-five (45) days after the Confirmation Date (or, if such date is not a Business Day, by the next Business Day thereafter).  Any Person or entity that fails to file such an application or request on or before such date shall be forever barred from asserting such

23

Administrative Claim against the Debtors or their property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Claim. Applications for approval of professionals' fees not previously awarded during the pendency of the Chapter 11 cases may be included in such professional's final applications as set forth herein and in the Plan. Objections, if any, to fee Claims shall be filed and served not later than fourteen (14) business days prior to the date set by the Court for the hearing to consider such requests.

**E.     Executory Contracts and Leases.**

45.     As of the Confirmation Date, all executory contracts and unexpired leases of the Debtors shall be assumed or rejected, as set forth in the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code.

46.     Upon the Confirmation Date of the Plan, the Debtors shall provide notice of the rejection pursuant to the Plan of an executory contract or unexpired lease to any non-debtor parties. In the event the Plan otherwise is not consummated, the Debtors may modify or amend (including, without limitation, making additions and/or deletions) all rights of the Debtors to assume or reject its unexpired leases and executory contracts shall be reinstated to the date immediately prior to the date of this Order.

**F.     Taxes and Transfers.**

47.     The transfer of any asset under the Plan or this Order has been duly authorized, and when issued, as provided in the Plan, will be validly issued, fully paid and nonassessable.

48.     Creditors seeking to protect the validity, enforceability, perfection and priority of the liens and security interests granted and/or continued under the Plan may file financing statements, deeds of trust, mortgages or other documents and take any and all actions as they deem

24

appropriate, in their respective discretion, to confirm the perfection of such security interests and liens.

49.     Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and all appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

50.     All filing and recording officers are hereby directed to accept for filing or recording all instruments of transfer to be filed and recorded notwithstanding any contrary provision of applicable non-bankruptcy law.  This Court retains jurisdiction to enforce the foregoing direction, by contempt proceedings or otherwise.

**G.     Miscellaneous.**

51.     From and after the Confirmation Date, this Court shall retain and have exclusive jurisdiction over all matters arising out of these Chapter 11 cases pursuant to, and for purposes of, subsection 105(a) and section 1142 of the Bankruptcy Code, including without limitation, jurisdiction over the matters set forth in the Plan, which is incorporated herein by reference, as if set forth *in extenso*.

52.     Except as otherwise provided in the Plan and this Order, notice of all subsequent pleadings in these Chapter 11 cases shall be limited to counsel for the Debtors, the United States Trustee and any party known to be directly affected by the relief sought.

53.     Notwithstanding anything in the Plan or this Order to the contrary, the amount of any priority tax Claim for U.S. federal income taxes, if any, and the rights of the holder of such Claim, if any, to payment in respect thereof shall: (a) survive the Effective Date and consummation

of the Plan and be determined in the manner and by the administrative or judicial tribunal in which the amount of such Claim and the rights of the holder of such Claim would have been resolved or adjudicated if the Chapter 11 cases had not been commenced; and (b) not be discharged, impaired or adversely affected by the Plan.  In accordance with section 1124 of the Bankruptcy Code, the Plan shall leave unaltered the legal, equitable and contractual rights of a holder of such Claim.

54.     Failure specifically to include or reference particular sections or provisions of the Plan or any related agreement in this Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Court that the Plan be confirmed and such related agreements be approved in their entirety.

55.     All entities holding Claims against the Debtors that are treated under the Plan are hereby directed to execute, deliver, file or record any document, and to take any action necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan.

56.     In accordance with section 1142 of the Bankruptcy Code, the Debtors and any other entity designated pursuant to the Plan, are hereby authorized, empowered and directed to issue, execute, deliver, file and record any document, and to take any action necessary or appropriate to implement, consummate and otherwise effectuate the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents issued, executed and delivered by them as necessary or appropriate to implement or effectuate the transactions contemplated by the Plan and as set forth in the Plan.

57.     Any document related to the Plan that refers to a plan of reorganization of the Debtors, other than the Plan confirmed by this Order, shall be, and it hereby is, deemed to be

modified such that the reference to a plan of reorganization of the Debtors in such document shall mean the Plan confirmed by this Order, as appropriate.

58.    In the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in such agreement, instrument or document).  In the event of any inconsistency between the Plan or any agreement, instrument or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

59.    The provisions of this Order are integrated with each other and are non-severable and mutually dependent.

60.    This Order is a final order and the period in which an appeal must be filed shall commence immediately upon the entry hereof.

61.    If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other Court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors receipt of written notice of such order. Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

27

62.     The Plan shall be substantially consummated on the Confirmation Date because the

transactions described in the Plan shall have occurred or shall have been provided for.

Submitted by:

THE SCHWARTZ LAW FIRM, INC.

By: /s/ Samuel A. Schwartz
Samuel A. Schwartz, Esq., NBN 10985
701 E. Bridger Ave., Suite 120
Las Vegas, NV 89101
*Attorneys for Debtors*

28

**SUBMISSION TO COUNSEL FOR APPROVAL PURSUANT TO LR 9021**

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

_____ The court has waived the requirement set forth in LR 9021(b)(1).

_____ No party appeared at the hearing or filed an objection to the motion.

__X__ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order or failed to respond, as indicated below [list each party and whether the party has approved, disapproved or failed to respond to the document]:

_____ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of this order.

APPROVED:          Michael Chen, Esq.; Brittany Wood, Esq.; Ace Van Patten, Esq.

DISAPPROVED:

FAILED TO RESPOND:

Submitted by:

THE SCHWARTZ LAW FIRM, INC.

By: /s/ Samuel A. Schwartz
Samuel A. Schwartz, Esq., NBN 10985
701 E. Bridger Ave., Suite 120
Las Vegas, NV 89101
*Attorneys for Debtors*

# # #

29

# EXHIBIT A

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
The Schwartz Law Firm, Inc.
701 E. Bridger Avenue, Suite 120
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 385-2741
Attorneys for the Debtors

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | Case No. 09-29123-BAM |
| | ) | Chapter 11 |
| Melani Schulte and William R. Schulte, | ) | |
| | ) | Jointly Administered with: |
| | ) | |
| 2704 Sattley LLC, | ) | 09-27238-BAM |
| Hot Endeavor LLC, | ) | 09-27909-BAM |
| Cherish LLC, | ) | 09-28513-BAM |
| SABRECO Inc., | ) | 09-31584-BAM |
| Keep Safe LLC | ) | 09-31585-BAM |
| | ) | |
| Debtors. | ) | Confirmation Hearing Date: January 31, 2011 |
| | ) | Confirmation Hearing Time: 9:30 a.m. |
| | ) | |

## THIRD AMENDED JOINT PLAN OF REORGANIZATION OF
## MELANI SCHULTE AND WILLIAM R. SCHULTE

### ARTICLE I - SUMMARY

This Third Amended Joint Plan of Reorganization (the "**Plan**") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**") proposes to pay creditors of the above-captioned debtors and debtors-in-possession (the "**Debtors**") from the reorganization of their residential property and secured debt.

This Plan provides for 2 classes of secured claims and 3 classes of unsecured claims. Unsecured creditors holding allowed claims may receive distributions, if objections to the Plan are lodged under Section 1129(a)(15) of the Bankruptcy Code, which the Debtors have valued at approximately 4% of each creditor's allowed claim. If no objections are lodged, the Debtors may elect to make zero distributions to general unsecured creditors. This Plan also provides for the payment of administrative and priority claims in full on the effective date of this Plan, or as agreed by the holder of such administrative or priority claim.

All creditors should refer to Articles II through IV of this Plan for information regarding the precise treatment of their claims. A Fourth Amended Joint Disclosure Statement (the "**Disclosure Statement**") that provides more detailed information regarding this Plan and the rights of creditors was circulated with this Plan. Your rights may be affected. You should read these papers carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.

ARTICLE II - CLASSIFICATION AND TREATMENT OF CLAIMS

This Plan constitutes the Chapter 11 plan of reorganization of the Debtors. All Claims against the Debtors are placed in classes (each a "**Class**") as designated by Classes 1 through 5. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims and Priority Tax Claims.

The categories of Claims (as defined in the Bankruptcy Code, listed below classify Claims for all purposes, including, without limitation, voting, confirmation and distribution pursuant to this Plan sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim to be classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that any such Claim is allowed in that Class and has not been paid or otherwise settled prior to the effective date of the Plan as determined in paragraph 6.02 below.

**THE DEBTORS INTEND TO SEEK SUBSTANTIVE CONSOLIDATION IN CONNECTION WITH THE PAYMENT OF THE GENERAL UNSECURED CLAIMS AGAINST THEIR ESTATES THROUGH THE PLAN. IF SUCH SUBSTANTIVE CONSOLIDATION IS AUTHORIZED AND ORDERED BY THE COURT, CERTAIN ALLOWED CLAIMS OF THE DEBTORS OR THEIR ESTATES SHALL BE SATISFIED FROM THE COMBINED CASH AND OTHER PROPERTY OF THE DEBTORS AND THEIR COMBINED ESTATES. ALL ALLOWED SECURED CLAIMS IN CLASSES 1 AND 2 WILL RETAIN THEIR LIENS AND NOT BE ELIMINATED AS THE RESULT OF THE SUBSTANTIVE CONSOLIDATION.**

**Classification of Claims**

2.01    Class 1(a) – Secured Claim of America's Servicing Company

(a)    *Classification*: Class 1(a) consists of the Secured Claim of America's Servicing Company against the Debtors' property located at 509 Canyon Greens, Las Vegas, Nevada 89144, which is secured by a lien against the Debtors' residential property, loan number 1205043971.

(b)    *Treatment*: The holder of the allowed Class 1(a) Secured Claim shall be unimpaired and paid in full in accordance with the terms of its related note and mortgage.

(c) *Voting*: Class 1(a) is an unimpaired class, and the holder of the Class 1(a) claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of the Class 1(a) claim is not entitled to vote to accept or reject the Plan.

2.02    <u>Class 2(a) – Secured Claim of CitiMortgage</u>

(a) *Classification*: Class 2(a) consists of the Secured Claim of CitiMortgage against the Debtors' property located at 9500 Aspen Glow Drive, Las Vegas, Nevada 89134 which is secured by a lien against the Debtors' residential property, loan number 0577014851-7.

(b) *Treatment*: The holder of the allowed Class 2(a) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth in **Exhibit 1**, attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c) *Valuation*: The Class 2(a) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d) *Unsecured Portion of the Claim*: Any amount of a Class 2(a) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e) *Voting*: Class 2(a) is an impaired class, and the holder of the Class 2(a) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(b) – Secured Claim of City National Bank</u>

(a) *Classification*: Class 2(b) consists of the Secured Claim of City National Bank against the Debtors' property located at 9500 Aspen Glow Drive, Las Vegas, Nevada 89134, which is secured by a lien against the Debtors' residential property, loan number 1824409.

(b) *Treatment*: The holder of the allowed Class 2(b) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth in **Exhibit 1**, attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c) *Valuation*: The Class 2(b) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving

the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(b) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(b) is an impaired class, and the holder of the Class 2(b) claim is entitled to vote to accept or reject the Plan.

Class 2(c) –Secured Claim of Chase Home Finance

(a)     *Classification*: Class 2(c) consists of the Secured Claim of Chase Home Finance against the Debtors' property located at 2460 Avenida Cortes, Henderson, Nevada 89074, which is secured by a lien against the Debtors' residential property, loan number 8483094531.

(b)     *Treatment*: The holder of the allowed Class 2(c) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(c) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(c) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(c) is an impaired class, and the holder of the Class 2(c) claim is entitled to vote to accept or reject the Plan.

Class 2(d) –Secured Claim of Countywide Home Loans

(a)     *Classification*: Class 2(d) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 2460 Avenida Cortes, Henderson, Nevada 89074, which is secured by a lien against the Debtors' residential property, loan number 156496481.

(b)     *Treatment*: The holder of the allowed Class 2(d) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth in **Exhibit 1**, attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(d) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(d) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(d) is an impaired class, and the holder of the Class 2(d) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(e) –Secured Claim of Countrywide Home Loans</u>

(a)     *Classification*: Class 2(e) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 4710 Brently Place, Las Vegas, Nevada 89122, which is secured by a lien against the Debtors' residential property, loan number 86314260.

(b)     *Treatment*: The holder of the allowed Class 2(e) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(e) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(e) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(e) is an impaired class, and the holder of the Class 2(e) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(f) –Secured Claim of Chase Home Finance</u>

(a)     *Classification*: Class 2(f) consists of the Secured Claim of Chase Home Finance against the Debtors' property located at 7873 Bridgefield Lane, Las Vegas, Nevada 89147, which is secured by a lien against the Debtors' residential property, loan number 8483094549.

(b)     *Treatment*: The holder of the allowed Class 2(f) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(f) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(f) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(f) is an impaired class, and the holder of the Class 2(f) claim is entitled to vote to accept or reject the Plan.

Class 2(g) –Secured Claim of Bank of Nevada

(a)     *Classification*: Class 2(g) consists of the Secured Claim of Bank of Nevada against the Debtors' property located at 7873 Bridgefield Lane, Las Vegas, Nevada 89147, which is secured by a lien against the Debtors' residential property, loan number 910016328.

(b)     *Treatment*: The holder of the allowed Class 2(g) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(g) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(g) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(g) is an impaired class, and the holder of the Class 2(g) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(h) –Secured Claim of Countrywide Home Loans</u>

(a)  *Classification*: Class 2(h) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 3322 Cheltenham Street, Las Vegas, Nevada 89129, which is secured by a lien against the Debtors' residential property, loan number 84536650.

(b)  *Treatment*: The holder of the allowed Class 2(h) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)  *Valuation*: The Class 2(h) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)  *Unsecured Portion of the Claim*: Any amount of a Class 2(h) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)  *Voting*: Class 2(h) is an impaired class, and the holder of the Class 2(h) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(i) –Secured Claim of Countrywide Home Loans</u>

(a)  *Classification*: Class 2(i) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 3383 Cloverdale Court, Las Vegas, Nevada 89117, which is secured by a lien against the Debtors' residential property, loan number 85885825.

(b)  *Treatment*: The holder of the allowed Class 2(i) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)  *Valuation*: The Class 2(i) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)  *Unsecured Portion of the Claim*: Any amount of a Class 2(i) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(i) is an impaired class, and the holder of the Class 2(i) claim is entitled to vote to accept or reject the Plan.

Class 2(j) –Secured Claim of CitiMortgage, Inc.

(a)     *Classification*: Class 2(j) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 1624 Desert Canyon Court, Las Vegas, Nevada 89128 which is secured by a lien against the Debtors' residential property, loan number 0011954829-5.

(b)     *Treatment*: The holder of the allowed Class 2(j) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(j) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(j) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(j) is an impaired class, and the holder of the Class 2(j) claim is entitled to vote to accept or reject the Plan.

Class 2(k) –Secured Claim of Bank of Nevada

(a)     *Classification*: Class 2(k) consists of the Secured Claim of Bank of Nevada against the Debtors' property located at 1624 Desert Canyon Court, Las Vegas, Nevada 89128 which is secured by a lien against the Debtors' residential property, loan number 910016328.

(b)     *Treatment*: The holder of the allowed Class 2(k) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(k) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(k) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(k) is an impaired class, and the holder of the Class 2(k) claim is entitled to vote to accept or reject the Plan.

Class 2(l) –Secured Claim of Countrywide Home Loans

(a)     *Classification*: Class 2(l) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 3729 Discovery Creek Avenue, North Las Vegas, Nevada 89031, which is secured by a lien against the Debtors' residential property, loan number 101427028.

(b)     *Treatment*: The holder of the allowed Class 2(l) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(l) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(l) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(l) is an impaired class, and the holder of the Class 2(l) claim is entitled to vote to accept or reject the Plan.

Class 2(m) –Secured Claim of Litton Loan Servicing

(a)     *Classification*: Class 2(m) consists of the Secured Claim of Litton Loan Servicing against the Debtors' property located at 1392 Echo Falls Avenue, Las Vegas, Nevada 89183, which is secured by a lien against the Debtors' residential property, loan number 19732478.

(b)     *Treatment*: The holder of the allowed Class 2(m) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(m) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property

as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)   *Unsecured Portion of the Claim*: Any amount of a Class 2(m) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)   *Voting*: Class 2(m) is an impaired class, and the holder of the Class 2(m) claim is entitled to vote to accept or reject the Plan.

Class 2(n) –Secured Claim of Countrywide Home Loans

(a)   *Classification*: Class 2(n) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 1701 Empire Mine Drive, Henderson, Nevada 89014, which is secured by a lien against the Debtors' residential property, loan number 85885841.

(b)   *Treatment*: The holder of the allowed Class 2(n) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)   *Valuation*: The Class 2(n) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)   *Unsecured Portion of the Claim*: Any amount of a Class 2(n) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)   *Voting*: Class 2(n) is an impaired class, and the holder of the Class 2(n) claim is entitled to vote to accept or reject the Plan.

Class 2(o) –Secured Claim of Chase Home Finance

(a)   *Classification*: Class 2(o) consists of the Secured Claim of Chase Home Finance against the Debtors' property located at 9020 Feather River Court, Las Vegas, Nevada 89117, which is secured by a lien against the Debtors' residential property, loan number 8483094523.

(b)   *Treatment*: The holder of the allowed Class 2(o) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(o) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(o) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(o) is an impaired class, and the holder of the Class 2(o) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(p) –Secured Claim of Countrywide Home Loans</u>

(a)    *Classification*: Class 2(p) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 9020 Feather River Court, Las Vegas, Nevada 89117, which is secured by a lien against the Debtors' residential property, loan number 156496465.

(b)    *Treatment*: The holder of the allowed Class 2(p) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(p) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(p) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(p) is an impaired class, and the holder of the Class 2(p) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(q) –Secured Claim of CitiMortgage, Inc.</u>

(a)    *Classification*: Class 2(q) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 1013 Golden Hawk Way, Las Vegas, Nevada 89108, which is secured by a lien against the Debtors' residential property, loan number 0616443148-5.

(b)     *Treatment*: The holder of the allowed Class 2(q) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(q) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(q) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(q) is an impaired class, and the holder of the Class 2(q) claim is entitled to vote to accept or reject the Plan.

Class 2(r) –Secured Claim of CitiMortgage, Inc.

(a)     *Classification*: Class 2(r) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 4521 W. La Madre Way, North Las Vegas, Nevada 89031, which is secured by a lien against the Debtors' residential property, loan number 0011951495-8.

(b)     *Treatment*: The holder of the allowed Class 2(r) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(r) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(r) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(r) is an impaired class, and the holder of the Class 2(r) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(s) –Secured Claim of CitiMortgage, Inc.</u>

(a)   *Classification*: Class 2(s) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 8562 Lambert Drive, Las Vegas, Nevada 89147, which is secured by a lien against the Debtors' residential property, loan number 0002525827-8.

(b)   *Treatment*: The holder of the allowed Class 2(s) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)   *Valuation*: The Class 2(s) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)   *Unsecured Portion of the Claim*: Any amount of a Class 2(s) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)   *Voting*: Class 2(s) is an impaired class, and the holder of the Class 2(s) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(t) –Secured Claim of CitiMortgage, Inc.</u>

(a)   *Classification*: Class 2(t) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 276 Manzanita Ranch Lane, Henderson, Nevada 89052 which is secured by a lien against the Debtors' residential property, loan number 0002525553-0.

(b)   *Treatment*: The holder of the allowed Class 2(t) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)   *Valuation*: The Class 2(t) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)   *Unsecured Portion of the Claim*: Any amount of a Class 2(t) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)  *Voting*: Class 2(t) is an impaired class, and the holder of the Class 2(t) claim is entitled to vote to accept or reject the Plan.

Class 2(u) –Secured Claim of CitiMortgage, Inc.

(a)  *Classification*: Class 2(u) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 2861 Marathon Drive, Henderson, Nevada 89074, which is secured by a lien against the Debtors' residential property, loan number 0702460064-0.

(b)  *Treatment*: The holder of the allowed Class 2(u) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)  *Valuation*: The Class 2(r) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)  *Unsecured Portion of the Claim*: Any amount of a Class 2(u) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)  *Voting*: Class 2(u) is an impaired class, and the holder of the Class 2(u) claim is entitled to vote to accept or reject the Plan.

Class 2(v) –Secured Claim of Fifth Third Bank

(a)  *Classification*: Class 2(v) consists of the Secured Claim of Fifth Third Bank against the Debtors' property located at 5218 Misty Morning Drive, Las Vegas, Nevada 89118, which is secured by a lien against the Debtors' residential property, loan number 0201746682.

(b)  *Treatment*: The holder of the allowed Class 2(v) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)  *Valuation*: The Class 2(v) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(v) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(v) is an impaired class, and the holder of the Class 2(v) claim is entitled to vote to accept or reject the Plan.

Class 2(w) –Secured Claim of Countrywide Home Loans

(a)    *Classification*: Class 2(w) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 10317 Neopolitan Place, Las Vegas, Nevada 89144 which is secured by a lien against the Debtors' residential property, loan number 74761662.

(b)    *Treatment*: The holder of the allowed Class 2(w) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(w) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(w) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(w) is an impaired class, and the holder of the Class 2(w) claim is entitled to vote to accept or reject the Plan.

Class 2(x) –Secured Claim of Litton Loan Servicing

(a)    *Classification*: Class 2(x) consists of the Secured Claim of Litton Loan Servicing against the Debtors' property located at 956 Ostrich Fern Court, Las Vegas, Nevada 89183, which is secured by a lien against the Debtors' residential property, loan number 19732460.

(b)    *Treatment*: The holder of the allowed Class 2(x) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(x) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property

as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(x) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(x) is an impaired class, and the holder of the Class 2(x) claim is entitled to vote to accept or reject the Plan.

Class 2(y) –Secured Claim of Chase Home Finance

(a)    *Classification*: Class 2(y) consists of the Secured Claim of Chase Home Finance against the Debtors' property located at 8216 Peaceful Canyon Drive, Las Vegas, Nevada 89128, which is secured by a lien against the Debtors' residential property, loan number 5942618181.

(b)    *Treatment*: The holder of the allowed Class 2(y) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(y) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(y) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(y) is an impaired class, and the holder of the Class 2(y) claim is entitled to vote to accept or reject the Plan.

Class 2(z) –Secured Claim of Countrywide Home Loans

(a)    *Classification*: Class 2(z) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 8216 Peaceful Canyon Drive, Las Vegas, Nevada 89128, which is secured by a lien against the Debtors' residential property, loan number 154705557.

(b)    *Treatment*: The holder of the allowed Class 2(z) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(z) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(z) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(z) is an impaired class, and the holder of the Class 2(z) claim is entitled to vote to accept or reject the Plan.

Class 2(aa) –Secured Claim of Chase Manhattan Mortgage

(a)     *Classification*: Class 2(aa) consists of the Secured Claim of Chase Manhattan Mortgage against the Debtors' property located at 6091 Pumpkin Patch Avenue, Las Vegas, Nevada 89142, which is secured by a lien against the Debtors' residential property, loan number 001251107609.

(b)     *Treatment*: The holder of the allowed Class 2(aa) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over the remaining loan term, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(aa) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(aa) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(aa) is an impaired class, and the holder of the Class 2(aa) claim is entitled to vote to accept or reject the Plan.

Class 2(bb) –Secured Claim of Countrywide Home Loans

(a)     *Classification*: Class 2(bb) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 5709 Ridgetree Avenue, Las Vegas, Nevada 89107, which is secured by a lien against the Debtors' residential property, loan number 943813.

(b)    *Treatment*: The holder of the allowed Class 2(bb) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(bb) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(bb) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(bb) is an impaired class, and the holder of the Class 2(bb) claim is entitled to vote to accept or reject the Plan.

Class 2(cc) –Secured Claim of Fidelity Bank

(a)    *Classification*: Class 2(cc) consists of the Secured Claim of Fidelity Bank against the Debtors' property located at 5524 Rock Creek Lane, Las Vegas, Nevada 89130, which is secured by a lien against the Debtors' residential property, loan number 0099010769.

(b)    *Treatment*: The holder of the allowed Class 2(cc) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(cc) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(cc) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(cc) is an impaired class, and the holder of the Class 2(cc) claim is entitled to vote to accept or reject the Plan.

Class 2(dd) –Secured Claim of CitiMortgage, Inc.

(a)     *Classification*: Class 2(dd) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 922 Saddle Horn Drive, Henderson, Nevada 89002, which is secured by a lien against the Debtors' residential property, loan number 0002415316-5.

(b)     *Treatment*: The holder of the allowed Class 2(dd) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(dd) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(dd) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(dd) is an impaired class, and the holder of the Class 2(dd) claim is entitled to vote to accept or reject the Plan.

Class 2(ee) –Secured Claim of CitiMortgage, Inc.

(a)     *Classification*: Class 2(ee) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 5609 San Ardo Place, Las Vegas, Nevada 89130, which is secured by a lien against the Debtors' residential property, loan number 00001535955-7.

(b)     *Treatment*: The holder of the allowed Class 2(ee) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(ee) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(ee) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(ee) is an impaired class, and the holder of the Class 2(ee) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(ff) –Secured Claim of Maxine Llewellyn and Mel Elizer</u>

(a)    *Classification*: Class 2(ff) consists of the Secured Claim of Maxine Llewellyn and Mel Elizer against the Debtors' property located at 2704 Sattley Circle, Las Vegas, Nevada 89117, which is secured by a lien against the Debtors' residential property.

(b)    *Treatment*: The holder of the allowed Class 2(ff) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, payable in monthly installments of $700.00, over a period of 5 years, with a balloon payment of the amount of its claim after the five-year period.

(c)    *Valuation*: The Class 2(ff) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)    *Unsecured Portion of the Claim*: Any amount of a Class 2(ff) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)    *Voting*: Class 2(ff) is an impaired class, and the holder of the Class 2(ff) claim is entitled to vote to accept or reject the Plan.

<u>Class 2(gg) –Secured Claim of Countrywide Home Loans</u>

(a)    *Classification*: Class 2(gg) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 9521 Sierra Summit Avenue, Las Vegas, Nevada 89134, which is secured by a lien against the Debtors' residential property, loan number 005266345.

(b)    *Treatment*: The holder of the allowed Class 2(gg) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)    *Valuation*: The Class 2(gg) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(gg) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(gg) is an impaired class, and the holder of the Class 2(gg) claim is entitled to vote to accept or reject the Plan.

Class 2(hh) –Secured Claim of Wells Fargo Home Mortgage

(a)     *Classification*: Class 2(hh) consists of the Secured Claim of Wells Fargo Home Mortgage against the Debtors' property located at 1528 Splinter Rock Way, North Las Vegas, Nevada 89031, which is secured by a lien against the Debtors' residential property, loan number 3464851.

(b)     *Treatment*: The holder of the allowed Class 2(hh) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(hh) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan.  The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(hh) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(hh) is an impaired class, and the holder of the Class 2(hh) claim is entitled to vote to accept or reject the Plan.

Class 2(ii) –Secured Claim of CitiMortgage, Inc.

(a)     *Classification*: Class 2(ii) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 1194 Stormy Valley Road, Las Vegas, Nevada 89123, which is secured by a lien against the Debtors' residential property, loan number 0002411561-0.

(b)     *Treatment*: The holder of the allowed Class 2(ii) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(ii) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property

as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(ii) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(ii) is an impaired class, and the holder of the Class 2(ii) claim is entitled to vote to accept or reject the Plan.

Class 2(jj) –Secured Claim of CitiMortgage, Inc.

(a)     *Classification*: Class 2(jj) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 2290 Surrey Meadows Avenue, Henderson, Nevada 89052, which is secured by a lien against the Debtors' residential property, loan number 0002488054-4.

(b)     *Treatment*: The holder of the allowed Class 2(jj) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)     *Valuation*: The Class 2(jj) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)     *Unsecured Portion of the Claim*: Any amount of a Class 2(jj) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)     *Voting*: Class 2(jj) is an impaired class, and the holder of the Class 2(jj) claim is entitled to vote to accept or reject the Plan.

Class 2(kk) –Secured Claim of Countrywide Home Loans

(a)     *Classification*: Class 2(kk) consists of the Secured Claim of Countrywide Home Loans against the Debtors' property located at 2614 Sweet Leilani Avenue, North Las Vegas, Nevada 89031, which is secured by a lien against the Debtors' residential property, loan number 100242287.

(b)     *Treatment*: The holder of the allowed Class 2(kk) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c) *Valuation*: The Class 2(kk) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d) *Unsecured Portion of the Claim*: Any amount of a Class 2(kk) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e) *Voting*: Class 2(kk) is an impaired class, and the holder of the Class 2(kk) claim is entitled to vote to accept or reject the Plan.

Class 2(ll) –Secured Claim of CitiMortgage, Inc.

(a) *Classification*: Class 2(ll) consists of the Secured Claim of CitiMortgage, Inc. against the Debtors' property located at 2525 Via Di Autostrada, Henderson, Nevada 89074, which is secured by a lien against the Debtors' residential property, loan number 0002519792-2.

(b) *Treatment*: The holder of the allowed Class 2(ll) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5.25% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c) *Valuation*: The Class 2(ll) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d) *Unsecured Portion of the Claim*: Any amount of a Class 2(ll) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e) *Voting*: Class 2(ll) is an impaired class, and the holder of the Class 2(ll) claim is entitled to vote to accept or reject the Plan.

Class 2(mm) –Secured Claim of Wells Fargo Bank, N.A.

(a) *Classification*: Class 2(mm) consists of the Secured Claim of Wells Fargo Bank, N.A. against the Debtors' property located at 276 Manzanita Ranch Lane, Henderson, Nevada 89012, which is secured by a lien against the Debtors' residential property, loan number 65065047357831998.

(b)   *Treatment*: The holder of the allowed Class 2(mm) Secured Claim shall be impaired and paid the allowed amount of its claim as set forth on **Exhibit 1** attached hereto, amortized at 5% over 30 years, and in accordance with all other terms of its related note and mortgage.

(c)   *Valuation*: The Class 2(mm) Secured Claim shall be revalued on the effective date of this Plan, pursuant to sections 1123 and 506 of the Bankruptcy Code, in accordance with the appraised value of such property as set forth on **Exhibit 1** of the Plan. The confirmation order approving the Plan shall set forth the values of each secured creditors first lien claim as of the effective date of the Plan.

(d)   *Unsecured Portion of the Claim*: Any amount of a Class 2(mm) claim that is deemed to be unsecured in accordance with section (c) above shall be afforded the treatment set forth in Class 5 below.

(e)   *Voting*: Class 2(mm) is an impaired class, and the holder of the Class 2(mm) claim is entitled to vote to accept or reject the Plan.

2.03    Class 3 – Priority Claims

(a)   *Classification*: Class 3 consists of the Priority Claims against the Debtors.

(b)   *Treatment*: The legal, equitable and contractual rights of the holders of allowed Class 3 Claims are unaltered. Except to the extent that a holder of an allowed Class 3 claim has been paid by the Debtors prior to the effective date of this Plan or otherwise agrees to different treatment, each holder of an allowed Class 3 Claim shall receive, in full and final satisfaction of such allowed Class 3 claim, payment in full in cash on or as soon as reasonably practicable after (i) the effective date of the Plan, (ii) the date such allowed Class 3 claim becomes allowed or (iii) such other date as may be ordered by the Bankruptcy Court.

(c)   *Voting*: Class 3 is an unimpaired Class, and is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Class 3 claims are not entitled to vote to accept or reject the Plan.

2.04    Class 4 – Convenience Claims

(a)   *Classification:* Class 4 consists of Convenience Claims in an amount under $1,000.00 each against the Debtors in accordance with section 1122(b) of the Bankruptcy Code.

(b)   *Treatment:* The legal, equitable and contractual rights of the holders of allowed Class 4 claims are unaltered. Except to the extent that a holder of an allowed Class 4 claim has been paid by the Debtors prior to the effective date of this Plan or otherwise agrees to different treatment, each

Page | 24

holder of an allowed Class 4 claim shall receive, in full and final satisfaction of such allowed Class 4 claim, payment in full in cash on or as soon as reasonably practicable after (i) the effective date of the Plan, (ii) the date such allowed Class 4 claim becomes allowed or (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting:* Class 4 is an unimpaired class, and the holders of Class 4 claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Class 4 claims are not entitled to vote to accept or reject the Plan.

2.05    Class 5 - General Unsecured Claims

(a)     *Classification:* Class 5 consists of General Unsecured Claims against the Debtors, which includes the unsecured portion of the Debtors' first and second lien holders' claims.

(b)     *Treatment:* Holders of allowed General Unsecured Claims shall receive, in full and final satisfaction of such allowed Class 5 claims, their pro rata share of the Debtors' monthly plan payments, which the Debtors estimate to be 4% of such creditor's claim.

(c)     *Voting:* Class 5 is an impaired Class, and holders of Class 5 claims are entitled to vote to accept or reject the Plan.

ARTICLE III

TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS.
U.S. TRUSTEES FEES AND PRIORITY TAX CLAIMS

3.01    Unclassified Claims. In accordance with section 1123(a)(1) of the Bankruptcy Code, administrative expense claims, and priority tax claims are not in classes.

3.02    Administrative Expense Claims. Each holder of an administrative expense claim allowed under Section 503 of the Bankruptcy Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtors.

3.03    Priority Tax Claims. Each holder of a priority tax claim will be paid in full on the effective date of this Plan, or with respect to the Internal Revenue Service, as agreed upon among the parties.

3.04    United States Trustee Fees. All fees required to be paid by 28 U.S.C. § 1930 will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the effective date of this Plan will be paid on the effective date.

ARTICLE IV
PROVISIONS FOR EXECUTORY CONTRACTS, UNEXPIRED LEASES AND
DISPOSITION OF VACANT LAND

4.01    Assumed Executory Contracts and Unexpired Leases.

(a) The Debtors shall assume, on the effective date of this Plan, the executory contracts and unexpired leases listed on **Exhibit 2** attached hereto.  Listed on **Exhibit 2** is also the Debtors' estimated cure amount, if any, necessary to assume such contract in accordance with Section 365 of the Bankruptcy Code.

(b) The Debtors will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under section 4.01(a) above.  A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

(c) The confirmation order shall constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the effective date of this Plan.  The Debtors reserve the right to amend **Exhibit 2** at any time before the effective date.

(d) Any objection by a party to an executory contract or unexpired lease to the Debtors' proposed assumption or any related cure amount set forth on **Exhibit 2** must be filed, served and actually received by the Debtors at least seven (7) days prior to the confirmation hearing of this Plan. Any party to an executory contract or unexpired lease that fails to object timely to the proposed cure amount will be deemed to have consented to such assignment of its executory contract or unexpired lease.  The confirmation order shall constitute an order of the Bankruptcy Court approving any proposed assignments of executory contracts or unexpired leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

(e) In the event of a dispute regarding (i) the amount of any cure payment, (ii) the ability of the Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assigned or (iii) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a final order or orders resolving the dispute and approving the assumption.  If an objection to a cure amount is sustained by the Bankruptcy Court, the Debtors at their sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming and assigning it.

ARTICLE V - MEANS FOR IMPLEMENTATION OF THE PLAN

5.01    Source of Payments.  If an objection to the Plan is lodged under Section 1129(a)(15) of the Bankruptcy Code, the Debtors' Payments and distributions under the Plan will be funded by the Debtors, based upon their (a) projected monthly rental income and (b) personal income.  The Liquidation Analysis attached the Disclosure Statement as **Exhibit C**, outlines the Debtors' sources and uses of income.  The Debtors' monthly Plan payment shall be four thousand dollars

($4,000.00). If no objections are lodged to the Plan, the Debtors may make no distributions to general unsecured creditors.

5.02    Method of Plan Payments

(a)    On or about the effective date of the Plan, to the extent necessary, the Debtors shall retain Cynthia Bitaut of Baxter Distribution Services, LLP, 2655 Box Canyon Drive #190, Las Vegas, Nevada 89128 as their disbursement agent (the "**Disbursement Agent**"). Except as otherwise provided in the Plan, upon the first full month after the entry of the order confirming the Plan, the Debtors shall begin making monthly distributions to the Disbursement Agent under the Plan. The Disbursement Agent shall begin, as soon as practical, making pro rata payments to the Debtors' unsecured creditors holding allowed claims, on a quarterly basis, until such claims are paid as set forth in the Plan.

(b)    Except as otherwise provided in the Plan, or upon the entry of a final, non-appealable order of the Bankruptcy Court, or as agreed to by the relevant parties, distributions under the Plan on account of a disputed claim that becomes an allowed claim after the effective date of the Plan shall be begin on the regular quarterly payment date, as established by the Disbursement Agent, which is at least thirty (30) days after such claim becomes an allowed claim.

(c)    Notwithstanding anything in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a disputed claim until all such disputes in connection with such disputed claim have been resolved by settlement among the parties or a final order of the Bankruptcy Court. In the event that there are disputed claims requiring adjudication and resolution, the Disbursement Agent shall establish appropriate reserves for potential payment of such Claims.

(d)    In no event, however, shall the Disbursement Agent be held liable for any failures of the Debtors to make any of their payments required under the Plan. If any holders of allowed claims against the Debtors' estate fail to receive payment in accordance with the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all matters related to the implementation of this Plan and the payments required hereunder.

(e)    The Disbursement Agent shall be authorized to retain attorneys, if necessary, to object to proofs of claim, pay administrative expenses and collect a reasonable fee for administering the Debtors' post-confirmation estate from the Debtors' plan payments.

5.03    The Holding Company. On or after the effective date of the Plan, the Debtors shall transfer title to their properties to a Nevada limited liability company (the "**Holding Company**"), for liability purposes. The transfer shall not limit the Debtors' personal liability to their Class 1 creditors or their obligations to make payments under this Plan.

5.04    Post-confirmation Management. The Debtors will manage their properties post-petition in the ordinary course, which will include the assumption and continued operation under all partnership agreements, as well as the debt service obligations thereunder. They will be authorized to enter into, terminate and renew lease agreements as they see fit. Such activities will include retaining management companies to aid in the renting of their property, drafting and

serving eviction notices, negotiating loan modifications or refinancing their properties, repairing the properties and maintaining a reserve account of up to one month's mortgage payments, or $10,000.00, whichever is greater.  In addition, the Debtors will be authorized to transfer the properties to the Holding Company to limit their liability from claims arising from their rental business (such as injuries occurring at the homes) after the date of confirmation.

5.05    Liquidation and Abandonment of Certain Debtor Entities.  Pursuant to Sections 363 and 554 of the Bankruptcy Code, the Debtors may abandon or liquidate Cherish LLC, Keep Safe LLC, 2704 Sattley LLC and Hot Endeavor, LLC (the "**Abandoned Entities**"), as all properties owned by those entities will be transferred back to the Debtors Melani and William R. Schulte, personally.  Therefore, the order confirming the Plan will constitute the Bankruptcy Court's finding and determination that the abandonment or liquidation of the Abandoned Entities is (1) in the best interests of the Debtors, their estates and parties in interest, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved pursuant to section 363 and 554 of the Bankruptcy Code and Bankruptcy Rule 9019.

5.06    Post-confirmation Payment.  The post-confirmation payment of the claims of allowed general unsecured creditors in the Debtors' cases shall be jointly administered.  Accordingly, the Debtors will pay their combined creditor pool through the continued joint administration of their estates post-confirmation, in order to maximize the distributions to unsecured creditors and avoid the related costs of paying their joint creditors separately for 5 years.  The order confirming the Plan shall direct the foregoing administration of the Debtors' post-confirmation estates.

5.07    Substantive Consolidation.  The filing of the Plan shall constitute a motion for an order of the Bankruptcy Court approving, and the Confirmation Order shall constitute the Bankruptcy Court's approval of, substantive consolidation of the payment of the general unsecured claims against the reorganized Debtors' estates, specifically the estates of Melani and William R. Schulte and SABRECO, Inc. (collectively, the "**Reorganized Debtors**").  On the effective date of the Plan, pursuant to Section 105(a) of the Bankruptcy Code, the Reorganized Debtors' estates shall be substantively consolidated solely for the purposes related to the Plan (including voting and distributions to general unsecured creditors). The substantive consolidation of the Reorganized Debtors' estates shall have the following effects:

(a)    All assets of the Reorganized Debtors' estates shall be treated as though they were assets of a single consolidated estate for purposes of distributions under the Plan;

(b)    Each and every claim scheduled, filed, to be filed, or deemed to have been filed in these Chapter 11 cases against either Reorganized Debtor shall be deemed scheduled or filed against a single consolidated Estate; and

(c)    No distributions shall be made under the Plan on account of claims among the Reorganized Debtors, and any and all liability on account of such claims between the Reorganized Debtors shall be deemed satisfied and discharged upon confirmation.

Notwithstanding the foregoing, on or after the effective date of the Plan, the Reorganized Debtors may take such actions as are necessary to complete a merger with or dissolution of any of the Reorganized Debtors' assets under applicable law.

**ALL ALLOWED SECURED CLAIMS IN CLASSES 1 AND 2 WILL RETAIN THEIR LIENS, SHALL BE PAID AS SET FORTH IN CLASSES 1 AND 2, AND NOT BE ELIMINATED AS THE RESULT OF THE SUBSTANTIVE CONSOLIDATION.**

ARTICLE VI
GENERAL PROVISIONS

6.01    Definitions and Rules of Construction.  The definitions and rules of construction set forth in Sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

6.02    Effective Date of Plan.  The effective date of this Plan is the eleventh business day following the date of the entry of the confirmation order.  But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

6.03    Modification of Plan.

The Debtors may modify the Plan at any time before confirmation of the Plan.  The Court, however, may require a new Disclosure Statement and/or re-voting on the Plan.  The Debtors may also seek to modify the Plan at any time after confirmation only if (A) the Plan has not been substantially consummated and (B) the Court authorizes the proposed modifications after notice and a hearing.

Upon request of the Debtors, the Plan may be modified at any time after confirmation of the Plan, but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take on accounting of any payment of a claim made other than under the Plan.

Effective as of the date hereof and subject to the limitations and rights contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the confirmation order; and (b) after the entry of the confirmation order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; provided, however, that any modification to the Plan shall not affect the rights or treatment of holders of unsecured claims.

6.04    Final Decree.  Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of bankruptcy Procedure, the Debtors, or such other party as the Court shall designate in the Plan confirmation order, shall file a motion with the Court to obtain a final

decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

6.05    Vesting of Assets in the Reorganized Debtors and the Holding Company. After confirmation of the Plan, all property of the Debtors shall vest in the reorganized Debtors and the Holding Company, free and clear of all liens, claims, charges or other encumbrances, except those enumerated in Section 6.06, the order approving the Motion to Value and the confirmation order. The reorganized Debtors may operate their business and may use, acquire or dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the confirmation order. Without limiting the foregoing, the Debtors shall pay the charges that incur after confirmation for professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of professional fee applications) without application to the Bankruptcy Court.

6.06    Release of Liens, Claims and Equity Interests. Except as otherwise provided herein or in the following sentence or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, upon confirmation, all liens, claims, mortgages, deeds of trust, or other security interests against the property of the Debtors' estate shall be fully released and discharged. The existing liens and lien rights of those lenders holding claims in Class 1 and Class 2 are expressly preserved under the Plan, and their existing liens shall ride through and remain attached to any and all underlying collateral in any transfer of property expressly set forth in, or contemplated by, the Plan. To the extent any provision in this Plan or the Confirmation Order can be read to contradict the express preservation of lien rights in this provision, this provision controls.

6.07    Certificate of Incorporation and Bylaws. The articles of organization and bylaws (or other formation documents) of the Holding Company shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code or as otherwise required by, and in a form reasonably acceptable to, the Debtors. On or as soon as reasonably practicable after confirmation of the Plan, the reorganized Debtors shall file a new certificate of organization with the Nevada secretary of state, as required by section 1123(a)(6) of the Bankruptcy Code.

6.08    Effectuating Documents; Further Transactions. The Debtors may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

6.09    Exemption from Certain Transfer Taxes. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the confirmation order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

6.10    Revocation of Plan. The Debtors reserve the right to revoke or withdraw the Plan prior to the confirmation hearing and to file subsequent Chapter 11 plans. If the Debtors revoke or

withdraw the Plan, or if confirmation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, the Debtors or any other entity; (b) prejudice in any manner the rights of the Debtors or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other entity.

6.11    Successors and Assigns.    The rights, benefits and obligations of any entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

6.12    Reservation of Rights.    Except as expressly set forth herein, the Plan shall have no force or effect until the Court enters the confirmation order.    Neither the filing of the Plan, any statement or provision contained in the Disclosure Statement, nor the taking of any action by a Debtors or any other entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtors with respect to the holders of claims or other entity; or (2) any holder of a Claim or other entity prior to the effective date of the Plan. The Debtors expressly reserve all rights to pursue any claims they may hold against their mortgage lenders or against any other entity prior to or after the effective date of the Plan.

6.13    Further Assurances.    The Debtors or the reorganized Debtors, as applicable, all holders of Claims receiving distributions under the Plan and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the confirmation order.

6.14    Severability.    If, prior to confirmation of the Plan, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, *provided* that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtors, and, to the extent such alteration or interpretation affects the rights or treatment of holders of unsecured claims, such claim holder.

6.15    Return of Security Deposits.    Unless the Debtors agree otherwise in a written agreement or stipulation approved by the Court, all security deposits provided by the Debtors to any person or entity at any time after the petition date shall be returned to the Debtors within twenty (20) days after the date of confirmation, without deduction or offset of any kind.

6.16    Filing of Additional Documents.    On or before the Effective Date, the Debtors may file with the Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

6.17    <u>Captions</u>.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

ARTICLE VII
DISCHARGE

**7.01 Discharge.**  Confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments to unsecured creditors under this Plan, if the Debtors elect to make such payments, which is 5 years or 20 quarterly payments, or as otherwise provided in § 1141(d)(5) of the Code.  The Debtors will not be discharged from any debt excepted from discharge under § 523 of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

Dated:  November 23, 2010

Respectfully submitted,

MELANI SCHULTE

/s/ Melani Schulte


WILLIAM R. SCHULTE

/s/ William R. Schulte

# EXHIBIT 1

## Exhibit 1

**Residential Property Owned by Melani and William R. Schulte         .**

9500 Aspen Glow Drive
Las Vegas, Nevada 89134
Value:                                    $142,500.00


2460 Avenida Cortes
Henderson, Nevada 89074
Value:                                    $123,000.00


4710 Brently Place
Las Vegas, Nevada 89122
Value:                                    $109,105.70


7873 Bridgefield Lane
Las Vegas, Nevada 89147
Value:                                    $126,000.00


3322 Cheltenham Street
Las Vegas, Nevada 89129
Value:                                    $99,806.60


3383 Cloverdale Court
Las Vegas, Nevada 89117
Value:                                    $168,856.34


1624 Desert Canyon Court
Las Vegas, Nevada 89128
Value:                                    $168,000.00


3729 Discovery Creek Avenue
North Las Vegas, Nevada 89031
Value:                                    $125,446.93


1392 Echo Falls Avenue
Las Vegas, Nevada 89183
Value:                                    $132,000.00


1701 Empire Mine Drive
Henderson, Nevada 89014
Value:                                    $80,000.00

9020 Feather River Court
Las Vegas, Nevada 89117
Value:                                    $135,000.00

1013 Golden Hawk Way
Las Vegas, Nevada 89108
Value:                                     $94,000.00

4521 W. La Madre Way
Las Vegas, Nevada 89031
Value:                                    $100,000.00

8562 Lambert Drive
Las Vegas, Nevada 89147
Value:                                    $148,000.00

276 Manzanita Ranch Lane
Henderson, Nevada 89012
Value:                                    $162,000.00

2861 Marathon Drive
Henderson, Nevada 89074
Value:                                    $125,000.00

5218 Misty Morning Drive
Las Vegas, Nevada 89118
Value:                                    $138,000.00

10317 Neopolitan Place
Las Vegas, Nevada 89144
Value:                                    $140,000.00

956 Ostrich Fern Court
Las Vegas, Nevada 89183
Value:                                    $152,440.29

8216 Peaceful Canyon Drive
Las Vegas, Nevada 89128
Value:                                    $143,000.00

6091 Pumpkin Patch Avenue
Las Vegas, Nevada 89142
Value:                                    $108,307.50

5709 Ridgetree Avenue
Las Vegas, Nevada 89107
Value:                                          $57,963.85

5524 Rock Creek Lane
Las Vegas, Nevada 89130
Value:                                          $100,000.00

922 Saddle Horn Drive
Henderson, Nevada 89002
Value:                                          $114,000.00

5609 San Ardo Place
Las Vegas, Nevada 89130
Value:                                          $115,000.00

2704 Sattley Circle
Las Vegas, Nevada 89117
Value:                                          $210,000.00

9521 Sierra Summit Avenue
Las Vegas, Nevada 89134
Value:                                          $135,000.00

1528 Splinter Rock Way
Las Vegas, Nevada 89031
Value:                                          $112,000.00

1194 Stormy Valley Road
Las Vegas, Nevada 89123
Value:                                          $127,000.00

2290 Surrey Meadows Avenue
Las Vegas, Nevada 89130
Value:                                          $195,000.00

2614 Sweet Leilani Avenue
North Las Vegas, Nevada 89131
Value:                                          $130,720.99

2525 Via Di Autostrada
Henderson, Nevada 89074
Value:                                          $125,000.00

509 Canyon Greens
Las Vegas, Nevada 89144
Value:                                    $807,141.58


**Total Appraised Value:**          **$4,949,289.78**

# EXHIBIT 2

## EXHIBIT 2

Melani Schulte and William R. Schulte Leases and Executory Contracts to be Assumed Pursuant to the Plan

Residential Lease Agreements

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Luther and Rita Cobbs for the rental of:
9500 Aspen Glow Drive
Las Vegas, Nevada 89134

Standard Residential Lease Agreement dated June 27, 2008 between the Debtors and Shireen McGrath for the rental of:
2460 Avenida Cortes
Henderson, Nevada 89074

Standard Residential Lease Agreement dated February 18, 2005 between the Debtors and Evelyn and Richard Deschamps for the rental of:
4710 Brently Place
Las Vegas, Nevada 89122

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Antonio & Linda Reina for the rental of:
7873 Bridgefield Lane
Las Vegas, Nevada 89147

Standard Residential Lease Agreement dated May 27, 2008 between the Debtors and William Hallman for the rental of:
3322 Cheltenham Street
Las Vegas, Nevada 89129

Standard Residential Lease Agreement dated March 7, 2010 between the Debtors and Nikheel Arnold Prasad for the rental of:
3383 Cloverdale Court
Las Vegas, Nevada 89117

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Ryan Mack & Lorraine Acevedo for the rental of:
1624 Desert Canyon Court
Las Vegas, Nevada 89128

Standard Residential Lease Agreement dated June 27, 2005 between the Debtors and Tyler Taylor for the rental of:
3729 Discovery Creek Avenue
North Las Vegas, Nevada 89031

Standard Residential Lease Agreement dated June 12, 2004 between the Debtors and Shaun Powell, Nicholas Hurd and Chad Jordan for the rental of:
1392 Echo Falls Avenue
Las Vegas, Nevada 89183

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Roly Agreda for the rental of:
1701 Empire Mine Drive
Henderson, Nevada 89014

Standard Residential Lease Agreement dated June 17, 2007 between the Debtors and James and Judy Craig for the rental of:
9020 Feather River Court
Las Vegas, Nevada 89117

Standard Residential Lease Agreement dated December 1, 2010 between the Debtors and Arni Flenoy for the rental of:
1013 Golden Hawk Way
Las Vegas, Nevada 89108

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Linda Marrone for the rental of:
4521 W. La Madre Way
Las Vegas, Nevada 89031

Standard Residential Lease Agreement dated March 19, 2009 between the Debtors and Be Ngoc Dong and Tran Kim for the rental of:
8562 Lambert Drive
Las Vegas, Nevada 89147

Standard Residential Lease Agreement dated March 27, 2010 between the Debtors and Xeomara Ramos for the rental of:
276 Manzanita Ranch Lane
Henderson, Nevada 89012

Standard Residential Lease Agreement dated March 17, 2007 between the Debtors and Benjamin Tranquillo and Nicole Carpenter for the rental of:
2861 Marathon Drive
Henderson, Nevada 89074

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Earl Humphrey for the rental of:
5218 Misty Morning Drive
Las Vegas, Nevada 89118

Standard Residential Lease Agreement dated May 14, 2010 between the Debtors and Rosemary Karnay and Daniel Shaefer for the rental of:
10317 Neopolitan Place
Las Vegas, Nevada 89144

Standard Residential Lease Agreement dated September 1, 2007 between the Debtors and Clint Fisher for the rental of:
956 Ostrich Fern Court
Las Vegas, Nevada 89183

Standard Residential Lease Agreement dated April 30, 2001 between the Debtors and James Earl and Lisa Hammond for the rental of:
8216 Peaceful Canyon Drive
Las Vegas, Nevada 89128

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Darrin and Jody Miller for the rental of:
6091 Pumpkin Patch Avenue
Las Vegas, Nevada 89142

Standard Residential Lease Agreement dated February 1, 2010 between the Debtors and Donald and Bonnie Lee for the rental of:
5709 Ridgetree Avenue
Las Vegas, Nevada 89107

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Charles Gallo for the rental of:
5524 Rock Creek Lane
Las Vegas, Nevada 89130

Standard Residential Lease Agreement dated October 1, 2009 between the Debtors and Richard and Mary Gordon for the rental of:
922 Saddle Horn Drive
Henderson, Nevada 89002

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and J. Richard Stull for the rental of:
5609 San Ardo Place
Las Vegas, Nevada 89130

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Devin Marrin for the rental of:
2704 Sattley Circle
Las Vegas, Nevada 89117

Standard Residential Lease Agreement dated August 27, 2009 between the Debtors and Lyla and Phillip Dwyer for the rental of:
9521 Sierra Summit Avenue
Las Vegas, Nevada 89134

Standard Residential Lease Agreement dated April 27, 2010 between the Debtors and Karen Yos for the rental of:
1528 Splinter Rock Way
Las Vegas, Nevada 89031

Standard Residential Lease Agreement dated July 27, 2009 between the Debtors and Donna Hanna and Kenneth Wade for the rental of:
1194 Stormy Valley Road
Las Vegas, Nevada 89123

Standard Residential Lease Agreement dated April 27, 2007 between the Debtors and William Lundy and Theresa Orden for the rental of:
2290 Surrey Meadows Avenue
Las Vegas, Nevada 89130

Standard Residential Lease Agreement dated January 4, 2007 between the Debtors and Tyler Taylor for the rental of:
2614 Sweet Leilani Avenue
North Las Vegas, Nevada 89131

Standard Residential Lease Agreement dated June 1, 2010 between the Debtors and Brian Hobbs for the rental of:
2525 Via Di Autostrada
Henderson, Nevada 89074

## Residential Mortgages

Residential Mortgage by and between the Debtors and America's Servicing Company for the purchase of:
509 Canyon Greens
Las Vegas, Nevada 89144
Cure Amount:                          $ 0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
9500 Aspen Glow Drive
Las Vegas, Nevada 89134
Cure Amount:                          $0.00

Residential Mortgage by and between Debtors and Chase Home Finance for the purchase of:
2460 Avenida Cortes
Henderson, Nevada 89074
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Loans for the purchase of:
4710 Brently Place
Las Vegas, Nevada 89122
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and Chase Home Finance for the purchase of:
7873 Bridgefield Lane
Las Vegas, Nevada 89147
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
3322 Cheltenham Street
Las Vegas, Nevada 89129
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
3383 Cloverdale Court
Las Vegas, Nevada 89117
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
1624 Desert Canyon Court
Las Vegas, Nevada 89128
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
3729 Discovery Creek Avenue
North Las Vegas, Nevada 89031
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and Litton Loan Servicing for the purchase of:
1392 Echo Falls Avenue
Las Vegas, Nevada 89183
Cure Amount:                          $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
1701 Empire Mine Drive
Henderson, Nevada 89014
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and Chase Home Finance for the purchase of:
9020 Feather River Court
Las Vegas, Nevada 89117
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
1013 Golden Hawk Way
Las Vegas, Nevada 89108
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
4521 W. La Madre Way
Las Vegas, Nevada 89031
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
8562 Lambert Drive
Las Vegas, Nevada 89147
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
276 Manzanita Ranch Lane
Henderson, Nevada 89012
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
2861 Marathon Drive
Henderson, Nevada 89074
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and Fifth Third Bank for the purchase of:
5218 Misty Morning Drive
Las Vegas, Nevada 89118
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
10317 Neopolitan Place
Las Vegas, Nevada 89144
Cure Amount:                              $0.00

Residential Mortgage by and between the Debtors and Litton Loan for the purchase of:
956 Ostrich Fern Court
Las Vegas, Nevada 89183
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and Chase Home Finance for the purchase of:
8216 Peaceful Canyon Drive
Las Vegas, Nevada 89128
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and Chase Manhattan Mortgage for the purchase of:
6091 Pumpkin Patch Avenue
Las Vegas, Nevada 89142
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
5709 Ridgetree Avenue
Las Vegas, Nevada 89107
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and Fidelity Bank for the purchase of:
5524 Rock Creek Lane
Las Vegas, Nevada 89130
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
922 Saddle Horn Drive
Henderson, Nevada 89002
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
5609 San Ardo Place
Las Vegas, Nevada 89130
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and Mel Elizer and Maxine Llewellyn for the purchase of:
2704 Sattley Circle
Las Vegas, Nevada 89117
Cure Amount:                        $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
9521 Sierra Summit Avenue
Las Vegas, Nevada 89134
Cure Amount:                               $0.00

Residential Mortgage by and between the Debtors and Wells Fargo Home Mortgage for the purchase of:
1528 Splinter Rock Way
Las Vegas, Nevada 89031
Cure Amount:                               $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
1194 Stormy Valley Road
Las Vegas, Nevada 89123
Cure Amount:                               $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
2290 Surrey Meadows Avenue
Las Vegas, Nevada 89130
Cure Amount:                               $0.00

Residential Mortgage by and between the Debtors and Countrywide Home Lending for the purchase of:
2614 Sweet Leilani Avenue
North Las Vegas, Nevada 89131
Cure Amount:                               $0.00

Residential Mortgage by and between the Debtors and CitiMortgage for the purchase of:
2525 Via Di Autostrada
Henderson, Nevada 89074
Cure Amount:                               $0.00

# EXHIBIT 8

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief



**WELLS FARGO HOME MORTGAGE**

## Customer Account Activity Statement
### Loan # 708 - 0553930145
### SCHULTE

Page 1 of 11

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/01/05 | | | | | | | | | | $942,857.54 | -$3,050.01 | $0.00 | $0.00 | $0.00 | Beginning Total/Balances |
| 01/13/05 | | Jan-05 | $15,569.44 | $3,600.17 | $4,910.72 | $1,888.83 | | | | $941,957.37 | -$1,161.18 | $0.00 | $0.00 | $0.00 | Funds Received |
| 01/13/05 | | Feb-05 | $1,005.36 | | $4,905.51 | $1,888.83 | | | | $940,951.99 | $571.65 | $0.00 | $0.00 | $0.00 | Additional Payment Made from Funds Received 01/13/06 |
| 01/13/05 | | | $89,000.00 | $89,000.00 | | | | | | $851,951.99 | $571.65 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 02/10/05 | | | | -$0.01 | | | | | | $851,951.98 | $571.64 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 02/22/05 | | Mar-05 | $2,799.72 | $1,041.87 | $4,869.02 | $1,888.83 | | | | $850,910.12 | $2,460.47 | $0.00 | $0.00 | $0.00 | Funds Received |
| 02/22/05 | | | $2,000.00 | $2,000.00 | | | | | | $848,910.12 | $2,460.47 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 02/26/05 | | | | | | -$3,288.42 | | | | $848,910.12 | -$857.95 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 03/17/05 | | | | | | -$3,765.00 | | | | $848,910.12 | -$4,622.95 | $0.00 | $0.00 | $0.00 | Hazard Insurance Disbursement |
| 04/21/05 | | Apr-05 | $2,799.72 | $1,057.71 | $4,853.18 | $1,888.83 | | | | $850,782.41 | -$2,714.12 | $0.00 | $0.00 | $0.00 | Funds Received |
| 04/21/05 | | | $2,000.00 | $2,000.00 | | | | | | $828,782.41 | -$2,714.12 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 04/21/05 | | May-05 | $2,799.72 | $1,073.84 | $4,837.05 | $1,888.83 | | | | $827,678.17 | -$825.29 | $0.00 | $0.00 | $0.00 | Funds Received |
| 04/21/05 | | | $7,200.28 | $7,200.28 | | | | | | $820,478.49 | -$825.29 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 06/09/05 | Jun-06 | | $9,625.01 | $1,116.73 | $4,794.18 | $2,714.12 | | | | $919,361.76 | -$1,888.83 | $0.00 | $0.00 | $0.00 | Funds Received |
| 06/07/05 | | | $1,374.69 | $1,374.69 | | | | | | $917,086.77 | -$1,888.83 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 06/07/05 | | | $1,129.71 | $1,129.71 | | $1,888.83 | | | | $916,957.06 | $3,777.66 | $0.00 | $0.00 | $0.00 | Funds Received |
| 06/09/05 | | | $2,200.28 | $2,200.28 | | | | | | $914,656.78 | $3,777.66 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 06/07/05 | | | $2,200.28 | $2,200.28 | | $1,888.83 | | | | $914,656.78 | $3,777.66 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 07/07/05 | Jul-05 | | -$2,200.26 | | | | $2,200.26 | | | $416,957.06 | $3,777.66 | $2,200.26 | $0.00 | $0.00 | Payment Reversal |
| 07/07/05 | | | -$4,791.18 | | | | $7,799.72 | | | $417,086.77 | $10,000.00 | $10,000.00 | $0.00 | $0.00 | Payment Reversal |
| 07/07/05 | | | -$1,374.69 | | | | $1,374.69 | | | $918,361.76 | $11,374.69 | $11,374.69 | $0.00 | $0.00 | Payment Reversal |
| 07/07/05 | | | -$2,714.12 | | | | $9,625.01 | | | $920,478.49 | -$528.29 | $35,000.00 | $0.00 | $0.00 | Payment Reversal |
| 07/07/05 | | | -$1,116.73 | | | | | | | $916,927.47 | $1,060.94 | $120,000.00 | $0.00 | $0.00 | Funds Applied from Unapplied Funds |
| 07/07/05 | | Jun-05 | $1,134.01 | | $4,776.99 | $1,888.83 | -$7,799.72 | | | $915,827.19 | $2,950.37 | $13,200.28 | $0.00 | $0.00 | Unapplied Funds Used for Principal Reduction |
| 07/07/05 | | | $2,200.28 | | | | -$2,200.26 | | | $913,627.19 | $4,641.20 | $10,000.00 | $0.00 | $0.00 | Unapplied Funds Used for Principal Reduction |
| 07/07/05 | Aug-05 | | $1,151.37 | | $4,758.92 | $1,888.83 | | | | $912,675.82 | $4,641.20 | $0.00 | $0.00 | $0.00 | Funds Received |
| 08/09/05 | | | $2,800.28 | $2,800.28 | | | | | | $909,875.54 | $4,641.20 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 09/09/05 | Sep-05 | | | | | -$3,397.37 | | | | $909,875.54 | $1,443.83 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 08/17/05 | | | $7,799.72 | $1,171.95 | $4,738.93 | $1,888.83 | | | | $909,875.54 | $3,332.66 | $0.00 | $0.00 | $0.00 | Funds Received |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.


**WELLS FARGO HOME MORTGAGE**

## Customer Account Activity Statement
### Loan # 708 - 0533930145
### SCHULTE

Page 2 of 11

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/17/05 | 09/17/05 | | $2,200.28 | $2,200.28 | | | | | | $905,503.30 | $3,332.86 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 09/05/05 | 09/17/05 | Oct-05 | $7,789.72 | $11,069.52 | $4,721.37 | $1,898.83 | | | | $903,313.76 | $5,271.49 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/05/05 | 09/05/05 | | $5,400.38 | $5,400.38 | | | | | | $899,913.60 | $5,221.49 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 08/22/05 | 08/22/05 | | | | | -$3,387.37 | | | | $889,913.60 | $1,824.12 | $0.00 | $0.00 | $0.00 | Special Assessment Tax Disbursement |
| 08/22/05 | 08/22/05 | | | | | -$643.29 | | | | $899,913.60 | $1,180.83 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 10/07/05 | 10/05/05 | Nov-05 | $7,789.72 | $1,223.84 | $4,887.05 | $1,668.85 | | | | $896,689.36 | $3,069.68 | $0.00 | $0.00 | $0.00 | Funds Received |
| 10/05/05 | 10/05/05 | | $2,700.28 | $2,700.28 | | | | | | $895,465.52 | $3,069.68 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 11/07/05 | 11/07/05 | Dec-05 | $7,789.72 | $1,244.28 | $4,886.61 | $1,668.85 | | | | $898,745.10 | $4,908.49 | $0.00 | $0.00 | $0.00 | Funds Received |
| 11/07/05 | 11/07/05 | | $2,700.28 | $2,700.28 | | | | | | $892,044.82 | $4,908.49 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 12/12/05 | 12/12/05 | | | | | -$3,387.37 | | | | $892,044.82 | $1,961.12 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 12/12/05 | 12/12/05 | Jan-06 | $7,698.34 | $1,264.82 | $4,848.07 | $1,885.45 | | | | $890,780.00 | $3,246.57 | $0.00 | $0.00 | $0.00 | Funds Received |
| 12/27/05 | 12/27/05 | | $2,303.66 | $2,303.66 | | | | | | $887,876.34 | $3,246.57 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 01/20/06 | 01/20/06 | Feb-06 | $7,698.34 | $1,286.53 | $4,924.36 | $1,885.45 | | | | $884,598.81 | $4,930.02 | $0.00 | $0.00 | $0.00 | Funds Received |
| 01/20/06 | 01/20/06 | | $2,303.66 | $2,303.66 | | | | | | $883,686.15 | $4,930.02 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 02/20/06 | 02/20/06 | Mar-06 | $7,698.34 | $1,308.30 | $4,602.53 | $1,885.45 | | | | $882,377.79 | $6,817.47 | $0.00 | $0.00 | $0.00 | Funds Received |
| 02/20/06 | 02/20/06 | | $2,303.66 | $2,303.66 | | | | | | $879,474.13 | $6,817.47 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 02/20/06 | | | | | | -$4,469.00 | | | | $879,474.13 | $2,348.47 | $0.00 | $0.00 | $0.00 | Funds Received |
| 02/20/06 | | | | | | -$3,397.37 | | | | $879,474.13 | $3,329.10 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 03/20/06 | | | | | | | | | | $879,474.13 | -$1,249.90 | $0.00 | $0.00 | $0.00 | Hazard Insurance Disbursement |
| 03/24/05 | Apr-06 | | $7,699.34 | $1,330.30 | $4,599.09 | $1,885.45 | | | | $878,145.93 | $438.80 | $0.00 | $0.00 | $0.00 | Funds Received |
| 03/24/05 | | | $2,303.66 | $2,303.66 | | | | | | $876,240.17 | $438.80 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 03/24/05 | | | $2,303.66 | $2,303.66 | | | | | | $873,897.82 | $438.80 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 04/24/06 | May-06 | | $7,698.34 | $1,352.30 | $4,658.54 | $1,685.45 | | | | $873,897.82 | $2,122.00 | $0.00 | $0.00 | $0.00 | Funds Received |
| 04/24/06 | | | $2,303.66 | $2,303.66 | | | | | | $870,984.18 | $2,122.00 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 04/24/06 | Jun-06 | | $7,698.34 | $1,374.51 | $4,638.30 | $1,830.45 | | | | $869,609.65 | $3,807.45 | $0.00 | $0.00 | $0.00 | Funds Received |
| 05/09/06 | | | $2,303.66 | $2,303.66 | | | | | | $898,705.69 | $3,807.45 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 05/09/06 | Jul-06 | | $7,698.34 | $1,396.80 | $4,614.00 | $1,685.45 | | | | $866,309.19 | $5,492.90 | $0.00 | $0.00 | $0.00 | Funds Received |
| 05/09/06 | | | $2,303.66 | $2,303.66 | | | | | | $882,405.53 | $5,492.90 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 06/09/06 | | | $299.00 | | | $299.00 | | | | $862,405.53 | $35,781.90 | $0.00 | $0.00 | $0.00 | Hazard Insurance Refund |
| 07/24/06 | Aug-06 | | $7,596.34 | $1,418.19 | $4,491.70 | $1,685.45 | | | | $860,985.34 | $7,417.35 | $0.00 | $0.00 | $0.00 | Funds Received |
| 07/24/06 | | | $303.66 | $303.66 | | | | | | $860,462.89 | $7,417.35 | $0.00 | $0.00 | $0.00 | Principal Reduction |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



**Customer Account Activity Statement**
**Loan # 708 - 0533930145**
**SCHULTE**

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/09/06 | | | | | | -$3,596.18 | | | | $860,482.66 | $3,261.17 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 09/15/06 | | | | | | -$833.89 | | | | $860,482.66 | $3,247.48 | $0.00 | $0.00 | $0.00 | Special Assessment Tax Disbursement |
| 09/21/06 | Sep-06 | | $7,595.34 | $1,429.21 | $4,481.88 | $1,665.66 | | | | $859,053.47 | $4,932.03 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/21/06 | | | $700.86 | $203.86 | | | | | | $858,549.61 | $4,932.03 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 08/18/06 | Oct-06 | | $7,595.34 | $1,439.88 | $4,471.80 | $1,685.66 | | | | $857,110.53 | $89,518.36 | $0.00 | $0.00 | $0.00 | Funds Received |
| 08/21/06 | | | $403.86 | $403.86 | | | | | | $856,706.87 | $86,618.36 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 08/18/06 | | | | | | -$3,596.19 | | | | $856,706.87 | $83,022.19 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 08/18/06 | | | | | $4,492.01 | $1,665.45 | | | | $856,257.69 | $4,707.64 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/25/06 | Nov-06 | | $7,595.34 | $11,446.88 | | | | | | $856,706.87 | $4,707.64 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/25/06 | | | $403.86 | $403.86 | | | | | | $856,484.33 | $4,707.64 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 07/25/06 | | | | | | -$3,596.19 | | | | $856,484.33 | $4,707.64 | $0.00 | $0.00 | $0.00 | Principal Reduction |
| 10/25/06 | | | $8,000.00 | $8,000.00 | | | -$8,000.00 | | | $848,484.33 | $4,707.64 | $8,000.00 | $0.00 | $0.00 | Unapplied Funds Used for Principal Reduction |
| 10/25/06 | | | | | | | -$8,000.00 | | | $848,454.33 | $1,111.45 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 12/30/06 | | | | | | | $8,000.00 | | | $848,454.33 | $1,111.45 | $8,000.00 | $0.00 | $0.00 | Late Charge Assessed |
| 12/31/06 | | | -$8,000.00 | | | | | | | $854,484.33 | $1,111.45 | $0.00 | $0.00 | $0.00 | Payment Reversal |
| 12/31/06 | | | | | | | -$7,681.83 | | -$295.54 | $854,484.33 | $2,782.30 | $8,000.00 | $285.54 | $0.00 | Funds Applied from Unapplied Funds |
| 12/31/06 | | | $1,468.52 | $4,482.37 | $1,670.94 | | -$7,681.83 | $295.54 | | $853,388.81 | $2,782.30 | $415.17 | $285.54 | $0.00 | Late Charge Waived |
| 12/19/06 | | | $416.17 | | | | -$416.17 | | | $852,877.84 | $82,782.30 | $0.00 | $0.00 | $0.00 | Unapplied Funds Used for Principal Reduction |
| 12/19/06 | | | | | | | -$416.17 | | | $851,506.34 | $4,493.33 | $416.17 | $0.00 | $0.00 | Funds Received |
| 01/15/07 | Jan-07 | | $1,468.30 | $1,442.69 | $1,870.94 | | -$3,596.19 | | | $851,506.34 | $867.14 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 01/12/07 | | | | | | | -$834.48 | | | $851,506.34 | $772.66 | $0.00 | $0.00 | $0.00 | Special Assessment Tax Disbursement |
| 02/01/07 | | | | $1,670.94 | | | -$834.48 | | | $851,889.80 | $220.06 | $0.00 | $0.00 | $0.00 | Funds Received |
| 02/01/07 | Feb-07 | | $7,591.83 | $1,475.90 | $4,434.94 | $1,670.94 | | | | $851,889.80 | $1,727.60 | $0.00 | $0.00 | $0.00 | Hazard Insurance Disbursement |
| 02/15/07 | | | | | | -$921.00 | | | | $850,033.36 | $1,727.60 | $0.00 | $0.00 | $0.00 | Hazard Insurance Disbursement |
| 02/15/07 | | | | | | -$4,864.00 | | | | $850,033.36 | -$3,281.40 | $0.00 | $0.00 | $0.00 | Late Charge Disbursement |
| 03/06/07 | | | | | | | -$296.54 | | | $850,033.36 | -$3,281.40 | $0.00 | $0.00 | $0.00 | Late Charge Assessed |
| 03/19/07 | Mar-07 | | $7,591.83 | $4,427.26 | $1,670.94 | | -$296.54 | | | $850,033.36 | -$3,281.40 | $295.54 | $0.00 | $0.00 | Special Assessment Tax Disbursement |
| 03/19/07 | | | $1,483.83 | | | | | | | $848,549.78 | $1,570.48 | $0.00 | $285.54 | $0.00 | Funds Received |
| 04/19/07 | | | | | | $295.54 | | | | $848,549.78 | -$1,820.46 | $0.00 | $0.00 | $0.00 | Late Charge Waived |
| 03/20/07 | Apr-07 | | $1,491.36 | $4,416.52 | $1,670.94 | | | | | $847,058.40 | $60.46 | $0.00 | $0.00 | $0.00 | Funds Received |
| 04/16/07 | May-07 | | $7,591.83 | $1,496.13 | $4,411.79 | $1,670.94 | | | | $845,568.27 | $1,721.42 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/14/07 | Jun-07 | | $7,591.83 | $1,508.94 | $4,403.85 | $1,670.94 | | | | $844,052.33 | $3,392.36 | $0.00 | $0.00 | $0.00 | Funds Received |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of the loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



## Customer Account Activity Statement
### Loan # 708 - 0533930145
### SCHULTE

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/06/07 | 08/06/07 | Jul-07 | $7,561.83 | $1,514.78 | $4,396.11 | $1,970.94 | | | | $842,537.05 | $5,063.30 | $0.00 | $0.00 | $0.00 | Funds Received |
| 08/14/07 | | | | | | -$3,939.60 | | | | $842,537.05 | $1,063.31 | $0.00 | $0.00 | $0.00 | Hazard Insurance Disbursement |
| 08/16/07 | | | | | | $1,970.94 | | | | $841,014.88 | $3,034.25 | $0.00 | $0.00 | $0.00 | Funds Received |
| 08/16/07 | 08/16/07 | Aug-07 | $7,561.83 | $1,522.67 | $4,388.22 | $1,970.94 | | | | $841,014.88 | -$469.83 | $0.00 | $0.00 | $0.00 | Funds Received |
| 08/20/07 | | | | | | -$3,704.08 | | | | $841,014.88 | -$4,173.91 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 09/10/07 | | | | | | -$831.77 | | | | $841,014.88 | $835.44 | $0.00 | $0.00 | $0.00 | Special Assessment Tax Disbursement |
| 09/17/07 | 09/17/07 | Sep-07 | $7,561.83 | $1,530.60 | $4,360.29 | $1,970.94 | | | | $839,484.28 | $835.44 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/31/07 | 09/31/07 | Oct-07 | $7,561.83 | $1,535.59 | $4,372.31 | $1,970.94 | | | | $837,948.70 | $2,210.38 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/14/07 | | | | | | -$3,704.07 | | | | $837,948.70 | -$1,463.78 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 10/01/07 | 10/01/07 | Nov-07 | $7,537.85 | $1,545.90 | $4,364.30 | $1,627.66 | | | | $836,398.11 | $135.27 | $0.00 | $0.00 | $0.00 | Funds Received |
| 11/12/07 | 11/08/07 | | | | | $1,827.66 | | | | $835,309.11 | $139.27 | $0.00 | $0.00 | $0.00 | Funds Received |
| 11/13/07 | 11/08/07 | Dec-07 | $7,537.85 | $1,564.84 | $4,358.26 | $1,627.00 | | | | $834,946.47 | $1,780.53 | $0.00 | $0.00 | $0.00 | Funds Received |
| 12/10/07 | 12/10/07 | | | | | -$7,857.85 | | | | $834,946.47 | $1,780.53 | $0.00 | $0.00 | $0.00 | Funds Received |
| 12/10/07 | | | | | | -$372.14 | | | | $834,946.47 | $1,843.74 | $0.00 | $0.00 | $0.00 | Funds Applied from Unapplied Funds |
| 12/10/07 | | | | | | -$4,710.90 | | | | $834,946.47 | -$1,843.74 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 12/11/07 | | | $372.14 | | | $372.14 | $372.14 | | | $834,946.47 | $372.14 | $372.14 | $0.00 | $0.00 | Funds Received |
| 12/11/07 | | | | | | -$372.14 | -$372.14 | | | $834,946.47 | $1,911.60 | $0.00 | $0.00 | $0.00 | Funds Applied from Unapplied Funds |
| 01/11/08 | 01/11/08 | Jan-08 | $7,872.87 | $1,887.24 | $4,023.60 | $1,961.98 | | | | $833,351.73 | $3,963.58 | $0.00 | $0.00 | $0.00 | Funds Received |
| 01/14/08 | 01/14/08 | Feb-08 | $7,872.87 | $1,882.74 | $4,348.15 | $1,961.98 | | | | $833,351.73 | $360.38 | $0.00 | $0.00 | $0.00 | Funds Received |
| 01/29/08 | 01/29/08 | | | $15,710.98 | $4,340.01 | -$827.35 | | | | $831,740.85 | $135.23 | $0.00 | $0.00 | $0.00 | Special Assessment Tax Disbursement |
| 02/05/08 | | | | | | $1,627.66 | | | | $831,740.85 | $1,780.53 | $0.00 | $0.00 | $0.00 | Funds Received |
| 02/19/08 | | | | | | -$827.35 | -$7,857.85 | | | $831,710.85 | $1,726.01 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 03/03/08 | | | | | | -$3,704.07 | $372.14 | | | $831,710.85 | $1,978.06 | $0.00 | $0.00 | $0.00 | Funds Received |
| 03/10/08 | 03/10/08 | | | | | -$4,710.90 | | | | $831,710.85 | -$85,669.00 | $0.00 | $0.00 | $0.00 | Hazard Insurance Disbursement |
| 03/20/08 | | | $8.89 | | | $9.89 | | | | $830,151.79 | -$84,736.00 | $0.00 | $0.00 | $0.00 | Hazard Insurance Refund |
| 03/28/08 | Mar-08 | | $7,872.87 | $1,579.06 | $1,961.98 | $1,961.98 | | | | $830,151.79 | -$84,773.07 | $0.00 | $0.00 | $0.00 | Funds Received |
| 04/14/08 | Apr-08 | | $7,872.87 | $1,887.29 | $4,323.60 | $1,961.98 | | | | $830,151.79 | -$82,131.79 | $0.00 | $0.00 | $0.00 | Hazard Insurance Refund |
| 04/14/08 | May-08 | | $7,872.87 | $1,585.55 | $4,315.34 | $1,961.98 | | | | $828,544.60 | -$812.12 | $0.00 | $0.00 | $0.00 | Funds Received |
| 06/13/08 | Jun-08 | | $7,872.87 | $1,603.88 | $4,307.00 | $1,961.98 | | | | $826,949.98 | $1,149.80 | $0.00 | $0.00 | $0.00 | Funds Received |
| 07/16/08 | Jul-08 | | $7,872.87 | $1,612.22 | $4,298.67 | $1,961.98 | | | | $826,949.98 | $3,111.84 | $0.00 | $0.00 | $0.00 | Funds Received |
| 07/22/08 | | | | | | -$3,615.18 | | | | $825,732.87 | -$503.34 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 08/13/08 | 08/13/08 | | | $1,620.61 | $4,290.28 | $1,961.98 | | | | $825,732.87 | -$3,703.34 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 09/15/08 | 09/15/08 | Aug-08 | $7,872.87 | $1,620.61 | $4,290.28 | $1,961.98 | | | | $823,112.20 | $1,258.64 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/15/08 | 09/15/08 | Sep-08 | $1,826.00 | $4,261.63 | $4,261.63 | $1,961.98 | | | | $820,483.20 | $3,220.62 | $0.00 | $0.00 | $0.00 | Funds Received |
| 09/16/08 | | | | | | -$3,615.20 | | | | $820,483.20 | -$394.58 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



**Customer Account Activity Statement**
**Loan # 708 - 0533930145**
**SCHULTE**

Page 5 of 11

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/23/08 | | | | | | -$624.32 | | | | $830,463.20 | -$1,218.10 | $0.00 | $0.00 | $0.00 | Special Assessment Tax Disbursement |
| 10/16/08 | 10/16/08 | Oct-08 | $7,827.07 | $1,537.64 | $4,273.35 | $2,008.10 | | | | $818,946.68 | $3,762.00 | $0.00 | $0.00 | $0.00 | Funds Received |
| 10/16/08 | | | | $1,981.98 | | $3,815.20 | | | | $817,199.50 | $2,760.86 | $0.00 | $0.00 | $0.00 | Funds Received |
| 11/17/08 | 11/17/08 | Nov-08 | $7,818.69 | $1,666.07 | $4,284.87 | $3,816.20 | | | | $817,199.50 | -$1,294.72 | $0.00 | $0.00 | $0.00 | Funds Received |
| 11/17/08 | | | | | | -$3,815.20 | | | | $815,544.95 | $963.86 | $0.00 | $0.00 | $0.00 | County Tax Disbursement |
| 12/08/08 | 12/15/08 | Dec-08 | $7,818.69 | $1,654.04 | $4,208.25 | $2,006.10 | | | | $815,544.95 | $943.86 | $0.00 | $0.00 | $0.00 | Funds Received |
| 12/15/08 | | | | | | | | -$295.54 | | $813,861.69 | $2,561.96 | $0.00 | $295.54 | $0.00 | Late Charge Assessed |
| 01/06/09 | 01/06/09 | Jan-09 | $7,818.59 | $1,683.26 | $4,247.83 | | | | | $813,861.69 | -$883.22 | $0.00 | $295.54 | $0.00 | Funds Received |
| 01/06/09 | | | | | | | | | | $813,861.69 | -$883.22 | $0.00 | $295.54 | $0.00 | County Tax Disbursement |
| 01/30/09 | | | | | | | | -$295.54 | | $813,861.69 | -$8,277.22 | $0.00 | $591.08 | $0.00 | Late Charge Assessed |
| 02/17/09 | | | | | | | | -$295.54 | | $813,861.69 | -$8,277.22 | $0.00 | $591.08 | $0.00 | Late Charge Assessed |
| 03/05/09 | | | | | | -$5,414.00 | | | | $813,861.69 | -$9,600.10 | $0.00 | $886.62 | $0.00 | Hazard Insurance Disbursement |
| 03/18/09 | | | | | | | | -$295.54 | | $813,861.69 | -$6,121.10 | $0.00 | $886.62 | $0.00 | Late Charge Assessed |
| 03/17/09 | | | | | | | | -$16.25 | | $813,861.69 | -$6,121.10 | $0.00 | $886.62 | $0.00 | Inspection Fee Assessed |
| 04/14/09 | | | $773.00 | | | -$822.88 | | | | $813,861.69 | -$6,121.10 | $0.00 | $1,182.16 | $0.00 | Special Assessment Tax Disbursement |
| 04/14/09 | | | | | | $773.00 | | | | $813,861.69 | -$6,121.10 | $0.00 | $1,182.16 | $0.00 | Hazard Insurance Refund |
| 04/27/09 | | | | | | | | -$295.54 | | $813,861.69 | -$6,121.10 | $0.00 | $1,186.41 | $0.00 | Late Charge Assessed |
| 04/27/09 | | | | | | | | | -$85.00 | $813,861.69 | -$6,121.10 | $0.00 | $1,493.95 | $15.00 | Property Preservation/Maintenance |
| 05/18/09 | | | | | | | | | -$85.00 | $813,861.69 | -$6,121.10 | $0.00 | $1,493.95 | $111.26 | Property Preservation/Maintenance |
| 05/22/09 | | | | | | | | | | $813,861.69 | -$6,121.10 | $0.00 | $1,493.95 | $111.26 | Miscellaneous Foreclosure/Bankruptcy Expense |
| 05/27/09 | | | | | | | | -$205.54 | | $813,861.69 | -$6,121.10 | $0.00 | $1,493.95 | $111.26 | Late Charge Assessed |
| 05/29/09 | | | | | | | | -$15.00 | | $813,861.69 | -$6,121.10 | $0.00 | $1,493.95 | $128.25 | Property Preservation/Maintenance |
| 06/01/09 | | | | | | | | -$1.25 | | $813,861.69 | -$6,121.10 | $0.00 | $1,483.95 | $128.25 | Property Preservation/Maintenance |
| 06/24/09 | | | | | | | | -$295.54 | | $813,861.69 | -$6,121.10 | $0.00 | $1,789.49 | $127.50 | Attorney Advance Disbursement |
| 06/24/09 | | | | | | | | -$33.00 | | $813,861.69 | -$6,121.10 | $0.00 | $1,789.49 | $201.50 | Statutory Expense Disbursement |
| 06/24/09 | | | | | | | | -$380.00 | | $813,861.69 | -$6,121.10 | $0.00 | $1,789.49 | $488.06 | Statutory Expense Disbursement |
| 07/01/09 | | | | | | | | -$135.58 | -$1,605.44 | $813,861.69 | -$6,121.10 | $0.00 | $1,789.49 | $2,651.52 | Statutory Expense Disbursement |
| 07/01/09 | | | | | | | | | | $813,861.69 | -$6,121.10 | $0.00 | $1,789.49 | $2,651.52 | Statutory Expense Disbursement |
| 07/01/09 | | | | | | | | | | $813,861.69 | -$6,121.10 | $0.00 | $1,789.49 | $2,651.52 | Statutory Expense Disbursement |
| 07/01/09 | | | | | | | | -$295.54 | | $813,861.69 | -$6,121.10 | $0.00 | $1,789.49 | $2,651.52 | Late Charge Assessed |
| 07/11/09 | | | | | | | | | | $813,861.69 | -$6,121.10 | $0.00 | $2,085.03 | $2,651.52 | County Tax Disbursement |
| 07/22/09 | | | | | | | | -$295.54 | | $813,861.69 | -$10,062.00 | $0.00 | $2,085.03 | $2,651.52 | County Tax Disbursement |
| 08/17/09 | | | | | | | | | | $813,861.69 | -$10,062.00 | $0.00 | $2,390.57 | $2,651.52 | Late Charge Assessed |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



## Customer Account Activity Statement
### Loan # 708 - 0533930145
### SCHULTE

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/25/09 | | | | | | | | | -$15.00 | $813,861.69 | -$10,062.99 | $0.00 | $2,360.57 | $2,718.82 | Property Preservation/Maintenance |
| 09/25/09 | | | | | | | | | -$150.00 | $813,861.69 | -$10,062.99 | $0.00 | $2,360.57 | $2,718.82 | Property Preservation/Maintenance |
| 09/10/09 | | | | | | | | | -$550.00 | $813,861.69 | -$10,062.99 | $0.00 | $2,360.57 | $3,268.82 | Miscellaneous Foreclosure/Bankruptcy Expense |
| 09/10/09 | | | | | | | | -$285.54 | | $813,861.69 | -$10,062.99 | $0.00 | $2,676.11 | $3,268.82 | Late Charge Assessed |
| 08/25/09 | | | | | | | | | -$15.00 | $813,861.69 | -$13,907.07 | $0.00 | $2,676.11 | $3,281.82 | Property Preservation/Maintenance |
| 08/25/09 | | | | | | -$3,934.98 | | | | $813,861.69 | -$13,907.07 | $0.00 | $2,676.11 | $3,281.82 | County Tax Disbursement |
| 08/25/09 | | | | | | | | -$308.54 | | $813,861.69 | -$13,907.07 | $0.00 | $2,691.36 | $3,281.82 | Late Charge Assessed |
| 10/14/09 | | | | | | | | | -$15.00 | $813,861.69 | -$13,907.07 | $0.00 | $2,691.36 | $3,281.82 | Property Preservation/Maintenance |
| 10/26/09 | | | | | | | | -$15.00 | | $813,861.69 | -$13,907.07 | $0.00 | $2,711.65 | $3,266.52 | Late Charge Assessed |
| 11/19/09 | | | | | | | | -$285.54 | | $813,861.69 | -$13,907.07 | $0.00 | $3,267.19 | $3,266.52 | Late Charge Assessed |
| 11/24/09 | | | | | | | | | -$15.00 | $813,861.69 | -$13,907.07 | $0.00 | $3,267.19 | $3,311.52 | Property Preservation/Maintenance |
| 12/07/09 | | | | | | -$3,924.98 | | | | $813,861.69 | -$17,202.05 | $0.00 | $3,267.19 | $3,311.52 | County Tax Disbursement |
| 12/18/09 | | | | | | | | -$305.54 | | $813,861.69 | -$17,202.05 | $0.00 | $3,682.73 | $3,311.52 | Late Charge Assessed |
| 12/24/09 | | | | | | | | | -$15.00 | $813,861.69 | -$17,202.05 | $0.00 | $3,682.73 | $3,328.52 | Property Preservation/Maintenance |
| 01/19/10 | | | | | | | | -$285.54 | | $813,861.69 | -$17,202.05 | $0.00 | $3,868.27 | $3,328.52 | Late Charge Assessed |
| 01/29/10 | | | | | | | | | -$15.00 | $813,861.69 | -$17,202.05 | $0.00 | $3,868.27 | $3,341.52 | Property Preservation/Maintenance |
| 02/19/10 | | | | | | | | -$285.54 | | $813,861.69 | -$17,202.05 | $0.00 | $4,163.81 | $3,341.52 | Late Charge Assessed |
| 02/24/10 | | | | | | -$3,924.98 | | | | $813,861.69 | -$21,997.03 | $0.00 | $4,163.81 | $3,341.92 | County Tax Disbursement |
| 02/25/10 | | | | | | -$4,849.00 | | | | $813,861.69 | -$21,997.03 | $0.00 | $4,163.81 | $3,491.92 | Hazard Insurance Disbursement |
| 02/25/10 | | | | | | | | | -$150.00 | $813,861.69 | -$21,997.03 | $0.00 | $4,153.81 | $3,491.02 | Miscellaneous Foreclosure/Bankruptcy Expense |
| 03/02/10 | | | | | | | | | -$15.00 | $813,861.69 | -$21,997.03 | $0.00 | $4,153.81 | $3,001.62 | Property Preservation/Maintenance |
| 03/10/10 | | | | | | | | | -$15.00 | $813,861.69 | -$26,716.03 | $0.00 | $4,153.81 | $3,021.62 | Property Preservation/Maintenance |
| 03/30/10 | | | | | | | | -$295.54 | | $813,861.69 | -$26,716.03 | $0.00 | $4,449.35 | $3,021.62 | Late Charge Assessed |
| 04/19/10 | | | | | | | | | -$15.00 | $813,861.69 | -$26,716.03 | $0.00 | $4,449.35 | $3,008.62 | Property Preservation/Maintenance |
| 04/29/10 | | | | | | | | -$295.54 | | $813,861.69 | -$26,716.03 | $0.00 | $4,744.89 | $3,008.62 | Property Preservation/Maintenance |
| 05/17/10 | | | | | | | | -$295.54 | | $813,861.69 | -$26,716.03 | $0.00 | $4,744.89 | $3,538.82 | Late Charge Assessed |
| 08/01/10 | | | | | | | | | -$15.00 | $813,861.69 | -$26,716.03 | $0.00 | $5,040.43 | $3,538.82 | Property Preservation/Maintenance |
| 08/17/10 | | | | | | | | -$295.54 | | $813,861.69 | -$26,716.03 | $0.00 | $5,040.43 | $3,551.52 | Property Preservation/Maintenance |
| 06/18/10 | | | | | | | | | -$15.00 | $813,861.69 | -$26,716.03 | $0.00 | $5,335.97 | $3,551.52 | Late Charge Assessed |
| 06/28/10 | | | | | | | | | -$15.00 | $813,861.69 | -$26,716.03 | $0.00 | $5,335.97 | $3,568.52 | Property Preservation/Maintenance |
| 07/19/10 | | | | | | | | -$285.54 | | $813,861.69 | -$26,716.03 | $0.00 | $5,631.51 | $3,568.52 | Late Charge Assessed |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



**WELLS FARGO HOME MORTGAGE**

## Customer Account Activity Statement
### Loan # 708 - 0533930145
### SCHULTE

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fee Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/26/10 | | | | | | | | | -$16.00 | $813,381.89 | -$20,718.63 | $0.00 | $8,601.51 | $3,351.52 | Property Preservation/Maintenance |
| 07/26/10 | | | | | | -$3,135.02 | | | | $813,381.89 | -$29,851.65 | $0.00 | $8,601.31 | $3,351.52 | County Tax Disbursement |
| 08/16/10 | | | | | | | | -$295.54 | | $813,381.89 | -$29,851.65 | $0.00 | $8,897.05 | $3,351.52 | Late Charge Assessed |
| 08/21/10 | 08/21/10 | | | | | | | | -$16.00 | $813,381.89 | -$29,851.65 | $0.00 | $6,822.06 | $3,599.52 | Property Preservation/Maintenance |
| 08/21/10 | | | | | | | | -$295.54 | | $813,381.89 | -$39,851.65 | $0.00 | $6,322.39 | $3,599.52 | Late Charge Assessed |
| 08/28/10 | | | $5,504.40 | | | | $5,504.40 | | | $813,381.89 | -$39,851.65 | $5,504.40 | $6,322.39 | $3,599.52 | Funds Received |
| 09/22/10 | | | | | | -$3,135.61 | | | | $813,381.89 | -$35,387.26 | $5,504.40 | $8,222.39 | $3,599.52 | County Tax Disbursement |
| 09/27/10 | 09/27/10 | | $5,504.40 | | | | $5,504.40 | | | $813,381.89 | -$13,887.26 | $0.00 | $6,222.68 | $3,599.52 | Funds Received |
| 09/27/10 | | | | | | | | | -$16.00 | $813,381.89 | -$32,887.26 | $11,008.80 | $6,222.59 | $3,611.52 | Property Preservation/Maintenance |
| 10/19/10 | | | | | | | | -$295.54 | | $813,381.89 | -$32,887.26 | $11,008.80 | $8,516.13 | $3,611.52 | Late Charge Assessed |
| 10/19/10 | | | | | | | | | -$260.00 | $813,381.89 | -$32,887.26 | $11,008.80 | $8,516.13 | $3,611.52 | Property Preservation/Maintenance |
| 10/25/10 | | | | | | | | | -$16.00 | $813,381.89 | -$32,887.26 | $11,008.80 | $8,516.13 | $3,611.52 | Property Preservation/Maintenance |
| 11/01/10 | 11/01/10 | Feb-09 | $5,504.40 | | | | -$16,837.90 | | -$20.00 | $812,268.77 | -$30,079.17 | $16,513.20 | $8,516.13 | $3,881.52 | Funds Received |
| 11/02/10 | 11/02/10 | Mar-09 | $5,504.40 | $1,671.92 | $4,228.97 | $2,009.00 | | | | $810,526.14 | -$30,871.00 | $11,008.80 | $8,516.13 | $3,881.52 | Funds Applied from Unapplied Funds |
| 11/05/10 | 11/05/10 | Mar-09 | $5,504.40 | $1,680.83 | $4,530.26 | $2,009.00 | | | | $810,526.14 | -$426,971.00 | $11,008.80 | $8,516.13 | $3,881.52 | Funds Applied from Unapplied Funds |
| 11/09/10 | | | | | | | | -$295.54 | | $810,526.14 | -$426,971.00 | $11,008.80 | $8,613.87 | $3,881.52 | Late Charge Assessed |
| 11/30/10 | | | | | | -$3,135.81 | | | | $810,526.14 | -$532,887.26 | $875.26 | $8,613.87 | $3,901.52 | Property Preservation/Maintenance |
| 12/09/10 | | | | | | | | | -$260.00 | $810,526.14 | -$532,887.26 | $875.26 | $8,901.87 | $3,901.52 | Miscellaneous Foreclosure/Bankruptcy Expense |
| 12/16/10 | | | | | | | | | -$295.54 | $810,526.14 | -$532,887.26 | $875.26 | $7,109.21 | $3,901.52 | Property Preservation/Maintenance |
| 12/24/10 | 12/24/10 | | $5,504.40 | | | $5,504.40 | | | | $810,526.14 | -$32,106.69 | $6,178.64 | $7,109.21 | $3,901.52 | Late Charge Assessed |
| 12/30/10 | 12/30/10 | | $5,504.40 | | | $5,504.40 | | | -$20.00 | $810,526.14 | -$32,106.69 | $6,178.64 | $8,021.52 | $3,921.52 | Funds Received |
| 12/30/10 | 12/30/10 | | | | | | | | | $808,839.76 | -$32,105.69 | $11,684.04 | $8,521.52 | $3,921.52 | Property Preservation/Maintenance |
| 12/31/10 | 12/31/10 | Apr-09 | | $1,698.16 | $4,172.71 | $2,006.00 | | | | $808,839.76 | -$430,368.43 | $4,024.89 | $8,521.52 | $3,921.52 | Funds Received |
| 01/18/11 | | | | | | | | -$295.54 | | $808,839.76 | -$430,368.43 | $4,024.89 | $7,404.75 | $3,941.52 | Late Charge Assessed |
| 01/26/11 | 01/26/11 | Apr-09 | $5,504.40 | | | | $5,504.40 | | | $807,141.50 | -$430,368.43 | $8,529.29 | $7,404.75 | $3,941.52 | Property Preservation/Maintenance |
| 01/26/11 | 01/26/11 | May-09 | $5,504.40 | $1,698.16 | $4,172.71 | $2,006.00 | | | | $807,141.50 | -$430,350.54 | $1,910.31 | $7,404.75 | $3,941.52 | Funds Received |
| 01/27/11 | | | | | | -$7,918.36 | | | | $807,141.50 | -$430,350.54 | $1,910.31 | $7,404.76 | $3,941.52 | Funds Applied from Unapplied Funds |
| 01/31/11 | | | | | | | | -$295.54 | | $807,141.50 | -$430,350.54 | $1,910.31 | $7,780.39 | $3,941.52 | Late Charge Assessed |
| 02/04/11 | | | | | | -$3,000.00 | | | | $807,141.50 | -$333,350.54 | $1,910.31 | $7,780.39 | $3,941.52 | Hazard Insurance Disbursement |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of the loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



## Customer Account Activity Statement
### Loan # 708 - 0533930145
### SCHULTE

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/24/11 | | | | | | -$3,138.51 | | | | $807,141.56 | -$36,690.35 | $1,610.31 | $1,700.26 | $3,941.52 | County Tax Disbursement |
| 03/02/11 | | | | | | | | | | $807,141.56 | -$36,690.05 | $1,610.31 | $1,700.26 | $3,981.52 | Property Preservation/Maintenance |
| 03/14/11 | 03/14/11 | | $5,468.82 | | | | $5,468.82 | | | $807,141.56 | -$36,690.05 | $7,069.13 | $1,700.29 | $3,981.52 | Funds Received |
| 03/16/11 | | | | | | | | -$20.00 | | $807,141.56 | -$36,480.06 | $7,069.13 | $1,965.63 | $3,981.52 | Late Charge Assessed |
| 03/21/11 | | | | | | | | | | $807,141.56 | -$36,900.05 | $7,069.19 | $1,965.63 | $3,981.52 | Property Preservation/Maintenance |
| 04/18/11 | 04/18/11 | | $5,468.82 | | | | $5,468.82 | | | $807,141.58 | -$36,900.05 | $12,527.95 | $3,981.62 | $3,981.62 | Funds Received |
| 04/18/11 | | | | | | | | -$295.54 | | $807,141.58 | -$36,900.05 | $12,527.95 | $3,981.37 | $3,981.62 | Late Charge Assessed |
| 04/20/11 | 04/20/11 | Jun-09 | | $1,707.02 | $4,203.86 | $2,006.03 | | | | $806,434.55 | -$34,482.86 | $4,609.97 | $3,981.37 | $3,981.62 | Funds Applied from Unapplied Funds |
| 04/29/11 | | | | | | | | -$20.00 | | $806,434.55 | -$34,482.86 | $4,609.97 | $3,981.37 | $4,001.62 | Property Preservation/Maintenance |
| 05/06/11 | 05/06/11 | | $5,468.82 | | | | $5,468.82 | | | $806,434.55 | -$34,482.86 | $10,067.79 | $3,981.37 | $4,001.62 | Funds Received |
| 05/09/11 | | | | | | | | -$295.54 | | $806,434.55 | -$34,482.86 | $10,067.79 | $5,668.91 | $4,001.62 | Late Charge Assessed |
| 05/25/11 | | | | | | | | -$20.00 | | $806,434.55 | -$34,482.86 | $10,067.79 | $5,668.91 | $4,021.52 | Property Preservation/Maintenance |
| 06/09/11 | | | | | | | $6,468.82 | | | $806,434.55 | -$34,482.86 | $16,530.61 | $5,668.91 | $4,021.52 | Funds Received |
| 06/13/11 | 06/13/11 | | $5,468.82 | | | | | | | $806,434.55 | -$34,482.86 | $16,530.61 | $6,668.91 | $4,021.52 | Funds Received |
| 07/01/11 | | | | | | | | -$295.54 | | $806,434.55 | -$34,482.86 | $16,530.61 | $8,082.45 | $4,021.52 | Late Charge Assessed |
| 07/18/11 | 07/18/11 | | $5,468.82 | | | $7,918.98 | $5,468.82 | | -$20.00 | $806,434.55 | -$34,482.86 | $20,985.43 | $8,082.45 | $4,041.52 | Property Preservation/Maintenance |
| 07/19/11 | | | | | | | | | | $806,434.55 | -$34,482.86 | $20,985.43 | $8,177.99 | $4,041.52 | Property Preservation/Maintenance |
| 07/26/11 | | | | | | | | -$295.54 | | $806,434.55 | -$34,482.86 | $20,985.43 | $8,177.99 | $4,041.52 | Late Charge Assessed |
| 09/12/11 | 09/12/11 | | $5,504.40 | | | | $5,504.40 | | | $806,434.55 | -$34,482.86 | $26,489.83 | $8,473.53 | $4,061.52 | Funds Received |
| 09/15/11 | | | | | | | | | -$20.00 | $806,434.55 | -$34,482.86 | $26,489.83 | $8,473.53 | $4,061.52 | Late Charge Assessed |
| 09/23/11 | | | | | | | | -$295.54 | | $806,434.55 | -$34,482.86 | $26,489.83 | $8,769.07 | $4,061.52 | Property Preservation/Maintenance |
| 09/14/11 | 09/13/11 | | $5,468.82 | | | | $5,468.82 | | -$20.00 | $806,434.55 | -$34,482.86 | $31,948.65 | $8,769.07 | $4,061.52 | Funds Received |
| 09/09/11 | | | | | | | | | | $806,434.55 | -$34,482.86 | $31,948.65 | $8,769.07 | $4,101.52 | Property Preservation/Maintenance |
| 09/26/11 | | | | | | | | -$295.54 | | $806,434.55 | -$34,482.86 | $31,948.65 | $27,407.47 | $4,101.52 | Property Preservation/Maintenance |
| 10/17/11 | 10/14/11 | | $5,468.82 | | | | $5,468.82 | -$20.00 | | $805,434.55 | -$34,482.86 | $37,407.47 | $27,407.47 | $4,101.52 | Funds Received |
| 10/17/11 | | | | | | | | | | $805,434.55 | -$34,482.86 | $37,407.47 | $10,064.51 | $4,101.52 | Late Charge Assessed |
| 10/28/11 | | | | | | | | | | $805,434.55 | -$34,482.86 | $37,407.47 | $10,064.51 | $4,121.52 | Property Preservation/Maintenance |
| 11/09/11 | | | | | | | | -$295.54 | | $805,434.55 | -$34,482.86 | $37,407.47 | $10,360.05 | $4,121.52 | Late Charge Assessed |
| 11/26/11 | 11/25/11 | | $5,468.82 | | | | $5,468.82 | | | $805,434.55 | -$34,482.86 | $42,866.29 | $10,360.15 | $4,121.52 | Funds Received |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



**Customer Account Activity Statement**
**Loan # 708 - 0533930145**
**SCHULTE**

| Date Received | Effective Date | Due Date | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/09/11 | | | | | | | | -$30.00 | $805,434.55 | -$34,482.86 | $42,866.29 | $10,360.15 | $4,141.52 | Property Preservation/Maintenance |
| 12/09/11 | 12/09/11 | Jul-09 | $1,716.82 | $4,194.37 | $2,000.00 | -$35,994.90 | | | $803,718.63 | -$32,474.77 | $3,271.39 | $10,360.15 | $4,141.52 | Funds Applied from Unapplied Funds |
| 12/09/11 | 12/09/11 | Aug-09 | $1,724.86 | $4,186.03 | $2,000.00 | | | | $801,993.77 | -$30,466.68 | $3,271.39 | $10,360.15 | $4,141.52 | Funds Applied from Unapplied Funds |
| 12/09/11 | 12/09/11 | Sep-09 | $1,733.94 | $4,177.05 | $2,000.00 | | | | $800,259.83 | -$28,468.68 | $3,271.39 | $10,360.15 | $4,141.52 | Funds Applied from Unapplied Funds |
| 12/09/11 | 12/09/11 | Oct-09 | $1,742.07 | $4,168.02 | $2,000.00 | | | | $798,517.06 | -$26,468.68 | $3,271.39 | $10,360.15 | $4,141.52 | Funds Applied from Unapplied Funds |
| 12/09/11 | 12/09/11 | Nov-09 | $1,751.95 | $4,159.04 | $2,000.00 | | | | $796,765.11 | -$24,442.41 | $3,271.39 | $10,360.15 | $4,141.52 | Funds Applied from Unapplied Funds |
| 12/21/11 | | | | | | | -$709.54 | | $796,765.11 | -$24,442.41 | $3,271.39 | $10,685.69 | $4,141.52 | Late Charges Assessed |
| 12/21/11 | | | | | | | | -$320.00 | $796,765.11 | -$24,442.41 | $3,271.39 | $10,685.69 | $4,161.52 | Property Preservation/Maintenance |
| 01/09/12 | | Jul-09 | -$1,751.95 | -$4,159.04 | -$2,000.00 | $7,918.98 | | | $798,517.06 | -$26,468.68 | $11,180.37 | $10,685.69 | $4,161.52 | Payment Reversal |
| 01/09/12 | | | | | | | | | $798,517.06 | -$26,468.68 | $11,180.37 | $10,685.69 | $4,161.52 | Payment Renewal |
| 01/09/12 | | Aug-09 | -$1,733.94 | -$4,177.05 | -$2,000.00 | $7,918.98 | | | $800,259.83 | -$28,468.68 | $19,108.35 | $10,855.69 | $4,161.52 | Payment Reversal |
| 01/09/12 | | | | | | | | | $800,259.83 | -$28,468.68 | $19,108.35 | $10,855.69 | $4,161.52 | Payment Renewal |
| 01/17/12 | | | | | | | -$320.00 | | $800,259.83 | -$28,468.68 | $27,008.33 | $10,585.69 | $4,161.52 | Late Charges Assessed |
| 01/26/12 | | | | | | | -$285.54 | | $800,851.93 | -$30,466.68 | $34,908.31 | $10,542.51 | $4,161.52 | Late Charge Renewal |
| 02/16/12 | | | | | | | -$285.54 | | $800,851.93 | -$34,482.86 | $42,868.29 | $11,248.77 | $4,161.52 | Payment Reversal |
| 02/16/12 | | | | | | | $5.00 | | $800,805.93 | -$34,482.86 | $42,868.29 | $11,642.31 | $4,161.52 | Payment Renewal |
| 02/16/12 | | | | | | | -$15.00 | | $805,434.55 | -$34,482.86 | $42,868.29 | $11,537.65 | $4,191.52 | Property Preservation/Maintenance |
| 03/09/12 | | | | | | | -$320.00 | | $805,434.55 | -$34,482.86 | $42,868.29 | $11,180.37 | $4,191.52 | Property Preservation/Maintenance |
| 03/28/12 | | | | | | | | -$285.54 | $805,434.55 | -$34,482.86 | $42,868.29 | $11,248.77 | $4,205.52 | Property Preservation/Maintenance |
| 04/03/12 | | | | | | | | $5.00 | $805,434.55 | -$34,482.86 | $42,868.29 | $11,642.31 | $4,221.52 | Corporate Advance Adjustment |
| 04/16/12 | | | | | | | | -$285.54 | $805,434.55 | -$34,482.86 | $42,868.29 | $11,537.65 | $4,221.52 | Property Preservation/Maintenance |
| 05/01/12 | | | | | | | | -$285.54 | $805,434.55 | -$34,482.86 | $42,868.29 | $12,133.39 | $4,236.52 | Property Preservation/Maintenance |
| 05/16/12 | | | | | | | -$15.00 | | $805,434.55 | -$34,482.86 | $42,868.29 | $12,133.39 | $4,236.52 | Late Charge Assessed |
| 05/30/12 | | | | | | | | -$15.00 | $805,434.55 | -$34,482.86 | $42,868.29 | $12,428.93 | $4,251.52 | Property Preservation/Maintenance |
| 06/30/12 | | | | | | | -$15.00 | | $805,434.55 | -$34,482.86 | $42,868.29 | $12,428.93 | $4,251.52 | Property Preservation/Maintenance |
| 07/16/12 | | | | | | | -$15.00 | | $805,434.55 | -$34,482.86 | $42,868.29 | $12,429.33 | $4,266.52 | Late Charge Assessed |
| 08/19/12 | | | | | | | -$15.00 | | $805,434.55 | -$34,482.86 | $42,868.29 | $12,133.39 | $4,281.52 | Property Preservation/Maintenance |
| 08/26/12 | | | | | | | -$15.00 | | $805,434.55 | -$34,482.86 | $42,868.29 | $12,428.93 | $4,281.52 | Late Charge Assessed |
| 07/16/12 | | | | | | | | -$285.54 | $805,434.55 | -$34,482.86 | $42,868.29 | $12,429.47 | $4,296.52 | Property Preservation/Maintenance |
| 07/31/12 | | | | | | | | -$285.54 | $805,434.55 | -$34,482.86 | $42,868.29 | $12,429.47 | $4,296.52 | Property Preservation/Maintenance |
| 08/09/12 | | | | | -$2,198.09 | | | -$16.00 | $805,434.55 | -$36,680.95 | $42,868.29 | $12,224.47 | $4,296.52 | Hazard Insurance Disbursement |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of the loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.


WELLS FARGO HOME MORTGAGE

Customer Account Activity Statement
Loan # 708 - 0533930145
SCHULTE

Page 10 of 11

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Corporate Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/19/12 | | | | | | | | -$395.54 | | $205,434.85 | -$36,860.86 | $42,886.29 | $13,020.01 | $4,266.52 | Late Charge Assessed |
| 05/30/13 | | | | | | -$2,735.74 | | | | $205,434.85 | -$39,616.60 | $42,886.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 05/30/13 | | | | | | -$2,730.49 | | | | $205,434.85 | -$42,147.09 | $42,886.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 05/30/13 | | | | | | -$2,730.49 | | | | $205,434.85 | -$44,877.58 | $42,886.20 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 06/03/13 | | | | | | -$2,730.49 | | | | $205,434.85 | -$47,608.07 | $42,886.20 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 06/03/13 | | | | | | -$2,730.49 | | | | $205,434.85 | -$50,179.44 | $42,886.20 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 06/03/13 | | | | | | -$2,871.37 | | | | $205,434.85 | -$53,340.27 | $42,895.20 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 06/03/13 | | | | | | -$2,865.83 | | | | $205,434.85 | -$56,211.10 | $42,895.20 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 06/03/13 | | | | | | -$2,865.83 | | | | $205,434.85 | -$59,076.93 | $42,895.20 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 08/01/13 | | | | | | -$19,281.00 | | | | $205,434.85 | -$78,357.93 | $42,886.29 | $13,020.01 | $4,266.52 | Hazard Insurance Disbursement |
| 07/19/13 | | | | | | -$19,281.00 | | | | $205,434.85 | -$91,331.34 | $42,886.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 05/29/13 | | | | | | -$2,865.41 | | | | $205,434.85 | -$94,317.80 | $42,855.32 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 12/19/13 | | | | | | -$2,865.36 | | | | $205,434.85 | -$97,203.06 | $42,886.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 02/04/14 | | | | | | -$2,885.26 | | | | $205,434.85 | -$99,234.68 | $42,886.29 | $13,020.01 | $4,266.52 | Hazard Insurance Disbursement |
| 02/04/14 | | | | $19,251.00 | | -$4,931.00 | | | | $205,434.85 | -$73,373.66 | $42,665.29 | $13,020.01 | $4,266.52 | Hazard Insurance Refund |
| 02/04/14 | | | | | | -$2,985.38 | | | | $205,434.85 | -$76,980.12 | $42,665.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 02/04/14 | | | | | | -$3,062.44 | | | | $205,434.85 | -$79,042.56 | $42,666.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 07/25/14 | | | | | | -$3,073.85 | | | | $205,434.85 | -$82,116.41 | $42,665.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 07/25/14 | | | | | | -$3,073.85 | | | | $205,434.85 | -$85,190.26 | $42,666.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 12/19/14 | | | | | | -$3,076.85 | | | | $205,434.85 | -$88,267.11 | $42,665.29 | $13,020.01 | $4,266.52 | County Tax Disbursement |
| 12/20/16 | | | | | | -$3,076.66 | | $10,341.90 | | $603,718.93 | -$91,839.72 | $4,847.39 | $13,020.01 | $4,266.52 | Funds Applied from Unapplied Funds |
| 04/25/16 | 12/31/11 | Jul-09 | $1,716.32 | $1,732.89 | $4,194.97 | | | | | $603,777.77 | -$90,066.33 | $4,847.39 | $13,020.01 | $4,266.52 | Funds Applied from Unapplied Funds |
| 04/25/16 | 12/31/11 | Aug-09 | $1,724.60 | $1,732.89 | $4,180.05 | -$39,218.60 | | | | $601,963.77 | -$90,086.33 | $4,847.39 | $13,020.01 | $4,266.52 | Funds Applied from Unapplied Funds |
| 12/31/11 | 12/31/11 | Sep-09 | $1,733.94 | $4,177.05 | | | | | | $600,209.93 | -$89,357.44 | $4,847.39 | $13,020.01 | $4,266.52 | Funds Applied from Unapplied Funds |
| 04/03/15 | 12/31/11 | Oct-09 | $1,742.87 | $4,168.02 | | | | | | $798,017.00 | -$86,628.30 | $4,847.39 | $13,020.01 | $4,266.52 | Funds Applied from Unapplied Funds |
| 04/03/15 | | | | $4,168.94 | | | | | | $798,765.11 | -$94,690.00 | $4,847.39 | $13,020.01 | $4,266.52 | Punds Applied from Unapplied Funds |
| 08/01/16 | 12/01/11 | Nov-09 | $1,751.93 | $4,169.94 | | | | | | $798,765.11 | -$94,890.00 | $4,847.39 | $13,020.01 | $4,266.52 | Late Charges Waived |
| 07/03/16 | | | | | | | | | | $798,765.11 | -$88,078.37 | $4,847.39 | $2,676.11 | $4,288.62 | County Tax Disbursement |
| 05/24/15 | | | | | | -$3,182.21 | | | | $790,763.11 | -$88,203.14 | $4,847.39 | $2,676.11 | $4,288.62 | County Tax Disbursement |
| 11/30/15 | | | | | | -$3,174.27 | | | | $790,763.11 | -$91,253.14 | $4,847.39 | $2,676.11 | $4,288.62 | Corp Adv Disb - Prop Pres |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



**WELLS FARGO HOME MORTGAGE**

Customer Account Activity Statement
Loan # 708 - 0533930145
SCHULTE

Page 11 of 11

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/22/16 | | | | | | -$3,174.27 | | | | $790,765.11 | -$94,427.41 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |
| 02/15/16 | | | | | | -$3,174.27 | | | | $790,765.11 | -$97,601.68 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |
| 02/29/16 | | | | | | -$5,672.00 | | | | $790,765.11 | -$103,273.68 | $4,647.39 | $2,676.11 | $4,268.52 | Hazard Insurance Disbursement |
| 07/22/16 | | | | | | -$3,162.43 | | | | $790,765.11 | -$106,436.11 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |
| 08/29/16 | | | | | | -$3,180.92 | | | | $790,765.11 | -$109,630.73 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |
| 12/22/16 | | | | | | -$3,180.62 | | | | $790,765.11 | -$112,817.35 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |
| 02/22/17 | | | | | | -$3,180.52 | | | | $790,765.11 | -$115,997.87 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |
| 02/29/17 | | | | | | -$6,136.00 | | | | $790,765.11 | -$122,133.87 | $4,647.39 | $2,676.11 | $4,268.52 | Hazard Insurance Disbursement |
| 05/12/17 | | | $6,136.00 | | | $6,136.00 | | | | $790,765.11 | -$115,997.87 | $4,647.39 | $2,676.11 | $4,268.52 | Hazard Insurance Refund |
| 08/07/17 | | | $9,136.00 | | | -$53,265.10 | | | | $790,765.11 | -$119,263.07 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |
| 08/28/17 | | | | | | -$3,483.32 | | | | $790,765.11 | -$122,526.39 | $4,647.39 | $2,676.11 | $4,268.52 | County Tax Disbursement |

This manually prepared Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.

# EXHIBIT 9

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief

LIST FOR RENT        ♡ SAVE      ✉ SHARE      ⊘ HIDE      MORE ▾              ⤢ EXPAND      ✕ CLOSE

Public      Landlord              Nevada · Las Vegas · 89144 · Summerlin North · 509 Canyon Greens Drive



# 509 Canyon Greens Dr, Las Vegas, NV 89144

**OFF MARKET**

Zestimate®:
**$2,085,740**

Rent Zestimate®:
$8,111 /mo

5 beds · 5.5 baths · 5,951 sqft

## Instant Offers

This home qualifies for Zillow Instant Offers. Get cash offers in 2-3 business days.

Cash offer _____ $

Cash offer _____ $

Cash offer _____ $

**500+** homeowners in your area

# EXHIBIT 10

to Debtor's Opposition to Motion for Relief from the Automatic Stay and
In Rem Relief

## ** § 362 INFORMATION COVER SHEET **†

| | | |
|---|---|---|
| <u>Schulte Properties LLC</u> | <u>18-12734-mkn</u> | _____ |
| **Debtor(s)** | **Case No:** | **Motion #:** |

The Bank of New York Mellon f/k/a The Bank of New York        **Chapter:** <u>11</u>
successor in interest to JP Morgan Chase Bank, N.A., successor
in interest to Bank One, National Association, as Trustee for
<u>CSFB Mortgage-Backed Pass-Through Certificates, Series 2003-27</u>
**MOVANT**

```
Certification of Attempt to Resolve the Matter without Court Action:

Moving counsel hereby certifies that pursuant to the requirements of LR 4001(a)(2), an attempt has been
made to resolve the matter without court action, but movant has been unable to do so.

Date: August 17, 2018                      Signature: __Jason C. Kolbe, Esq.__
                                                         Attorney for Movant
```

PROPERTY INVOLVED IN THIS MOTION: 509 Canyon Greens Drive, Las Vegas, NV 89144

NOTICE SERVED ON:        Debtor(s) ☒;        Debtor(s) Counsel ☒;        Trustee ☒

DATE OF SERVICE: <u>August 17, 2018</u>

| MOVING PARTY'S CONTENTIONS: | DEBTOR'S CONTENTIONS: |
|---|---|
| The EXTENT and PRIORITY of LIENS:* | The EXTENT and PRIORITY of LIENS: |
| Movant: $1,366,435.19 | 1st _____ |
| Second Line: Stripped in previous bankruptcy | 2nd _____ |
| Third lien: UNKNOWN | 3rd _____ |
| Total Encumbrances: $1,366,435.19 | 4th _____ |
| | Other: _____ |
| APPRAISAL or OPINION as to VALUE: | Total Encumbrances: $_____ |
| "Per Schedule "A" $2,085,740.00 | APPRAISAL or OPINION as to VALUE: |

| TERMS OF MOVANT'S CONTRACT WITH THE DEBTOR:* | DEBTOR'S OFFER OF "ADEQUATE PROTECTION" FOR MOVANT: |
|---|---|
| Amount of Note: $960,000.00 | |
| Interest Rate: 6.25% | |
| Duration: 30 Year | |
| Payment Per Month: $7,567.64 | |
| Date of Default: December 1, 2009 | |
| Amount of Contractual Arrearages: $810,497.97 | |
| Date of Notice of Default: May 8, 2009 | |
| **SPECIAL CIRCUMSTANCES: The undersigned hereby certifies that an attempt has been made to confer with debtor(s) counsel, or with debtor(s) and that more than three (3) business days have expired, and that after sincere effort to do so, counsel has been unable to resolve this matter without court action.** | SPECIAL CIRCUMSTANCES: |
| SUBMITTED BY: <u>Jason C. Kolbe, Esq.</u> | SUBMITTED BY: _____ |
| SIGNATURE: <u>/s/ Jason C. Kolbe, Esq.</u> | SIGNATURE: |

* All amounts due to Movant as of July 31, 2018